UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ZIMMER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:14-CV-152-JD |
| v. | ) |
| | ) |
| STRYKER CORP., STRYKER | ) |
| ORTHOPAEDICS, and | ) |
| CODY STOVALL, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

This matter is a business dispute between two orthopedic medical device manufacturers, plaintiff Zimmer, Inc. and defendants Stryker Corporation, Stryker Orthopaedics (collectively, "Stryker[1]"), and former Zimmer sales representative (and present Stryker sales representative) Cody Stovall. Zimmer has accused Stryker of poaching Stovall from it, inducing him to breach his non-competition, non-solicitation, and confidentiality agreements with Zimmer, and implementing a fraudulent plan to get Stovall in operating rooms with Stovall's former Zimmer customers while circumventing his non-competition agreement. The Complaint alleges breach of contract against Stovall (Count I), breach of fiduciary duty against Stovall (Count II), unfair and deceptive trade practices against Stryker and Stovall (Count III), tortious interference with contracts against Stryker (Count IV), tortious interference with contract and business relationships against Stryker and Stovall (Count V), and civil conspiracy against all defendants

---

[1] In its motion to dismiss, Stryker asserts that Stovall is employed by Howmedica Osteonics Corporation, of which Stryker Orthopaedics is a d/b/a; and that defendant Stryker Corporation does not employ Stovall and therefore has not participated in any of the conduct outlined in Zimmer's Complaint and is not a proper defendant. However, the defendants have not moved to dismiss Stryker Corporation, and the Court refers to Stryker Corp. and Stryker Orthopaedics as "Stryker."

1

(Count VI) [DE 1]. For the reasons below, the motion is **GRANTED** in part and **DENIED** in part.

On February 21, 2014, Stovall filed an Answer to the Complaint [DE 21]. Stryker, on the other hand, has not filed an Answer, and has moved to dismiss the counts against it instead [DE 22; DE 25[2]]. Zimmer responded to the motion on March 6, 2014 [DE 27], and Zimmer replied on March 28, 2014 [DE 28].

Before delving into the facts of the underlying dispute, a brief review of the short but eventful history of this litigation is in order. In addition to seeking damages and requesting a jury trial, the Complaint sought a preliminary injunction. On the same day it filed the Complaint, Zimmer filed a motion for a preliminary injunction, seeking to enjoin Stovall from violating his agreements with Zimmer by working for Stryker [DE 7]. Also on the same day it filed its Complaint, Zimmer filed a motion to expedite discovery in advance of the preliminary injunction hearing [DE 8]. Following briefing on the motion, on February 11, 2014, the Court granted the motion in part and denied it in part, granting Zimmer's request for expedited discovery but limiting the scope of the requests [DE 19]. A hearing on the motion for preliminary injunction was set for May 9, 2014, but on April 3, 2014, Zimmer and Stovall moved for the entry of an agreed order that would obviate the need for a preliminary injunction hearing and withdrew Zimmer's motion for a preliminary injunction [DE 31]. The Court entered the order on April 4, 2014 [DE 7].

---

[2] Stryker initially filed a memorandum in support of its motion that mischaracterized the litigation tactics between the parties in another case filed in this district [DE 23]. Stryker filed a corrected memorandum a week later [DE 25], which the Court addresses below. Zimmer argues that the initially-filed memorandum is somehow evidence of underhanded tactics on Stryker's part [DE 27 at 15-16]. The Court finds that the parties' dealings in other matters are irrelevant to the issues presented in the motion to dismiss.

# I. FACTUAL BACKGROUND

Zimmer and Stryker are both manufacturers of orthopedic devices that are used in medical procedures and compete directly against one another [DE 1 at 1, ¶¶ 1, 12]. To sell its products, Zimmer (like other competitors in the field) uses sales representatives that it sends into assigned territories to sell its wares to surgeons and hospitals [*Id.* at ¶ 11]. Zimmer spends millions of dollars to train and assist its sales force [*Id.* at ¶ 18]. Sales representatives are responsible for cultivating relationships with customers, providing technical support to surgeons and staff during surgeries, and training doctors on how to use Zimmer's products [*Id.* at ¶ 13]. In doing so, sales representatives have access to doctors that allows them to become acquainted with different surgeon's preferences and ways of doing their jobs, which Zimmer contends is information that isn't available to the public, is of great value to Zimmer, and, if it fell into the hands of a competitor, would give the competitor an unfair advantage [*Id.* at ¶¶ 15-16].

