UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ZIMMER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:14-CV-152 JD |
| | ) |
| STRYKER CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

This is a commercial dispute between orthopedic implant manufacturers. Plaintiff Zimmer, Inc. alleges that Defendants Stryker Corporation and Stryker Orthopaedics (collectively Stryker[1]) recruited former Zimmer sales representatives to sell Stryker orthopedic implants in violation of their noncompetition agreements. It says this was a wide-ranging scheme in which former Zimmer representatives operated under the guise of selling Vitagel, which does not compete with Zimmer products, while really pushing orthopedics that do. The Defendants respond that there is no evidence to substantiate this scheme. Rather, they say that this is a straightforward case about alleged impropriety relating to a single employee, Cody Stovall (the only individual defendant in this case). They thus filed this motion which seeks partial summary judgment on three issues: (1) that the Plaintiff does not have any evidence of the use of Vitagel as a cover to sell competing products in violation of Zimmer representatives' noncompetition agreements (or any other evidence of wrongdoing beyond Stryker's acquisition of Stovall), (2) that Stryker is not liable for the purported misconduct of CrossLink, a Stryker distributor and (3)

---

[1] While the Defendants continue to assert that Stryker Corporation is not a proper defendant, [DE 93 at 7 n. 1], they have not filed a motion to dismiss. So, consistent with this Court's prior order, [DE 48 at 1 n. 1], the Court does not differentiate between Stryker Orthopaedics and Stryker Corporation, but rather collectively refers to them as "Stryker."

that any claims based on Chris Smith, a former Zimmer representative are barred by the statute of limitations. [DE 92]. The parties have now fully briefed this motion and it is ripe for review. [DE 93, 120, 124].

## STANDARD OF REVIEW

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To survive a motion for summary judgment, the party with the burden of proof "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). The Court may consider a motion for partial summary judgment "as to particular issues or facts in a case, even if those issues are not in and of themselves dispositive of a claim or case." *Chubb Indem. Ins. Co. v. 21 E. Cedar, LLC*, No. 10 CV 7111, 2014 WL 2619469, at *4 (N.D. Ill. June 12, 2014); *see also Hill-Jackson v. FAF, Inc.*, No. 1:10-CV-01296, 2011 WL 3902772, at *2 (S.D. Ind. Sept. 6, 2011) ("A party may file a motion for partial summary judgment in order to dispose of and narrow down issues for trial."). Since the Court is evaluating a motion for partial summary judgment filed by the Defendants, it will construe all disputed facts in the light most favorable to the Plaintiff. *See Anderson*, 477 U.S. at 255 (at the summary judgment stage "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

# FACTS

This case centers on Zimmer's allegation that Stryker has repeatedly poached its sales representatives and then used their relationships with physicians to sell Stryker orthopedics. While Zimmer requires its representatives to sign noncompetition agreements, it says Stryker subverted those agreements by hiring Zimmer personnel under the pretense of selling Vitagel (a spray used to control bleeding in surgery), which does not compete with Zimmer products. In reality, Zimmer says Stryker does not have much interest in trying to sell Vitagel since it is priced out of the market. Rather, Vitagel was merely a way to get sales personnel into the operating room with doctors they had serviced at Zimmer to surreptitiously hawk Stryker products.

Stryker allegedly employed this tactic with six of Zimmer's former representatives. First are Chris Smith and William Whilden. Smith worked for Zimmer Mid-Atlantic, a Zimmer distributor, from 2004 to 2012. Whilden worked for other Zimmer distributors, most recently Zimmer Triple Play, from 1992 to 2013. Both resigned to take positions selling Vitagel, Chris Smith for Stryker and William Whilden for CrossLink, a Stryker distributor. While there is evidence that they interacted with their former customers as Vitagel sales representatives, there is no direct evidence that they promoted competing products or that Stryker sales were adversely affected as a result. This order will devote little discussion to these individuals, because Zimmer does not seek damages relating to either of them.