In exchange for performing these functions for Zimmer, the sales representatives are well-compensated [*Id.* at ¶ 17]. Stovall's compensation as a Zimmer sales representative was $238,681.43 in 2013 [*Id.* at ¶ 49]. Sales representatives are also required to sign confidentiality and non-competition agreements to protect its relationships, course of dealing, and customer goodwill, which Zimmer contends are the result of its investment in its sales force and are assets with significant value [*Id.* at ¶¶ 19-20]. The purpose of the non-disclosure, non-competition, and non-solicitation agreements are to permit Zimmer to retain customer relationships when a sales representative departs [*Id.* at ¶ 21].

In February 2008, Stovall began working for Zimmer Southwest, a former distributor of Zimmer products, assigned to a territory that included Amarillo, Texas, and its surrounding areas [*Id.* at ¶ 22]. He was a part of a unit called Team Brittain, which was led by Zimmer sales

representative Carla Brittain [*Id.* at ¶¶ 22-23]. Stovall was new to the area, and Brittain and other Zimmer representatives assigned to the area mentored Stovall and introduced him to their contacts and customers [*Id.* at ¶¶ 24-26].

In 2012, Zimmer switched to an in-house sales force, and offered Stovall a position as a Zimmer sales representative [*Id.* at ¶ 28]. He accepted and signed the Zimmer Confidentiality, Non-Competition, and Non-Solicitation Agreement for Sales Managers and Representatives on September 11, 2012 ("the Agreement"), acknowledging that he would have access to Zimmer's trade secrets and confidential information; participate in the development, execution, and usage of Zimmer's products, technologies, and strategies; receive specialized training from Zimmer; and have access to Zimmer's customers and other business relationships [*Id.* at ¶¶ 29-30].

The Agreement provided that during and after his employment, Stovall would "not disclose, transfer, or use (or seek to induce others to disclose, transfer or use) any Confidential Information for any purpose" other than for authorized purposes [DE 1 at ¶ 31]. It forbid Stovall from engaging, "directly or indirectly, in any activity, employment, or business venture" that competed with Zimmer; "deprives or potentially could deprive [Zimmer] of any business opportunity;" "conflicts or could potentially conflict with [Zimmer's] business interests;" or was "otherwise detrimental or potentially detrimental to [Zimmer]" [DE 1 at ¶ 32]. The Agreement specifically forbid Stovall from even preparing to undertake any of those activities [*Id.*]. The Agreement also provided that for one year following his departure from Zimmer, Stovall would be subject to non-competition and non-solicitation covenants that limited the location in which he could work, the products he could sell, the customers he could work with, and the capacity in which he could work for Zimmer's competitors [*Id.* at ¶ 33]. The Agreement specifically forbid the solicitation of Zimmer customers, prospective customers, or employees [*Id.*].

4

Zimmer eventually divided the Amarillo territory between Stovall and Brittain, who retained some customers with whom she had years-long relationships [*Id.* at ¶¶ 39-40]. As a result, Stovall had exclusive responsibility for a number of Zimmer's surgeon customers, and he provided technical support by being present in surgeries with customers and otherwise interacted closely with surgical staff, with assistance from Zimmer [*Id.* at ¶¶ 42-47].

On January 10, 2014, Stovall resigned from Zimmer [*Id.* at ¶ 48]. Shortly thereafter, he began working for Stryker, a Zimmer direct competitor, as a sales representative, selling a Stryker product called RegenKit Platelet-rich plasma spray in his old territory, to his former Zimmer customers [*Id.* at ¶ 50]. According to the Complaint, Stryker and Stovall are using the plasma spray – which is not an orthopedic product – as a way for Stovall to circumvent his agreement with Zimmer and to call upon his former Zimmer surgeon customers [*Id.* at ¶¶ 51-52, 63]. The scheme, which Zimmer describes as a "Trojan Horse" ploy that Stryker has used elsewhere, would allow Stovall to get into surgeries that his former Zimmer customers are performing so that Stovall can assist Stryker and its orthopedic sales representatives and get his former Zimmer customers to switch to Stryker products, in direct violation of Stovall's Zimmer Agreement [*Id.* at ¶¶ 64-67].