Second is the Dickerson Team. This was a successful orthopedic sales group that worked for Zimmer Carolinas, a Zimmer distributor in South Carolina. It consisted of Leon Dickerson, Christopher Terrell and Jay Barnhardt. By 2012, these individuals generated roughly $12 million in annual revenue. They resigned on September 27, 2012 and accepted positions with

3

CrossLink shortly thereafter. While the Dickerson Team purportedly came to CrossLink to sell Vitagel, there is evidence that its members maintained contact with their former Zimmer customers. Further, upon the Dickerson Team's transition, two of its key customers abruptly transitioned from Zimmer to Stryker products.

Finally there is Cody Stovall. Stovall worked for Zimmer as a sales representative in Texas from 2008 until 2014. In January 2014, he resigned and accepted a position selling Vitagel for Stryker. Zimmer presents significant evidence that Stovall's transition involved efforts to appropriate Zimmer business for Stryker. This includes, among other things, text messages in which Stovall discussed conversations he had with doctors about switching to Stryker products upon his resignation and testimony that Stovall provided Zimmer customers' instrument requirements to Stryker before he resigned. The Defendants contest this evidence with, *inter alia*, the testimony of Stovall and his customers, who indicate that Stovall never attempted to solicit Zimmer business.

Shortly after Stovall began his position with Stryker, the Plaintiff filed this lawsuit. Its amended complaint brings five claims: (1) breach of contract against Stovall, (2) breach of fiduciary duty against Stovall, (3) unfair competition against Stryker and Stovall, (4) tortious interference with contracts against Stryker and (5) tortious interference with business relationships against Stryker and Stovall.

The Defendants vigorously contest any wrongdoing. They say that all of the above employees were hired by Stryker or CrossLink with the legitimate intent that they promote Vitagel for the duration of their noncompetition obligations, which they did. Further, they say that the Plaintiff has overstated its case as regarding a nationwide scheme, when it should really be a straightforward lawsuit about a single employee in Texas. They thus seek summary

4

judgment on three issues regarding Zimmer's third, fourth and fifth claims. First, they argue that those claims should be confined to events surrounding Stryker's hiring of Stovall in Texas and should not advance to the extent they are based on the unsubstantiated Vitagel scheme. Second, they say that Stryker is not liable to the extent CrossLink, a Stryker distributor, engaged in misconduct. Third, they say that any claims pertaining to Chris Smith are barred by the statute of limitations. The Court addresses each argument in turn.

## ANALYSIS

### The Vitagel Scheme

The Defendants first assert that, to the extent the Plaintiff has any evidence of wrongdoing, it is cabined to Stovall. Further, they say that the assertion that Stryker used Vitagel to cover up noncompetition violations by former Zimmer representatives is baseless. The Plaintiff responds that the Defendants used Vitagel as part of a scheme to conceal noncompetition violations by sales representatives across the country.

*The Dickerson Team*

Most notably, they point to the hiring of the Dickerson Team. Recall that this was a successful orthopedic sales group that transitioned from Zimmer Carolinas to Stryker distributor CrossLink in September 2012. The Defendants assert that this was an innocuous move, as CrossLink hired the Dickerson Team to sell Vitagel, which does not compete with Zimmer's products. Further, all three members of that team testified that they did not solicit their former customers in violation of their noncompetition agreements. [DE 93-14 at 11] (Barnhardt); [DE 94-9 at 14] (Dickerson); [DE 94-10 at 17] (Terrell).

Zimmer responds that the sale of Vitagel was a front for the Dickerson Team to maintain

contact with its former customers while covertly lobbying them to switch from Zimmer to Stryker orthopedics. They offer three pieces of evidence to support this conclusion.