Zimmer also contends that Stryker has incentivized Stovall to breach his agreement by promising him a large salary and bonuses based on the amount of Zimmer orthopedic implant business that he can bring to Stryker – specifically, that Stryker has guaranteed Stovall a $27,000 per month salary, on top of a $30,000 bonus for every $500,000 of Zimmer business that he converts to Stryker [*Id.* at ¶¶ 53-54]. Stryker, through its employee Lance Cowart, made a similar offer to Zimmer employee Brittain, promising an annual salary of $300,000 in exchange for working for Stryker, selling the plasma spray [*Id.* at ¶ 55-56].

5

Zimmer alleges that after Stryker offered to pay Stovall to convert Zimmer customers to Stryker, Stovall, while still employed by Zimmer, tried to undermine Zimmer by telling his customers that he was leaving Zimmer for Stryker because Zimmer couldn't properly support the customers; that he helped Stryker schedule surgeries with Zimmer customers; and that Stovall himself participated in the surgeries and attempted to convince surgeons to switch from Zimmer to Stryker products [*Id.* at ¶¶ 57-60]. Additionally, before he resigned from Zimmer, Stovall solicited multiple Zimmer sales representatives to join Stryker and to take their Zimmer customers with them to Stryker [*Id.* at ¶ 61].

Zimmer contends that at Stryker, Stovall is serving or will be serving in a capacity where he will directly violate his agreement with Zimmer, by virtue of using his relationships with Zimmer's customers and his knowledge of Zimmer's confidential information, including "sales and marketing information, organizational and sales employee information, advertising information, confidential pricing information, customer lists and preferences, marketing and sales techniques, confidential consumer information, territory sales plans, product development and delivery schedules, and product technical information" [*Id.* at ¶ 62]. Moreover, Zimmer contends that Stovall is and will continue to compete for sales and relationships among Zimmer customers; be involved with surgeries with Stryker representatives; and sell Stryker's products by taking advantage of his prior relationships with Zimmer customers, in a way that takes advantage of his relationships that were built at Zimmer's expense [*Id.* at ¶ 68].

## II. STANDARD OF REVIEW

Rule 12(b)(6) authorizes dismissal of a complaint when it fails to set forth a claim upon which relief can be granted. In general, when a court considers a Rule 12(b)(6) motion to dismiss, courts must inquire whether the complaint satisfies the federal "notice-pleading"

standard. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). Notice-pleading requires that a complainant provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide "fair notice" of the claim and its basis. *Id*. (citing Fed. R. Civ. P. 8(a)(2)); *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (citations omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). To determine the sufficiency of a claim, the court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v. CB Sports Bar, Inc*., 623 F.3d 1143, 1146 (7th Cir. 2010) (citation omitted).

The Supreme Court has adopted a two-pronged approach when considering a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly*). First, pleadings consisting of no more than mere conclusions are not entitled to the assumption of truth. *Id.* This includes legal conclusions couched as factual allegations, as well as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Second, if there are well-pleaded factual allegations, courts should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

"In *Twombly* and *Iqbal*, the Supreme Court held that in order to survive a motion to dismiss, a complaint must be plausible on its face, meaning that the plaintiff must have pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *G&S Holdings LLC v. Continental Cas. Co.*, 697 F.3d 534, 537 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *Twombly*, 550 U.S. at 556, 127

7

S.Ct. 1955). "A complaint need not contain detailed factual allegations to meet that standard, but must go beyond mere labels and conclusions, and must 'be enough to raise a right to relief above the speculative level.'" *G&S Holdings*, 697 F.3d at 537 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955) (internal quotation marks omitted). As the Seventh Circuit has explained,

> *Iqbal* clarified two working principles underlying the *Twombly* decision. First, although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion. *Id*. Accordingly, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Id*. Second, the plausibility standard calls for a "context-specific" inquiry that requires the court "to draw on its judicial experience and common sense." *Id*. at 679, 129 S.Ct. 1937. This is "not akin to a 'probability requirement,'" but the plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678, 129 S.Ct. 1937.

*McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012).

The Court will assess the plaintiff's claims accordingly.

### III. DISCUSSION

Stryker has moved to dismiss Count III, Unfair and Deceptive Trade Practices; Count IV, Tortious Interference with Contracts; Count V, Tortious Interference with Contract and Business Relationships; and Count VI, Civil Conspiracy [DE 22]. The Court will address each of these claims below.

8

## 1. Count IV, Tortious Interference with Contracts

In Count IV of its Complaint, Zimmer contends that Stryker and Stovall have tortiously interfered with Stovall's Agreement with Zimmer. Under Indiana law, the elements of tortious interference with contract are:

> (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach.

*G&S Holdings*, 697 F.3d at 543 (quoting *Melton v. Ousley*, 925 N.E.2d 430, 440 (Ind. Ct. App. 2010)). Here, Stryker claims that Zimmer has failed to set forth sufficient factual allegations to support the third and fourth elements – the defendant's intentional inducement of breach of the contract, and the absence of justification [DE 25].

As to the intentional inducement element, Stryker argues that Zimmer's allegation that Stryker intentionally induced Stovall to breach his contract with Zimmer "simply by placing him 'in the same territory in which he worked for Zimmer'" is insufficient as a matter of law to rise to the level of intentional inducement, because "Stovall would have to work in his same territory ***and provide similar products to his customers*** in order to breach his Agreement," and Zimmer's failure to allege that Stryker induced him to do so is fatal [DE 25 at 4, emphasis in original]. Stryker also argues that Zimmer's allegation that it induced Stovall to breach his agreement by "incentivizing Stovall to improperly" convert Zimmer customers to Stryker fails, because Stovall is selling a Stryker product that Zimmer does not offer, which would not violate the terms of the Agreement [DE 25 at 5]. Ergo, Stryker argues, there are no Zimmer customers to convert. The import of both of Stryker's arguments is that because it has hired Stovall to sell the plasma spray and not to sell orthopedic devices, there is no harm, no foul, and no breach.

Stryker is correct that there must be an actual breach of a contract for a plaintiff to recover on a tortious interference theory. *Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914, 922 (Ind. Ct. App. 2002) (as a matter of law, there must be a breach of contract for plaintiff to proceed on a claim for tortious interference with contract). However, its arguments both fail for the simple reason that they overlook huge portions of Zimmer's Complaint: specifically, the portions that describe what Zimmer calls the "Trojan horse" scheme. Even without the descriptive title, the upshot of the Complaint is clear: Zimmer alleges that Stryker engages sales representatives (including Stovall) who previously worked with its competitors to sell products like the plasma spray that its competitors do not produce and that the sales representative has not sold before. The plasma spray, however, according to the Complaint, is simply a key that grants the sales representative access to the operating room, where the sales representative can rub elbows with his or her former employer's surgeon customers and assist the Stryker orthopedic representative with selling Stryker products – using the information he or she gained from his or her previous employment. The Complaint, when taken as a whole, is clear that though the new Stryker representative may be officially assigned to sell a different product than he or she did at a past employer, the sales representative is trying to sell the same product in practice, breaching the Agreement. At this stage, Zimmer's allegations are sufficient to survive a motion to dismiss on this basis.

Moreover, Stryker's argument that Stovall has not worked for Stryker at all at this point, and therefore could not have breached his agreement, is not sufficient to grant a motion to dismiss: Zimmer has specifically alleged that Stovall began sabotaging Zimmer's relationships with its customers, to Stryker's benefit, before he left Zimmer's employ, and that he solicited Zimmer employees to leave Zimmer – behavior that would be in breach of Stovall's Agreement.

Second, as to the absence of justification element, Stryker argues that Zimmer's Complaint fails to properly assert that Stryker lacked justification, because it pleads only "the conclusory allegation, wholly unsupported by facts, that Stryker's inducement of Stovall's purported breaches contract [sic] was 'done without justification.' (Cmplt., ¶104.)" [DE 25 at 5]. Stryker further argues that the "overarching theme of Zimmer's Complaint, however, is that the motivation underlying Stryker's purported conduct is to gain Zimmer's (and therefore Stryker's own) business" [DE 25 at 5]. In other words, Stryker argues both that the Complaint lacks sufficient detail under Rule 12(b)(6), but also that Zimmer has overpleaded itself out of court. Both arguments fail.