First, there are the economics of the acquisition of the Dickerson Team. It came at a substantial cost. CrossLink paid Dickerson alone a $500,000 bonus (structured as a loan forgivable after three years) and a $486,000 guaranteed annual salary. [DE 120-3 at 20]. The Plaintiff asserts that this is suspicious, since Vitagel costs only about $500 per unit. [DE 120-3 at 28]. Furthermore, it was not a high volume product. In fact, it was not even approved for sale in the main hospitals that the Dickerson Team serviced. Ultimately, neither Dickerson nor his team members sold *any* of it in the first year that they were employed. [DE 120-3 at 21]. Terrell testified that it had been priced out of the market by competitors' offerings. [DE 120-5 at 10].

Second, the Dickerson Team's members maintained their relationships with their prior customers. Dickerson and Terrell testified that, after joining CrossLink, they began making sales calls to doctors they serviced at Zimmer within a matter of weeks. These included Drs. Jennings and Ridgeway, who had been two of their principal Zimmer customers. [DE 120-3 at 23, 120-5 at 9]. Barnhardt likewise testified that, upon accepting employment with CrossLink, he began "making sales calls in the same area" that he had serviced with Zimmer and "to the same surgeons" to whom he had sold previously. [DE 120-4 at 6-7].

Third, customer behavior changed immediately following the Dickerson Team's transition. Specifically, the day after the Dickerson Team resigned one of its primary accounts, St. Francis Hospital, asked Zimmer Carolinas to remove its inventory. [DE 120-3 at 16]. Further, the Plaintiff's expert, Jeffrey Katz, opined that Stryker orthopedic sales to Drs. Jennings and Ridgeway, which had been very low, increased sharply when the Dickerson Team moved to CrossLink in October 2012. [DE 120-2 at 9] (showing Stryker sales to Dr. Jennings increased

6

from $40,000 in September 2012 to $250,000 in October 2012 and Stryker sales to Dr. Ridgeway increased from $0 in September 2012 to $80,000 in October 2012). His report further indicates that Zimmer sales declined in roughly inverse proportion over the same period. [DE 120-2 at 9] (showing Zimmer sales to Dr. Jennings decreased from $175,000 in September 2012 to $0 in October 2012 and Zimmer sales to Dr. Ridgeway decreased from $120,000 in September 2012 to $30,000 in October 2012).

Collectively, this evidence is sufficient to support a claim for tortious interference with contractual relations. Making out such a claim requires "(1) the existence of a valid and enforceable contract; (2) the defendants' knowledge of the existence of the contract; (3) the defendants' intentional inducement of breach of the contract; (4) the absence of justification; and (5) resultant damages." *Sheets v. Birky*, 54 N.E.3d 1064, 1072 (Ind. Ct. App. 2016).

The Defendants primarily argue that the Dickerson Team members did not breach their noncompetition agreements, which would prohibit the Plaintiff from satisfying the third element of its claim. *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 922 (Ind. Ct. App. 2002) (finding tortious interference with contractual relations claim foreclosed where the Plaintiff was unable to establish a breach of contract). The above evidence, however, permits a reasonable conclusion to the contrary. Specifically, it indicates that CrossLink hired the Dickerson Team at substantial expense to sell Vitagel, an inexpensive, low-volume product. That team then began making sales calls to its former customers, immediately after which St. Francis Hospital requested that Zimmer Carolinas remove its products from St. Francis Hospitals, Stryker orthopedic sales increased and Zimmer orthopedic sales decreased. While circumstantial, this evidence could permit a reasonable juror to conclude that CrossLink actually hired the Dickerson Team to sell orthopedics to its prior customers and that the Dickerson Team subsequently did so in breach of

7

its members' noncompetition agreements. *See Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 273315, at *20 (N.D. Ill. Jan. 20, 2015) (noting that tortious interference claims are "inherently difficult to prove" and plaintiffs must thus "typically rely on circumstantial evidence to show inducement by the alleged tortfeasors"); *Rhino Linings USA, Inc. v. Harriman*, 658 F. Supp. 2d 892, 905 (S.D. Ind. 2009) (denying summary judgment on tortious interference claim based on circumstantial evidence).