To properly plead a claim for tortious interference with contract, "[a] plaintiff must state more than a mere assertion that the defendant's conduct was unjustified." *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000). "One who induces a party to a contract to break it, intending to injure another person or to get a benefit for himself, commits an actionable wrong unless there is sufficient justification for the interference." *Bragg v. City of Muncie*, 930 N.E.2d 1144, 1147 (Ind. Ct. App. 2010). In determining whether actions were unjustified, the Court may assess a number of factors: "(a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties." *Melton*, 925 N.E.2d at 440-41 (citing Restatement (Second) of Torts § 767 (1977)).

Here, there is no question that Zimmer has alleged more than a bare assertion that Stryker's conduct was unjustified. While Stryker has plucked the words "done without justification" from Zimmer's Complaint, the rest of the Complaint provides more than adequate factual support to analyze Stryker's behavior under the standards laid out in *Melton* (a task that is not suited to a motion to dismiss) and accordingly, this argument is without merit.

However, "[t]his element is established only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Melton*, 925 N.E.2d at 446. This, Stryker argues, is fatal to Zimmer's claim, because Zimmer has pled that Stryker *was* acting with a legitimate business purpose: to pick up more business for itself. Accordingly, Stryker argues, Zimmer has pleaded itself out of court, for ". . . competition is a legitimate interest that established justification for purposes of a tortious interference claim" [DE 25 at 6].

In support of its arguments, Stryker relies heavily on the district court's opinion in *Konecranes, Inc. v. Davis*, No. 1:12-cv-01700-JMS-MJD, 2013 WL 1566326 (S.D. Ind. Apr. 12, 2013), in which the court held that the defendants did not tortiously interfere with the plaintiff's contracts. In *Konecranes*, the plaintiff sued its former employee and a subcontractor that it frequently used, who the former employee went to work for. *Id.* at *1. The former employee had signed non-competition and non-disclosure agreements (the court made no mention of a non-solicitation agreement). *Id.* After the employee began working for the subcontractor, the plaintiff lost two business accounts to the subcontractor, and the plaintiff sued, claiming that the former employee was using confidential information to convert the plaintiff's business to the defendant company. *Id.* The plaintiff raised a tortious interference with contract claim, arguing that the defendants "intentionally induced Nucor and SDI to cancel and/or not renew Purchase

12

Orders with Konecranes." *Id.* at *2. The defendants moved to dismiss the claim, arguing that the plaintiff pleaded itself out of court when it alleged that the defendants had induced the plaintiff's former clients to switch their business to the defendant, because such allegations made it clear that the defendants acted with justification – specifically, the justification of getting new business for itself. *Id.* The court agreed, holding that the "allegations regarding their solicitation of business for ICS constitutes an acknowledgment by Konecranes that Mr. Davis and ICS were motivated at least in part by a legitimate business interest—their own desire to secure new customers." *Id.*

In this case, the contract that is at issue in Count IV is Zimmer's Agreement with Stovall – not Zimmer's contracts with its customers, which was the situation presented in *Konecranes* (and, as discussed below, the situation raised in Count V of Zimmer's Complaint). So the question regarding justification is whether Stryker was justified in obtaining Stovall's services in the manner that Zimmer has alleged that it has done so – not, strictly speaking, whether Stryker has somehow induced Zimmer's clients to stop purchasing Zimmer goods and instead to purchase Stryker goods (though the Complaint certainly contains allegations to that effect as well). That is the only situation Stryker addresses – by way of citation to *Konecranes* – in its memorandum in support of its motion to dismiss Count IV. And here, the Court finds that Zimmer has appropriately alleged that Stryker acted without justification in hiring Stovall for the explicit purpose of violating his Agreement with Zimmer.