This evidence also supports a finding in Zimmer's favor on the remaining elements of a tortious interference with contractual relations claim. First, Dickerson, Terrell and Barnhardt all signed noncompetition agreements, which the Defendants do not contest were valid, enforceable contracts. [DE 120-4 at 15] (Barnhardt); [DE 120-3 at 29] (Dickerson); [DE 120-5 at 19] (Terrell). The Defendants also do not dispute that CrossLink was aware of these agreements, which is why it hired the Dickerson Team to sell Vitagel. [DE 93 at 12] ("Due to their non-compete obligations, [CrossLink President] Fleetwood hired Dickerson, Barnhardt, and Terrell to sell Vitagel for the first year since Zimmer had no similar products.").

The evidence further supports a finding that CrossLink's conduct was not justified. The Second Restatement of Torts § 767 sets forth the relevant factors in determining whether conduct is justified. The overriding question, however, "is whether the defendant's conduct has been fair and reasonable under the circumstances." *Melton v. Ousley*, 925 N.E.2d 430, 441 (Ind. Ct. App. 2010). Here, if a factfinder were to determine that CrossLink recruited Zimmer's sales representatives in knowing violation of their noncompetition agreements, it follows that it would not have been justified in doing so. *See Wade v. Culp*, 23 N.E.2d 615, 619 (Ind. Ct. App. 1939) ("When one has knowledge of the contract rights of another, his wrongful inducement of a breach thereof is a willful destruction of the property of another and cannot be justified on the

8

theory that it enhances and advances the business interests of the wrongdoer.") (quoting *Sorenson v. Chevrolet Motor Co.*, 214 N.W. 754, 755 (Minn. 1927)); *see also Fishkin v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 589 (E.D. Pa. 2008) (finding no justification where an entity entered into a joint venture with two individuals "knowing that the venture violated their non-competition agreements with their former employer" and thus caused "the exact harm the non-competition agreements were designed to prevent."). Finally, Zimmer has presented evidence of damages through its expert, who opined that Zimmer lost sales as a result of the Dickerson Team's solicitation of its prior orthopedic customers. [DE 120-2 at 14] (estimating that Zimmer incurred between $1,415,900 and $1,784,348 in lost profits during the twelve-month noncompetition period). As such, the Court concludes that Zimmer has made out a prima facie case for tortious interference with contractual relations.

In light of that, the Plaintiff's allegations with regard to the Dickerson Team cannot support a tortious interference with business relations claim. In Indiana a Plaintiff cannot bring such a claim where there is a contract underlying the relationship at issue. *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1132 (Ind. Ct. App. 2011) ("We have consistently held that an action for intentional interference with a business relationship arises where there is no contract underlying the relationship."); *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 71 F. Supp. 3d 866, 893-94 (S.D. Ind. 2014) (rejecting tortious interference with business relations claim where the relationship between the parties was governed by a written distribution agreement); *Mimms v. CVS Pharmacy, Inc.*, No. 1:15-CV-00970, 2015 WL 6449293, at *5 n. 1 (S.D. Ind. Oct. 22, 2015) (noting that, while alternative pleading may be appropriate, whether a tortious interference with business relations claim or a tortious interference with contractual relations claim is appropriate "should be borne out during

discovery"). Here, the Plaintiff's tortious interference with business relations claim is based on the same grounds as its tortious interference with contractual relations claim and is thus not viable.

That leaves the Plaintiff's unfair competition claim. The tort of unfair competition comes in many flavors. *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001) (noting that unfair competition was historically considered "a subspecies of the class of torts known as tortious interference with business or contractual relations.") (quoting William L. Prosser, *Prosser, Law of Torts* 956 (4th ed. 1971)). As advanced by the Plaintiff here, it includes "acts by an employee against an employer following that employment and the use by that employee of trade secrets or other confidential information acquired in the course of his employment for his benefit or that of a competitor in a manner which is detrimental to his former employer." *Woodward Ins., Inc. v. White*, 437 N.E.2d 59, 67 (Ind. 1982). In bringing an unfair competition claim, the Plaintiff has the burden of establishing the confidentiality of the information at issue. *See Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1064 (S.D. Ind. 2011).