Additionally, *Konecranes* differs from this case because there, the plaintiff alleged only, "without any factual support, that '[t]here was no justification for [Mr.] Davis and ICS to interfere with those contractual relationships,' . . . and simultaneously allege[d] facts that contradict that allegation—specifically, that Mr. Davis and ICS acted so that Konecranes

13

customers would 'change their crane maintenance provider from Konecranes to ICS.'" *Id*. at 3. In contrast, in this case, Zimmer has pleaded facts supporting its argument that Stryker lacked justification, including allegations that Stryker intended to destroy Zimmer's goodwill with customers, its investment in its sales force, and to steal Zimmer's confidential information. While Stryker may be able to present evidence at the summary judgment stage to show that it acted with the justification of trying to get business for itself, such a factual inquiry is not appropriate for resolution on a motion to dismiss in light of the allegations Zimmer has pleaded here. At this juncture, Zimmer's allegations are sufficient to establish that Zimmer has properly pleaded lack of justification. Accordingly, the motion to dismiss Count IV is **DENIED**.

**2.    Count V, Tortious Interference with Contract and Business Relationships**

Count V, in contrast to Count IV, is pleaded against both Stryker and Stovall and is aimed at the defendants' interference with Zimmer's business with its customers [DE 27 at 9-10, n.1]. Count V asserts two claims in the alternative to one another: tortious interference with business relationships, and tortious interference with contracts. "The elements of the two claims are the same with the following exceptions: (1) the first does not require a showing of the existence of a valid contract; and (2) the second does not require a showing of illegality. *Melton*, 925 N.E.2d at 440, n.9 (citing *Furno v. Citizens Ins. Co*., 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992)).[3]

As to Zimmer's claim for tortious interference with contract, Stryker argues that Zimmer has failed to identify any specific contracts or contractual relationships that have been breached as a result of the activity alleged in the Complaint [DE 28 at 6]. Stryker is correct that the Complaint is not entirely explicit as to *what* contracts it contends were breached as a result of

---

[3] In addition to the arguments specific to this count, Stryker also reasserts its arguments for dismissal outlined in Count IV – specifically, that Zimmer improperly alleged intentional interference and the absence of justification. The same analysis applies to those arguments in Count V.

Stryker's and Stovall's actions: the Complaint alleges only that the defendants used the Trojan Horse scheme both in the case at bar and "in other parts of the country to Zimmer's detriment and in an effort to contravene and interfere with Zimmer's valid contracts and long-standing business relationships," and that it has suffered "the loss of its customers, its investment in its sales representatives . . . lost revenues, valuable confidential information, and goodwill" [DE 1 at 111]. The problem, then, is that the Complaint fails to set forth with any factual specificity what contracts – if any – that Stryker and Stovall are accused of breaching. There is no allegation that sufficiently sets forth the breach of contract that must serve as the basis of a tortious interference with contract claim. Accordingly, the motion to dismiss the tortious interference with contract claim is **GRANTED**, and this claim is dismissed without prejudice.

In the alternative, however, Zimmer has pleaded a claim for tortious interference with business relationships, which does not require the plaintiff to plead the existence of a valid contract – instead, it requires only the existence of a business relationship, which Zimmer has properly set forth. Stryker does not argue that Zimmer has failed there. As discussed above, however, the tort does require the plaintiff to plead illegal conduct, *see Melton*, 925 N.E.2d at 440, n.9 (citing *Furno*, 590 N.E.2d 1137 at 1140), and Stryker argues that Zimmer has failed to properly plead any illegal conduct, and instead only pleads that "Stryker and Stovall used unlawful means" [DE 28 at 7, citing DE 1 at ¶ 110; DE 27 at 10]. Zimmer responds that it has done so[4] by pleading that Stovall and Stryker "used unlawful means to intentionally and unjustifiably interfere with Zimmer's business relationships by soliciting Zimmer's customers to leave Zimmer and move their business to Stryker" [DE 27 at 10, citing DE 1 at ¶ 110].

---

[4] Zimmer has also argued that it is not required to establish "unlawful acts" to avoid dismissal of Count V, because it has pleaded the tortious interference with business relationships claim in the alternative to a tortious interference with contract claim, which does not require allegations of unlawful conduct [DE 27 at 9, n.1]. This argument fails in light of the Court's ruling on the motion to dismiss the tortious interference with contract claim in Count V.