Outside of Stovall, however, the Plaintiff does not present evidence that any of the former employees it identifies used Zimmer's trade secrets or confidential information on Stryker's behalf. While the Dickerson Team drew upon its prior customers, the record does not indicate that those customers' identities were confidential or that Zimmer made any effort to protect their confidentiality. *See id.* (granting summary judgment on unfair competition claim where there was no evidence that any measures had been taken to protect the confidentiality of the customer list at issue). And while the Dickerson Team could have drawn upon other information its members obtained during their employment with Zimmer Carolinas, such as doctors' preferences and operating procedures, there is likewise no evidence in the record to that effect. Without the

same, summary judgment on the Plaintiff's unfair competition claim, to the extent it is predicated on the actions of the Dickerson Team, is warranted.[2] *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (noting that a party cannot rely on speculation to defeat summary judgment).[3] Thus, as regards the Dickerson Team, the Court finds that the Plaintiff's tortious interference with contractual relations claim is viable, but its tortious interference with business relations and unfair competition claims are not. Since the Plaintiff does not seek damages with regard to Smith or Whilden, that leaves only the Plaintiff's allegations pertaining to Stovall.

*Stovall*

The Defendants do not contest that the Plaintiff has sufficient evidence to bring each of its claims to a jury based on Stovall's transition. [DE 93 at 16 n. 3] ("This Motion for Partial Summary Judgment is not brought with respect to the purported orthopaedic sales to Doctors North and Risko unrelated to the Trojan Horse theory/Vitagel sales"). Rather, they argue that the Plaintiff cannot substantiate its third, fourth or fifth claims to the extent they both relate to Stovall and are predicated on a Vitagel sales theory, as there is no evidence that Stovall ever sold Vitagel. *Id*.

But Vitagel is not a severable aspect of the Plaintiff's claims. The Plaintiff's theory is

---

[2] Summary judgment on the Plaintiff's unfair competition claim may also be justified for another reason not raised by the parties. The tort of unfair competition, to the extent it imposes liability for misappropriation of confidential information, appears preempted by the Indiana Uniform Trade Secrets Act. *HDNet LLC v. N. Am. Boxing Council*, 972 N.E.2d 920 (Ind. Ct. App. 2012) (finding common law tort causes of action for information theft preempted by the IUTSA); *Konecranes, Inc. v. Davis*, No. 1:12-CV-01700-JMS, 2013 WL 1566326, at *4 (S.D. Ind. Apr. 12, 2013) (applying *HDNet* to find unfair competition claim based on employee's use of former employer's confidential information preempted).

[3] In their opening brief, the Defendants argue in a footnote that "it is questionable whether under Indiana law, Stryker could even be liable for unfair competition" as Indiana only permits such a tort where an *employee* engages in misconduct. [DE 93 at 16 n. 4]. To the extent the Defendants consider this an independent argument, it is so cursory that it is likely waived. *See Bakalis v. Golembeski*, 35 F.3d 318, 326 n. 8 (7th Cir. 1994) (finding waiver where an argument was "made only in a footnote in the opening brief" even where it was later fully developed in the reply brief). But even if that were not so, the Court need not reach this argument as it determines that the Plaintiff's unfair competition claim fails on other grounds as discussed above.

that Stryker hired Stovall to appropriate his orthopedic business.  There is substantial (albeit hotly contested) support for this, which includes evidence that Stryker offered Stovall a bonus for business that he brought over from Zimmer, [DE 121-6 at 20], that Stovall provided information regarding Dr. North's and Dr. Risko's instrument requirements to Stryker, [DE 121-10 at 5], that he solicited those doctors to switch to Stryker products, [DE 121-6 at 26-27], and that Drs. North and Risko then did so, [DE 121-10 at 4, 121-11 at 7-8], causing Zimmer to lose profits.  [DE 120-2 at 3-4].  Vitagel was a necessary component of this plan, as it provided the cover for Stovall's transition in light of his noncompetition agreement.  Further, while Stovall didn't ultimately sell any Vitagel, he could have still used the pretense that he intended to do so to justify his move to Stryker.