15

In Indiana, the tort of interference with business relationships "requires some independent illegal action." *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003). Though the Indiana courts have not defined "illegality" in this context, *see Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1251-52 (N.D. Ind. 2005) (citing cases), the Seventh Circuit has explicitly held that "illegal conduct" as required for a tortious interference claim does not require the showing of a criminal act. *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 631 (7th Cir. 1999); *see also Meridian Fin. Advisors Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1064 (S.D. Ind. 2011) ("[s]ufficiently 'wrongful' conduct, such as a breach of fiduciary duty, can satisfy the requirement of independent illegal action"). The *Syndicate Sales* court found that dilution of a trademark could satisfy the "illegal conduct" requirement for a tortious interference with business relations claim. *Id.* Other courts interpreting Indiana law have held the same. *See, e.g.*, *United States ex. rel. Durcholz v. FKW*, Inc., 997 F.Supp. 1143, 1153 (S.D. Ind. 1998) (violations of the False Claims Act met "illegality" requirement for a tortious interference with business relations claim); *Moffett v. Gene B. Glick Co., Inc.*, 604 F.Supp. 229, 239 (N.D. Ind. 1984), *rev'd on other grounds* (invasion of privacy and intentional infliction of emotional distress satisfies "illegal conduct" requirement); *but see Levee v. Beeching*, 729 N.E.2d 215, 222–23 (Ind. Ct. App. 2000) (defamation not illegal conduct for claims of tortious interference with business relations); *HAS, Inc. v. Bridgton, Inc.*, No IP 98–0167–C H/G, 1999 WL 1893209, at *16 (S.D. Ind. Sept. 20, 1999) (breach of contract alone is not sufficient illegal conduct for tortious interference claim); *Biomet,* 384 F. Supp. 2d 1241, 1252 (breach of contract not sufficient illegal conduct for tortious interference claim).

In this case, Zimmer has provided sufficient factual allegations to, at a minimum, establish that Stovall breached his fiduciary duty to Zimmer by cancelling surgeries and

drumming up business for Stryker while he was still employed by Zimmer. Zimmer has also included a claim in its Complaint for breach of fiduciary duty that has not been challenged by Stryker (though unsurprisingly, as the claim is raised only against Stovall, and Stryker was not named). Though these allegations pertain to Stovall's fiduciary duties to Zimmer, and Stryker itself owed no fiduciary duty to its competitor, at this stage, the allegations that Stryker induced Stovall to breach his fiduciary duties to Zimmer, or conspired with Stovall to do so (see below), are sufficient to survive a motion to dismiss.

### 3. Count III, Unfair and Deceptive Trade Practices

Count III of the Complaint alleges Unfair and Deceptive Trade Practices against Stryker and Stovall. The count does not provide any statutory authority for Zimmer's claim, and Stryker argues in its motion to dismiss that Indiana law does not provide for such a claim [DE 25 at 8]. Zimmer argues that Indiana does, in fact, recognize just such a tort [DE 27 at 11-12].

"Indiana courts have created a cause of action for unfair competition, defined as 'the attempt to create confusion concerning the source of the unfair competitor's goods.'" *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001) (quoting *Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627, 633 (7th Cir. 1968), *cert. denied*, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968) (citations omitted)); *see also Bartholomew Co. Bev. Co., Inc. v. Barco Bev. Corp., Inc.*, 524 N.E.2d 353, 358 (Ind. Ct. App. 1988) ("A valid common law cause of action exists for the tort of unfair competition"). "This common law tort was historically considered 'a subspecies of the class of torts known as tortious interference with business or contractual relations.'" *Felsher*, 755 N.E.2d at 598 (citation omitted). In other words, unfair competition claims are a particular type of tortious interference claims. Moreover, though "the law of unfair competition has been defined as the palming off of ones goods or services as that of some one

17

else . . . the tort of unfair competition is much broader and also includes actions for the interference with a contract or business relationship." *Bartholomew Co. Bev.*, 524 N.E.2d at 358.