So, that Stovall was hired to sell Vitagel is simply one piece of uncontested evidence that supports a basic premise underlying the Plaintiff's claims: that he was purportedly hired to sell a product that does not compete with Zimmer, while in reality he worked both before and after his transition to convert Zimmer business on Stryker's behalf.  Because the Defendants do not otherwise contest that there is sufficient evidence to bring those claims to trial, the Court finds no basis to grant partial summary judgment on them.

To recap, then, the Defendants' first argument for partial summary judgment is that the Plaintiff cannot support its tortious interference with contractual relations, tortious interference with business relations or unfair competition claims to the extent they are based on the Vitagel sales scheme or any alleged wrongdoing outside of Styrker's hiring of Stovall.  The Court disagrees.  Specifically, it finds that CrossLink's hiring of the Dickerson Team to sell Vitagel can support a tortious interference with contractual relations claim (but not a tortious interference with business relations or unfair competition claim).  Further, since the Vitagel scheme is

necessarily intertwined with all three of those claims as they pertain to Stovall, and the Defendants do not generally contest that those can survive summary judgment, the Court does not grant partial summary judgment on them.

Stryker's Liability

That leads to the Defendants' second ground for partial summary judgment: that Stryker is not liable for any misconduct by its distributor, CrossLink. As noted above, the Plaintiff has presented evidence to substantiate a claim for tortious interference with contractual relations based on CrossLink's acquisition of the Dickerson Team. But Stryker says that it had nothing to do with that hiring decision. It offers the testimony of each of the Dickerson Team's members that they did not communicate with Stryker during the hiring process, [DE 94-10 at 15] (Terrell); [DE 93-14 at 10-11] (Barnhardt); [DE 94-9 at 4] (Dickerson), and notes that Stryker is not a party to their employment contracts with CrossLink. [DE 94-5] (Dickerson); [DE 94-6] (Barnhardt); [DE 94-7] (Terrell). Moreover, CrossLink President Thomas Fleetwood testified that he determined the Dickerson Team should sell Vitagel without any input from Stryker. [DE 94-4 at 18-19]. Barnhardt and Dickerson also testified that they did not report to Stryker management after starting work. [DE 93-14 at 9] (Barnhardt); [DE 94-9 at 10] (Dickerson). So, Stryker says, there is no basis to hold it accountable for the independent actions of its distributor, which is not named as a defendant in this lawsuit.

*Agency*

The Plaintiff responds that CrossLink acted as an agent of Stryker. "It is beyond dispute that an injured party may bring an action against both an agent and his principal to recover for torts committed by the agent." *Bischoff Realty, Inc. v. Ledford*, 562 N.E.2d 1321, 1324 (Ind. Ct. App. 1990). To establish an actual agency relationship, three elements must be shown: (1)

manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent. *Bauermeister v. Churchman*, No. 88A05-1601-CT-96, 2016 WL 3369575, at *3 (Ind. Ct. App. June 16, 2016). "The principal's control over the purported agent's day-to-day operations is of paramount importance. Day-to-day operations could include such things as personnel decisions, bookkeeping and financial matters, and buying and selling inventory and supplies." *Carlisle v. Deere & Co.*, 576 F.3d 649, 656 (7th Cir. 2009) (citation omitted). While a distributor can be an agent of a manufacturer, *Smith v. Biomet, Inc.*, 384 F. Supp. 2d 1241, 1256–57 (N.D. Ind. 2005), a distributor-manufacturer relationship does not by itself give rise to a finding of agency. *Am. Commercial Lines, LLC v. Lubrizol Corp.*, 817 F.3d 548, 551 (7th Cir. 2016); *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1334-37 (7th Cir. 1995); *see also* Restatement (Second of Agency) § 14J. An agency relationship may be proven by circumstantial evidence. *Bauermeister*, 2016 WL 3369575 at *3.