In particular, one of the potential formulations of unfair competition that the Indiana Supreme Court has recognized is ". . . a theory of unfair competition [premised upon] . . . acts by an employee against an employer following that employment and the use by that employee of trade secrets or other confidential information acquired in the course of his employment for his benefit or that of a competitor in a manner which is detrimental to his former employer." *Woodward Ins. Inc. v. White*, 437 N.E.2d 59, 67 (Ind. 1982). Under the formulation outlined in *Woodward Insurance*, ". . . a claim for unfair competition may be brought when the employee uses 'trade secrets or other confidential information acquired in the course of his employment for his benefit or that of a competitor in a manner which is detrimental to his former employer.'" *Meridian Fin. Advisors Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1064 (S.D. Ind. 2011).

This is precisely the situation Zimmer has presented here in its Complaint, where it has alleged that Stryker hired Stovall to learn and use Zimmer's confidential information, in a manner that was directly to Zimmer's detriment – it has alleged that before he left Zimmer's employ, Stovall and Stryker worked together to schedule surgeries for Stryker that Stovall participated in and encouraged his Zimmer clients to switch from Zimmer to Stryker [DE 1 at ¶¶ 57-60]. Zimmer has alleged that Stovall will use his knowledge of Zimmer's confidential information to give Stryker a competitive advantage [DE 1 at ¶ 62]. Accordingly, Zimmer has properly pleaded a claim for unfair competition under Indiana law, and the motion to dismiss Count III is **DENIED**.

### 4. Count VI, Civil Conspiracy

Finally, Zimmer has alleged a claim of civil conspiracy against Stovall and Stryker. Stryker has moved to dismiss the count on the ground that Indiana courts do not recognize a cause of action for civil conspiracy. It is correct: "In Indiana, there is no separate civil cause of action for civil conspiracy." *K.M.K. v. A.K.*, 908 N.E.2d 658, 663 (Ind. Ct. App. 2009). However, as Zimmer retorts, "[t]here is a civil cause of action for damages resulting from a conspiracy." *Id.* The issue, then, is what that exactly means for this lawsuit.

"A civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." *Boyle v. Anderson Fire Fighters Ass'n Local 1262, AFL-CIO*, 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986). Unlike in a criminal conspiracy, the import of a civil conspiracy is not the illegal agreement itself – it's the damages that *result* from the agreement. *Id.* "[A]llegations of a civil conspiracy are just another way of asserting a concerted action in the commission of a tort." *Boyle*, 497 N.E.2d at 1079. In other words, a party can't be found liable simply for participation in a civil conspiracy. Rather, if parties are found to have conspired *in the commission of another tort*, the parties are "responsible as a joint tortfeasor for damages caused by the wrongful or contemptuous acts regardless of the degree of active participation." *Id.* (citation omitted).

Here, that means that although Zimmer cannot raise a separate claim against Stovall and Stryker for civil conspiracy, if it proves a civil conspiracy in the commission of one of the other torts it has properly alleged, then Stovall and Stryker would both be responsible in damages for the actions of one another. *See, e.g.*, *Woodward Ins.*, 437 N.E.2d at 67 (citing *Miller v. Ortman*, 136 N.E.2d 17, 34 (Ind. 1956) (under Indiana law, "[t]he goodwill of a business which includes the confidential customer information is a protectable interest by contract or against a conspiracy

19

to appropriate it by unlawful acts")).  Accordingly, Stryker is correct that Zimmer cannot lodge a claim for civil conspiracy against it, and the motion will be **GRANTED** on this claim.  However, the allegations of the Complaint do make it clear that Zimmer has properly alleged the existence of a conspiracy in the commission of the other torts raised in its Complaint, relevant then as a potential and alternative theory for damages.

## IV.  CONCLUSION

For the foregoing reasons, Stryker's Motion to Dismiss [DE 22] is **GRANTED** in part and **DENIED** in part.  The Court GRANTS the motion as to the tortious interference with contract claim against Stryker only in Count V and Count VI as to both.  Count V is DISMISSED WITHOUT PREJUDICE and Count VI is DISMISSED WITH PREJUDICE.  The Court DENIES the motion as to Counts III and IV.  Counts I, II, III, IV, and Count V (the tortious interference with business relationships claim) remain pending.

SO ORDERED.

ENTERED:  August 6, 2014

                /s/ JON E. DEGUILIO
              Judge
              United States District Court

.