Stryker argues that it does not exert sufficient control over CrossLink to establish an agency relationship. It notes that CrossLink does not exclusively sell Stryker products. [DE 94-4 at 5]. Further, Fleetwood, testified that Stryker has no ownership interest in CrossLink, does not make decisions as to who CrossLink can hire and fire and does not have any say in CrossLink's day-to-day operations. [DE 94-4 at 29-30].

Zimmer presents evidence to the contrary. It notes that CrossLink represents "various [Stryker] product lines" as an exclusive distributor for Stryker. [DE 93 at 10]; [DE 94-4 at 6]. In that role, CrossLink personnel have undertaken tasks such as representing Vitagel during surgeries, [DE 120-8 at 25-26], educating customers as to how it works and seeking hospital approval for it. [DE 120-4 at 5]. When customers purchase Stryker products they do not pay CrossLink, but rather pay Stryker, who then remits a commission to CrossLink. [DE 94-4 at 7].

14

Further, Fleetwood testified that he "reports" to Stryker regional vice president William Fain, who reviews his performance twice annually. [DE 120-6 at 3-4]. Outside of those reviews, the two "talk regularly" and Fleetwood "sometimes" consults Fain when considering business initiatives, new approaches to hospitals or high-profile hires. Indeed, he discussed the acquisition of the Dickerson Team with Fain. [DE 120-6 at 4-5]. Afterwards, Stryker's vice president of sales agreed to pay for half of its cost. [DE 120-7 at 3-5]. Collectively, this evidence could lead a reasonable juror to conclude that Stryker supervises CrossLink in the promotion and sale of its products, exercising sufficient control over CrossLink to establish an agency relationship.[4] *See Biomet*, 384 F. Supp. 2d at 1256-57 (finding fact issue as to whether exclusive distributor acted as orthopedic implant manufacturer's agent, where distributor's personnel were the "face" of the manufacturer in the region, promoted products to surgeons and provided technical assistance to surgeons).

Moreover, *Leon* and *Miles Distributors*, upon which the Defendants seek to rely, are distinguishable. In *Leon* the district court found as a matter of law that a forklift dealer was not an agent of a forklift manufacturer and the Seventh Circuit affirmed. *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326 (7th Cir. 1995). However, there was no evidence that the manufacturer provided any "direction or consultation" to the dealer regarding its day-to-day operations, unlike the consultations between Fleetwood and Fain and performance evaluations in this case. *Id*. at 1336. In fact, "the only small measure of control [the manufacturer] exerted over [the dealer's] business was that it reimbursed [the dealer] for performing [the manufacturer's] warranty service

---

[4] The Plaintiff notes that in prior briefing defense counsel referred to CrossLink as "one of two exclusive agents of Stryker in the Southeast Region." [DE 39 at 2]. While perhaps somewhat probative of an agency relationship, the Court assigns little weight to this conclusory label. Rather, it is the "control the principal has over the alleged agent and the intent and functioning of the parties" that are determinative of an agency relationship. *Leon*, 69 F.3d at 1334.

and required [the dealer] to visit [the manufacturer's] customers." *Id.* at 1334. A sales agreement between the two parties also explicitly denied the existence of an agency relationship. *Id.* at 1336.

In *Miles Distributors*, the district court granted a motion for summary judgment where the plaintiff failed to establish the existence of the agency relationship necessary to support its breach of fiduciary duty claim. *Miles Distributors, Inc. v. Specialty Const. Brands, Inc.*, 417 F. Supp. 2d 1030 (N.D. Ind. 2006), *aff'd*, 476 F.3d 442 (7th Cir. 2007). It found that "even assuming that Defendant did direct Plaintiff to promote the product line and to visit key customers, these facts alone are not sufficient to create a genuine issue of material fact relative to Defendant's control." *Id.* at 1039. However, there the defendant had no control over pricing, unlike this case where CrossLink solicits business, but customers pay Stryker directly. [DE 94-4 at 7]. Further, the defendant exerted no day-to-day control over the plaintiff in contrast to the facts described above. *Miles Distributors*, 417 F. Supp. 2d at 1039. Thus, the Court concludes that Zimmer has presented sufficient evidence to raise a fact issue as to whether CrossLink was Stryker's agent.

*Liability Under Second Restatement of Torts § 876*

But even had it not done so, there is a simpler basis for imputing liability to Stryker. Indiana courts have recognized liability for those that act in concert with another's tortious conduct under § 876 of the Second Restatement of Torts. *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 499 (N.D. Ind. 2014) (noting that Indiana courts "recognize aiding and abetting liability [under § 876] for torts in general"); *Buchanan ex rel. Buchanan v. Vowell*, 926 N.E.2d 515, 521-22 (Ind. Ct. App. 2010) (finding a claim that one party acted in concert with another's negligence sufficient to survive a motion to dismiss under§ 876). Thus, one is liable for the

16

tortious conduct of another where he "(a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979).

Here, if a juror were to conclude that that CrossLink tortiously interfered with the Dickerson Team members' noncompetition agreements, he could also reasonably infer that Stryker knew of and substantially assisted that conduct. CrossLink's Fleetwood testified that he discussed the hiring of the Dickerson Team with Stryker's Fain and Stryker then agreed to pay for half of its hefty price tag. [DE 120-6 at 4-5, 120-7 at 3-5].[5] That would certainly constitute substantial assistance. It would further indicate that Stryker believed it would sufficiently benefit from CrossLink's acquisition of the Dickerson Team to warrant the expense. While there are innocuous reasons why that might be so, it could also suggest that Stryker was aware of and sought to facilitate efforts to flip the Dickerson Team's customers, from which it stood to profit. At the summary judgment stage, the Court will not weigh competing inferences, but rather views all evidence in the light most favorable to the nonmovant. Under that standard, the Court concludes that Stryker could be liable for CrossLink's actions under § 876.

Chris Smith

That leaves the Defendants' argument that the statute of limitations has run as to any tort claims based on Chris Smith. The Plaintiff has, however, explicitly indicated that it is not

---

[5] The Defendants assert that this is undermined by Fleetwood's testimony that he independently determined that the Dickerson Team could sell Vitagel prior to discussing the matter with Stryker. [DE 124 at 5-6]. Stryker need not have independently devised this plan, however, to have substantially assisted it.

17

seeking damages in association with Stryker's hiring of Chris Smith or William Whilden. [DE 120 at 13] ("Zimmer has elected not to seek damages specifically related to Whilden's activities."); [DE 120 at 8] ("Zimmer was unable to establish specific lost profits as a result of Smith's activities and, therefore, is not seeking damages specifically attributable to Smith."). Thus, the Court need not determine whether any claim as to Smith is barred by the statute of limitations. To the extent the Defendants contest the Plaintiff's ability to present evidence regarding Smith or Whilden at trial, they may file a motion in limine at a date to later be set by this Court.

## CONCLUSION

The Defendants' motion for summary judgment [DE 92] is GRANTED IN PART AND DENIED IN PART. The Plaintiff may pursue a tortious interference with contractual relations claim based on CrossLink's hiring of the Dickerson Team to sell Vitagel. It may not pursue tortious interference with business relations or unfair competition claims based on those events. The Plaintiff's tortious interference with contractual relations, tortious interference with business relations and unfair competition claims are otherwise limited to allegations regarding Stryker's hiring of Stovall.

SO ORDERED.

ENTERED: November 1, 2016

/s/ JON E. DEGUILIO
Judge
United States District Court