**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| ZIMMER, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-152 |
| | ) | |
| v. | ) | Hon. Jon E. DeGuilio |
| | ) | |
| | ) | |
| | ) | |
| STRYKER CORPORATION, | ) | |
| HOWMEDICA OSTEONICS CORP. d/b/a | ) | |
| STRYKER ORTHOPAEDICS and CODY | ) | |
| STOVALL, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION _IN LIMINE_ TO EXCLUDE THE EXPERT REPORT OF**
**JEFFREY M. KATZ AND TO BAR HIM FROM TESTIFYING AT TRIAL**

Defendants STRYKER CORPORATION and HOWMEDICA OSTEONICS CORP. ("Howmedica") (collectively "Stryker") and CODY STOVALL ("Stovall"), pursuant to the Court's Scheduling, Pre-Trial Conference, and Trial Order [DE 138], hereby move to exclude the Expert Report of Jeffrey M. Katz ("Katz" and "Katz Report") and to bar him from offering trial testimony based on Fed. R. Evid. 702 and the Supreme Court's *Daubert* ruling. Specifically, Katz should be barred as an expert witness because he failed to independently verify the data provided to him and because he failed to employ a reliable methodology in support of his opinions.

Plaintiff Zimmer retained Katz to proffer an opinion as to its claimed lost profits from Stovall's and "other former" Zimmer sales representatives' breaches of their contractual agreements with Zimmer, in addition to Stryker's alleged actions which purportedly induced former Zimmer employees to breach. However, Katz's opinions are based on speculation, not verifiable facts, and do not comport with Federal Rule of Evidence 702 or the *Daubert* standard. This Court recognized on summary judgment that to prevail at trial, Zimmer has to prove that the former Zimmer employees breached their post-employment non-compete agreements. (Opinion, Dkt. 131). But it is not enough to establish liability that they merely left Zimmer, as was their right, without competing against Zimmer. It is similarly not enough to establish an admissible damages model for Zimmer's expert to calculate the profits Zimmer supposedly lost from their former employees merely leaving Zimmer, versus the profits Zimmer lost from the former employees actually competing against Zimmer. Yet, the former is all that Zimmer's expert did.

Katz employed two methodologies, the "before and after" or the "but for" methodology, and the "yard-stick" methodology. But those two methodologies avowedly purport to measure only one thing: the profits Zimmer would have made had the former employees not left Zimmer.

As employed by Zimmer's expert, those methodologies simply do not account for any lost profits as a result of the former employees competing against Zimmer in breach of their agreements. Quitting Zimmer is not actionable, but breaching non-compete agreements is. Since Zimmer's expert only calculated damages that supposedly resulted from the former employees quitting Zimmer and not from breaching their agreements, his opinions should be barred under *Daubert*.

Katz's damages opinion on behalf of Zimmer is both excessive and not based on facts or verifiable data. Katz's methodology is deeply flawed, based on unsupported assumptions that are belied by the factual record available to him. <u>First</u>, Katz assumes damages without establishing any causal link between the alleged wrongdoing of Defendants *and* non-parties and the purported losses. This is especially egregious given that there is no record evidence of CrossLink, a medical sales distributorship based out of South Carolina, or its employees (none of which are parties to this action), being hired to sell non-competing Vitagel in order to secretly solicit former customers in their respective territory, further bolstered by Zimmer's decision not to bring claims against CrossLink or its employees. Accordingly, Katz's attempt to attribute damages to Stryker for the purported misconduct of non-parties is based on the faulty assumption of liability for breaches of contract for claims against non-parties that were never brought by Zimmer. <u>Second</u>, Katz ignores indisputable evidence that Zimmer could not have continued to accommodate or fully service its territory needs in Amarillo or South Carolina subsequent to the departure of its sales representatives, yet assumed a 100% customer retention rate, without any verification or analysis. <u>Third</u>, Katz projects on-going damages to Zimmer for a period of five (5) years *after* expiration of the restrictive covenants at issue, based on unverified information

and pure supposition. Katz's opinions are fundamentally unsupported by the facts. Therefore, his opinions and report should be barred.

**STATEMENT OF FACTS**

**A.    The Katz Report.**

Katz opines that Zimmer sustained damages in the "average" amount of $2,493,364, stemming from Zimmer's purported "loss" of its orthopaedic implant business from the misconduct of Defendants Stovall, Stryker, and non-parties Barnhardt, Dickerson, Terrell and CrossLink, in the one-year non-compete period. (*See* Katz Rept. at 40 (**Ex. 1**).) Katz further opines that the damages are ongoing to Zimmer for up to five years after the expiration of the restrictive covenants, totaling an average amount of $2,850,796. (*See id.*) To arrive at this conclusion, Katz utilized both the "before and after" and "yardstick" methods for his calculations, and upon concluding both methods were deserving of equal weight, he averaged the totals from the two approaches for his final number. (*Id.*; *see also* Katz Dep. at 106-107 (**Ex. 2**)). To that end, Katz: (a) assumes that "but for" the alleged misconduct of Stovall, Barnhardt, Dickerson, Terrell, CrossLink and/or Stryker, Zimmer would not have been damaged; (b) claims Zimmer would have retained 100% of its business in Amarillo and South Carolina during the one-year non-compete period; and (c) asserts that Zimmer's damages continued for a period up to five years beyond the expiration of the one-year non-compete, albeit at a 50% retention rate, because of the increased competition. (*Id.*)

These conclusions, however, are not grounded in verifiable facts and are directly contradicted by the record in this case. Katz declined to consider alternative reasons for Zimmer's loss of customers in each territory and could not establish any causal link between the purported damages and the parties he says are to blame. Katz's methodology is unreliable,

3

unsupported by the factual record, and led to him grossly inflating Zimmer's alleged damages, all of which require that his report and testimony be excluded.

### B.    Stovall's Employment With Howmedica To Sell Vitagel.

Stovall is a former sales representative of Zimmer in Amarillo, Texas.  (Stovall Dep. at 7-10, **Ex. 3**).  In 2013, Zimmer hatched a plan to hire away all of Howmedica's employees in Amarillo, Texas.  (*Id.* at 21-25).  The plan, however, backfired, and in the end, based on Zimmer's effort to create strife within the Amarillo territory as well as Zimmer's failure to remedy product deficiencies and staffing issues, Stovall resigned from Zimmer on January 10, 2014 and accepted employment with Howmedica.  (*Id.* at 79; Cowart Dep. at 61 **Ex. 4**) Howmedica planned to have Stovall sell Vitagel during his non-compete period to customers outside his prior Zimmer territory.  (Cowart Dep. at 40; Royce Dep. at 46-47, **Ex. 5**; Stovall Dep. at 82).  Vitagel is a surgical hemostat manufactured by Howmedica, for which Zimmer does not have a competing product.  (Cowart Dep. at 31).  In addition to not selling competing products, Stovall was not poised to sell to any of his former accounts that he serviced for Zimmer. (Cowart Dep. 40; Royce Dep. at 46-47). Zimmer sued Stovall before he ever set foot in a single account in Amarillo, Texas as a Howmedica Vitagel Sales Representative. (Stovall Dep. at 82, 87, 89).

### C.    CrossLink Is An Independent Distributor For Many Manufacturers.

CrossLink is a wholesale distributor of orthopaedic products based in Atlanta, Georgia. (Fleetwood Dep. at 9 **Ex. 6**).  It is one of two distributors in the Southeast Region that distributes Howmedica's and *other* manufacturers' products.  (*Id.* at 15).  CrossLink represents various Howmedica product lines in Georgia, South Carolina, North Carolina, and parts of Florida, Virginia, and Alabama, as well as various non-Howmedica products.  (*Id.* at 23-25).  CrossLink

maintains no presence in Texas and, accordingly, has nothing to do with the sale of any Howmedica orthopaedic products in Amarillo, Texas or anything to do with Stovall.  (*Id.*)

Stryker does not have any ownership interest in CrossLink.  (Fleetwood Dep. at 73). Rather, CrossLink is a non-Stryker entity, independently owned and operated.  (*Id.* at 15-16, 73-74).  Stryker does not have any say in the day-to-day operations at CrossLink.  (*Id.* at 73-74).  In addition, Stryker provides no input regarding the sales representatives hired by CrossLink or the territories or product lines those sales representatives will service.  (*Id.* at 35, 39-40).  Stryker is not a party to any employment contracts with CrossLink's sales representatives, and Stryker has no managerial authority over any CrossLink employees.  (*See, e.g.*, Dickerson, Terrell, and Barnhardt agreements (Dkt. 93-10, 93-11, 93-12); Barnhardt Dep. at 48, 60, **Ex. 7**; Dickerson Dep. at 44, 61, 66, **Ex. 8**; Terrell Dep. at 48, **Ex. 9**).

### D.    Howmedica's Employment of Chris Smith in Maryland.

In or around June 2012, Howmedica hired Chris Smith ("Smith") as a sales representative in Maryland.  (Dkt. 54 at ¶75).  Prior to accepting employment with Howmedica, Smith worked as a sales representative for Zimmer Mid-Atlantic Inc., a Zimmer distributor.  (*Id.* Dkt. 54 at Ex. 3).  Howmedica hired Smith to sell Vitagel during his non-compete period because Zimmer did not offer any competitive products to Vitagel.  At the time of his hiring, Howmedica advised Zimmer of this in writing.  (K. Tompkins Letter, Dkt. 93-6).  Howmedica did not intend for, and Smith did not, solicit customers he formerly serviced for Zimmer Mid-Atlantic to purchase Howmedica orthopaedic products through the guise of selling Vitagel.  (*Id*; Dkt. 54 at Ex. 3). Katz does not opine as to any losses of Zimmer orthopaedic business during the relevant time frame which correspond with any increases in orthopaedic business at Howmedica due to Smith. (Katz Rept. at 29).

### E. CrossLink Hires Sales Representatives to Sell Vitagel.

Around October 2012, CrossLink decided to hire additional sales representatives in South Carolina to service its orthopaedic customers. (Fleetwood Dep. at 13-14, 18-19). Accordingly, CrossLink's President Fleetwood recruited and hired Dickerson, Barnhardt, and Terrell. (Fleetwood Dep. at 18-19; 25-28). Dickerson, Barnhardt, and Terrell signed employment agreements with CrossLink, not Stryker. (*See* Agreements at Dkt 93-10, 93-11 and 93-12; *see also* Fleetwood Dep. at 77). CrossLink did not solicit Stryker's input for the hiring of these sales representatives, nor was it required to. (Fleetwood Dep. at 35, 39-40). Nor did Stryker make any recommendations regarding the hiring of Dickerson, Barnhardt, or Terrell. (*Id.* at pp. 27-28, 31, 74). Dickerson, Barnhardt, and Terrell had no communications whatsoever with anyone at Stryker at the time they were being recruited and hired by CrossLink. (Dickerson Dep. at 21, 60-61, 78-79; Barnhardt Dep. at 12, 59-60; Terrell Dep. at 43-44, 61). Importantly, Dickerson, Barnhardt, and Terrell have never been employed by Stryker or Howmedica.

Prior to accepting employment with CrossLink, Dickerson, Barnhardt, and Terrell worked for a Zimmer distributor, Zimmer Carolinas, and had agreed that for one year after their resignation from Zimmer Carolinas, they would not sell products competitive with Zimmer products in the same territory. (Dkt. 54 at Exs. 3, 7-9). Due to their non-compete obligations, Fleetwood hired Dickerson, Barnhardt, and Terrell to sell Vitagel for the first year, but did not talk to anyone at Stryker about this idea. (Fleetwood Dep. at 32-34, 36-37, 62-63). Zimmer does not sell *any* products competitive with Vitagel. (Victor Dep. at 149-150, **Ex. 10**). Fleetwood had no knowledge whether Stryker may have done this in any other parts of the country with a Howmedica sales representative. (Fleetwood Dep. at 33-34). At no point in time did Dickerson, Barnhardt, or Terrell speak to any Stryker employee regarding their contractual obligations to Zimmer Carolinas or the sale of Vitagel. (Terrell Dep. at 62; Barnhardt Dep. at 12, 48;

Dickerson Dep. at 21, 78-79). Dickerson, Barnhardt and Terrell were not successful in making any Vitagel sales during the non-compete period. (Terrell Dep. at 62; Dickerson Dep. at 48; Barnhardt Dep. at 60). Dickerson, Barnhardt, and Terrell did not make any attempt to sell Howmedica orthopaedic products during their non-compete period and did not utilize their sale of Vitagel as a secret ploy to solicit their former doctors to use Howmedica orthopaedic products. (Barnhardt Dep. at 46, 54; Dickerson Dep. at 26, 50, 52, 55, 59; Terrell Dep. at 10). Zimmer has no evidence to the contrary.

Around February 2013, CrossLink recruited and hired William Whilden ("Whilden") in Columbus, Georgia. (Fleetwood Dep. at 46-47, 63). Whilden is not, and never has been, employed by Stryker or Howmedica. (Whilden Dep. at 42, 87, **Ex. 11**). Whilden never spoke with any Stryker employee during his recruitment to CrossLink. (*Id.* at 48, 108-109). Prior to being hired by CrossLink, Whilden was employed as a sales associate for Zimmer Triple Play, a Zimmer independent distributor. (Whilden Dep. 10-11). Pursuant to his agreement with Zimmer Triple Play, Whilden agreed for one year not to sell any products which competed with the Zimmer products he sold. (Dkt. 54 at Ex. 3). In an effort to comply with the terms of his non-compete obligations to Zimmer Triple Play, CrossLink hired Whilden to sell Vitagel, as a non-competitive product with those offered by Zimmer. Similar to Smith, Katz does not attribute any damages felt by Zimmer in the Georgia territory to Whilden or Stryker's alleged wrongdoing. (Katz Rept. at 38-39).

Neither CrossLink nor any of the CrossLink employees are a party to this lawsuit. Consequently, there was never a breach of Zimmer's contracts with the CrossLink employees and with no such breach, there can be no damages attributed to Stryker.

7

## LEGAL STANDARD

The testimony of expert witnesses is governed by Federal Rule of Evidence 702, which provides that a qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court interpreted this rule to require that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993). The Seventh Circuit has interpreted *Daubert* to require a two-step inquiry, where both steps must be met before the proposed expert testimony is deemed admissible. According to the Seventh Circuit, a district court must determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact in understanding the evidence at issue. *See Walker v. Soo Line R. Co.,* 208 F.3d 581, 586 (7th Cir. 2000). When making these determinations, the district court operates as a "gatekeeper," acting "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998).

As gatekeeper, the court focuses its examination on the expert's methodology. *See Daubert,* 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *Walker*, 208 F.3d at 587 (stating that when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed"). This is because even "[a] supremely qualified expert cannot waltz into the

courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999). At bottom, the fundamental purpose of the reliability inquiry is to "rule out 'subjective belief or speculation.'" *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 614 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 590). This is because Rule 702 requires "more than a subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "Nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999). An opinion becomes speculative when there is too big of an analytical gap between the data and the opinion provided. *Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) (affirming exclusion of expert opinion on expected revenues using unrealistic assumptions); *see also Beachler v. Amoco Oil Co.*, 112 F.3d 902, 909 n. 6 (7th Cir. 1997) (affirming exclusion of expert damages opinion because speculative and not supported by any factual foundation).

## ARGUMENT

Katz's expert report and testimony should be excluded because they are the result of unreliable methods and principles in this case. In making his damages calculations, Katz states that he uses both the "before-and-after" method, which analyzes a plaintiff's past profits in estimating its future profits, and the "yardstick" method, which reviews the profits of comparable businesses in estimating a plaintiff's future profits. While both are generally accepted methodologies, an expert is still required to use "adequate bases" for calculations and the projections "cannot be the product of mere speculation." *See Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1067 (5th Cir. 1985); *see also United States v. Brown*, 7 F.3d 638, 652-53 (7th Cir. 1993) ("expert testimony [must] be rejected if it lacks an adequate basis in fact").

Accordingly, the "principal assumptions" underlying Katz's opinions in this case lack

reliability and therefore, his lost profits and revenue calculations do not satisfy Rule 702. Specifically, based on the facts of this case, Katz failed to conduct any independent analysis of his assumptions to determine their reasonableness, including failing to test and verify: (a) any causal connection between the alleged bad acts of Stovall, Barnhardt, Dickerson, Terrell and/or Stryker and the claimed damages to Zimmer; (b) Zimmer's damages projections based on an overstated business retention rate during the one-year non-compete period; (c) the reasonableness of the extended damages period for up to five years beyond the expiration of the one-year non-compete; and (d) engage in a comprehensive analysis as to whether Stryker was an appropriate proxy to Zimmer for purposes of the application of the yardstick method. Failing to do so, Katz's opinion does not satisfy Rule 702 or *Daubert* and should be barred.

I.     **BY FAILING TO VERIFY HIS ASSUMPTIONS, KATZ'S OPINION ON DAMAGES ATTRIBUTABLE TO STOVALL AND STRYKER, IS UNRELIABLE.**

     A.     **Experts Must Independently Verify the Reasonableness of Their Assumptions.**

While an expert is "permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him," in doing so the "the expert must incorporate the information supplied to him into his underlying facts, independently review the information, and then formulate, with calculations consistent with his expertise, an opinion that relies upon that [and] any other relevant information." *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-CV-00341-SEB-DM, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009). In other words, "when an expert relies upon information given to him by a party or counsel, he must independently verify that information before using it in his calculations." *Id.*; *see also MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009). When the expert merely "parrots information provided to him by a party,

that opinion is generally excluded." *King-Indiana*, 2009 WL 3187685, at *2; *see also Black & Decker v. Bosch Tools,* No. 04 C 7955, 2006 WL 5156873, at *1 (N.D. Ill. Sep. 8, 2006) (Rules of Evidence do not "allow a witness under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinions."). This principle is equally true for internal projections, which rest on a company's "hopes rather than the results of scientific analysis," or the "company's say-so rather than statistical analysis." *Zenith Elecs. v. WH-TV Broad. Corp.,* 395 F.3d 416, 420 (7th Cir. 2005).

> ### B. Katz Failed to Identify a Causal Link between the Alleged Bad Acts of Stovall and Stryker and Any Damages to Zimmer.

Katz conflates the principles of assumption of liability with that of causation in developing his opinions for this action. (Katz Dep. 23-24, 64-65, 97-98). Zimmer tenders Katz as an expert on lost profits and damages pursuant to its claims, but Katz cannot meet the requirements of Rule 702 because he failed to consider and account for "obvious alternative explanations" with respect to alleged damages in the Amarillo, Texas territory. *See* FED. R. EVID. 702 Advisory Comm. Notes (2000 Amends.) (Important benchmark for gauging reliability is "[w]hether the expert has accounted for obvious alternative explanations"); *see also Fuesting v. Zimmer, Inc.,* 421 F.3d 528, 534–35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006) (citing the same).

Specifically, here, there are other potential causation factors that Katz either ignored or did not consider in rendering his damages opinion as to Zimmer. Katz admits that he did not examine any information relevant to identifying a causal link, including the sworn affidavits of Drs. North and Risko in preparing his report, both of whom stated unequivocally that Stovall did not solicit them on behalf of Stryker. (Katz Dep. at 65-66; *cf.* North Aff. (Dkt. 55-2) and Risko

Aff. (Dkt. 55-3)). Katz further acknowledged he never looked for evidence of solicitation and never saw anything specific in the record to support evidence of solicitation by Stovall leading to loss of sales to Drs. North and Risko, nor did he have *any* direct evidence to link damages to Stovall's purported misconduct.

> Q.    So do you have any evidence that Cody Stovall made any sales in Amarillo during his post termination restricted covenant period?
>
> A.    I haven't seen anything specifically with regard to Mr. Stovall in the post termination period where its linking him directly with sales. I mean, you have suspect things in my opinion, such as when they go on a fishing trip and he -- with Dr. North, I think, and Mr. Stovall says they never discussed business. I mean, that seems a little hard to believe, but I don't have anything that directly says this sale is Mr. Stovall's sale.

(Katz Dep. at 58). Likewise, Katz did not review the depositions of Carla Brittain or Rocky Victor regarding efforts to maintain Zimmer's relationships in the territory. (Katz Dep. at 65). Rather, Katz just *assumed* the relationship was "poisoned" by Stovall.

> Q.    Why do you say the relationship was poisoned?
>
> A.    Well, if there's problems -- if the doctors perceive there are problems and Mr. Victor goes there and asks them what do you need to -- what do I need to fix the problems, what can I do to help, and they're just totally not interested, something has happened before that that doesn't even give Zimmer the opportunity to keep the business. And assuming the violation of the noncompete and the restrictive covenant and all those sorts of things, again, you have to look in the but for world. In the but for world, things wouldn't have happened beforehand to poison it.
>
> Q.    You said there were problems. What were the problems before?
>
> A.    I, I don't recall.
>
> Q.    Do you know if Carla Britton (sic) made any effort to meet with Drs. Risko or North subsequent to the termination of Mr. Stovall's relationship with Zimmer?
>
> A.    I, I don't know.

(Katz Dep. at 51). In essence, the methodology that Katz utilized is based on little more than Katz's own intuition, which is insufficient. *See Zenith,* 395 F.3d at 418 (an expert's "intuition"

not a sufficient basis for opinion).  Given this obvious "analytical gap" in Katz's analysis, he should be prohibited from testifying at trial.  *See Target Market Publ'g,* 136 F.3d at 1144.

The district court's analysis and holding in *Victory Records, Inc. v. Virgin Records of America, Inc.*, is instructive.  No. 08 C 3977, 2011 WL 382743 (N.D. Ill. Feb. 3, 2011).  There, the plaintiff music company alleged a claim for tortious interference against competitor defendant regarding a contract with a rock band, claiming sales of second and third albums for the band were compromised as a result of defendant's misconduct. Defendant moved to exclude plaintiff's proposed damages expert, a music industry accountant, who calculated lost profits using both the "before and after" and "yardstick" methodologies.  *Id.* at *1.  Plaintiff's expert not only assumed causation, but it was "part and parcel of his opinion."  *Id.* at *5.  The court barred plaintiff's expert on the grounds that he failed to account for obvious alternative explanations that caused diminished sales for the second and third albums for the rock band.  *Id.* at *5-6. "Given this significant gap in [plaintiff expert's] knowledge and analysis, he cannot testify with the reliability demanded by Rule 702 either that Virgin caused Victory's alleged losses or that it is 'reasonable to assume' that Virgin did so."  *Id.* at *6 (citing *F:A J Kikson v. Underwriters Labs., Inc.,* 492 F.3d 794, 802 (7th Cir. 2007) (barring expert for failure to account for factors distinguishing past sales from future sales)).

Similarly, Katz fails to identify <u>any</u> causal link between the alleged misconduct of Stovall and/or Stryker and any losses to Zimmer, but rather, he assumes causation without any factual basis.  (Katz Rept. at 40-41; *see also* Katz Dep. 50-51, 64-65, 97-98).  Katz admittedly ignores whether any loss of sales to Drs. North and/or Risko was caused by Stovall's alleged wrongful conduct or by other alternative factors, such that they may have transferred their business to Stryker for reasons completely unrelated to Stovall or Stryker.  For example, Dr. North testified

13

that he had wanted "to use some Stryker stuff" and "didn't like the revision knee of Zimmer or their instrumentation." (North Dep. at 61, **Ex. 12**). Likewise, Dr. North stated he was concerned that with only Brittain as the Zimmer representative in Amarillo, Zimmer would not be able to adequately service his surgical needs. (*Id.* at 64-65). Dr. Risko voiced comparable concerns about Zimmer's deficiencies and its ability to provide a representative to service his implant needs for his patients. (Risko Dep. at 55-56, **Ex. 13**). Indeed, both Drs. North and Risko specifically stated that they <u>did not transfer</u> their business to Howmedica because of Stovall, but rather because of Zimmer's failure to contact them in efforts to continue to service them after Stovall's resignation. (Dkt. 56, Ex. 3 at ¶¶ 7, 11-12; Dkt. 56, Ex. 2 at ¶¶ 8, 13-14). This is fatal to the reliability of Katz's opinion and fails to meet the Rule 702 standard.

   **C.     Katz's "Before and After" Calculations for Lost Profits in the Amarillo Territory Are Flawed and Therefore, Unreliable.**

   Katz uses the "before and after" method to calculate lost profits to Zimmer subsequent to the departure of Stovall in 2014. While an acceptable methodology to calculate profit loss, Katz relies on unverified assumptions in this case and therefore, his findings are unreliable. Under this method, Katz compared Zimmer's sales to Drs. North and Risko in the year before and the year after Stovall resigned from Zimmer and expresses the amount of the loss as the difference between the before and after levels. (Katz Rept. at 14). Essentially, Drs. North and Risko increased their purchases of hip and knee reconstructive products from Stryker *after* Stovall left Zimmer, and Zimmer saw a decrease in sales. As discussed above, Katz assumes this is attributable to Stovall's misconduct, but fails to identify any causal link based on the facts. (*See supra*). But also, Katz purposefully limited his calculations to Drs. North and Risko, even though Stovall serviced many *other* doctors in the Amarillo territory, because the sales analysis "showed sales continuing with the other doctors and not a big decline like we saw with Drs.

Risko and North" and other doctors "clearly [] were okay with the Zimmer products because they continued to use them." (Katz Dep. at 88-90).

Because Katz cherry-picked the decline in sales as representative of his "after" data, his calculations are flawed and fail to establish that Zimmer's sales *overall* in Amarillo were impacted because of Stovall's alleged misconduct. Even though Stovall serviced other customers in Amarillo beyond Drs. North and Risko, Katz failed to include Zimmer sales data with respect to those other surgeons in his analysis. An expert's choice in data sampling is at the heart of his methodology. *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *10-11 (S.D. Ind. Sept. 18, 2006) (expert testimony excluded where "samples [were not] chosen using some method that assures the samples are appropriately representative"). The sampling data chosen by Katz as to the Amarillo territory is particularly relevant because he uses two doctors as representative of the whole. *See Teamsters v. United States,* 431 U.S. 324, 340 n. 20 (1977) ("Considerations such as small sample size may, of course, detract from the value of [statistical] evidence"). Simply put, the "before" sampling is not representative of the "after" sampling to result in a reliable damages calculation.

Further, Katz overstated Zimmer's "but for" retention rate in the amount of 100% for its physician customers during the one year non-compete period immediately following Stovall's resignation. Without any factual bases, Katz assumes that Zimmer would have retained 100% of the hip and knee product sales in the Amarillo territory during the Stovall non-compete period, and continue to retain 50% of those sales after the expiration of the restrictive covenants. (Katz Rept. at 14-16.) A "simple before-and-after financial picture of an established company" can suffice to demonstrate the loss, ***if causation is also established***. *See Cambridge Plating Co. v. Napco, Inc.,* 85 F.3d 752, 771 (1st Cir. 1996) (emphasis supplied); *see also MDG Int'l, Inc. v.*

15

*Australian Gold, Inc.,* No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009) (an expert's opinions must be based on the evidence in the case, and, if the opinions are based on empirical assumptions, those assumptions must be supported by evidence).   Katz calculated damages based on statements made by Zimmer sales manager Rocky Victor, assuming that Zimmer would retain 75-80% of a sales representative's sales *after* expiration of a non-compete, only if Zimmer could introduce a new representative in the territory to mitigate any loss.  (Katz Rept. at 18; Katz Dep. at 80-81).  The problem with this assumption, however, is that Katz did nothing to independently verify the veracity of these statements, including reviewing or considering any quantitative data regarding the effect on sales when a sales representative leaves a territory but <u>does not</u> violate his or her non-compete.  (Katz Dep. at 77-80).  Katz goes so far to state that he "tried doing some Google searches to see if anything would come up" but could not find anything to support his assumed 100 percent retention rate.  (*Id.* at 81).  Nevertheless, Katz believed it was appropriate to apply territory-wide retention rates to specific surgeon sales in order to come up with a "reasonably certain estimate of damages." (*Id.*)

Katz's before-and-after analysis fails because there is no evidence to support the assumption that Zimmer would have retained 100% of the sales in Amarillo for the immediate 12-month period subsequent to Stovall's resignation.  Rather, his assumptions are directly controverted by the facts available to him.  *See MDG Int'l, Inc.*, 2009 WL 1916728, at *4; *see also Elock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir. 2000) (reversing district court's admission of expert damage's testimony relying on empirical assumptions unsupported by record).  For example, in September 2013, Stovall received an offer to sell cardiovascular products with competitor CSI, and expressed his dissatisfaction to Rocky Victor about continuing to work for Zimmer.  (Victor Dep. at 58-59.)  In attempting to coax Stovall to stay with Zimmer, Victor

stated he spoke with his supervisors about renegotiating Stovall's compensation based on Stovall's threat to leave for a competitor, fearing the impact it would have on Zimmer's expected $3 million growth rate. (*Id.*) Victor asserted "to say this business will be at risk without Cody is an understatement." (*Id.*) Likewise, Brittain was the only Zimmer sales representative in the territory after Stovall left and likely would not have been able to service the territory on her own. (*See id.*) Both Stovall and Victor confirmed it was not unusual for Zimmer sales representatives to rely on Stryker sales representatives to cover a surgery because Zimmer was unavailable to accommodate all surgeries due to staffing issues. (Stovall Dep. at 42, 104; Victor Dep. at 135). Additionally, Zimmer had limited equipment in Amarillo, even before Stovall resigned, which Dr. North expressed concern about to Zimmer with respect to its ability to assist his future surgical needs. (Victor Dep. at 122-124).

Not only that, Katz failed to account for other factors to negate a 100% retention rate of business based on the facts of this case. Katz conceded that there are myriad reasons why a surgeon may transfer business to a different company *other than* loss of a sales representative—for example, technology that improves patient outcomes. (Katz Dep. at 83). Further, Katz could cite no testimony in the record that demonstrates that Stryker *or Stovall* were actively soliciting Drs. North and Risko for the sale of hip and knee products. (Katz Dep. at 76, 90-91). Katz similarly did not have any knowledge of the size of Zimmer's market share in the Amarillo territory. (Katz Dep. at 105). Nor did Katz consider the size or type of Brittain's territory in Amarillo, despite acknowledging that she had "older doctors" who might retire and similarly, that influx or departure of doctors in the territory could account for lost sales. (Katz Dept. at 104-105). Thus, failing any verifiable causation or definitive data on decline of sales in the

Amarillo territory in the one-year period subsequent to Stovall's departure, Katz's "before and after" methodology is fatally flawed and must be excluded.

## II. KATZ'S DAMAGES CALCULATIONS ATTRIBUTED TO STRYKER BASED ON ALLEGED MISCONDUCT OF NON-PARTIES IS NOT SUPPORTED BY SUFFICIENT FACTS AND IS THEREFORE, UNRELIABLE.

Katz's opinion should also be excluded because he attributes certain damages to Stryker based on non-party conduct in South Carolina and an alleged "Trojan Horse" scheme meant to deplete Zimmer's sales in the territory. (Katz Rept. at 30-31). Each of the non-party sales representatives—Barnhardt, Dickerson, Terrell, Smith, and Whilden—had contractual agreements with Zimmer, imposing certain restrictive covenants, and as alleged by Zimmer, Stryker facilitated a breach of those obligations via their sales representative relationship with Stryker and/or its distributor CrossLink. (1st Am. Compl. at ¶¶ 71-101). Notably, however, Katz does not attribute any damages to Stryker based on Smith's or Whilden's purported misconduct, acknowledging that no causal link can be established. (Katz Rept. at 29-30; 38-39).

But Katz's opinions with respect to the non-parties who joined CrossLink (or Stryker) suffer from the same faulty conclusions as those regarding Stovall, namely, there is no basis in fact between the alleged misconduct of third parties and the calculated damages attributed to Stryker. Rule 702(b) requires that expert testimony be based on sufficient facts and data. *See Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (2003) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). There is no evidence to support Katz's damages calculations based on third party conduct and these opinions must be barred.

First, Katz cannot identify any causal link between Barnhardt, Dickerson, and Terrell's alleged misconduct and Zimmer's loss of profits in South Carolina. Critically, Katz admits that

18

Barnhardt, Dickerson, Terrell, and CrossLink are not parties to this action. (Katz Dep. at 129.)

Katz further acknowledges that Barnhardt, Dickerson, and Terrell are not employees of Stryker, and that CrossLink is not a subsidiary of Stryker such that it is subject to Stryker control. (*Id*. at 129-30.) As a result, Katz cannot identify any evidence of damages to Zimmer pursuant to any *Stryker* misconduct, especially considering that all three non-party sales representatives testified that, despite their best efforts, they were unsuccessful in making any Vitagel sales during their non-compete period. (Terrell Dep. at 62; Dickerson Dep. at 48; Barnhardt Dep. at 60). Likewise, there is no record evidence that Barnhardt, Dickerson or Terrell solicited *any* Zimmer customers after resigning from Zimmer, or that Zimmer suffered any lost sales in the territory as a result of any alleged breach. (Katz Rept. at 30-31.) At bottom, Katz cannot show that Barnhardt, Dickerson, or Terrell breached their contractual obligations with Zimmer, nor can he show that any damages to Zimmer were caused by those alleged breaches, certainly not at Stryker's doing. In fact, he uses rank speculation to guess that something inappropriate transpired.

> Q.    As it relates to the damages you associate with CrossLink, what evidence do you have that Stryker did any -- took any action that resulted in the damage you associate with CrossLink?
>
> A.    With regard to the South Carolina region and CrossLink, at the time of my report, one of the key things of Stryker involvement, I think was your word, was the fact that the day after Mr. Barnhardt, Dickerson and Terrell gave their notice to Zimmer that the doctors called Zimmer to have the products and the Zimmer devices removed, *which would mean that Stryker probably was notified beforehand to be ready to supply it almost immediately. So that suggests to me there was some sort of involvement*. And then subsequently you at least had the deposition of Mr. Fleetwood where he spoke to Mr. Fain.
>
> Q.    So those are the two pieces of evidence you think that you can recall that you tie Stryker's involvement to CrossLink in the South Carolina region?
>
> A.    Well it helps to support the assumption that I was given. Ultimately I was given the assumption that there's liability here or that the parties breached the agreement.

19

(Katz Dep. at 94-95, emphasis supplied.)   Katz admits that none of the losses in the South Carolina region are attributed or tied to Stovall's conduct—an actual party to the litigation.  (*Id.* at 99.)  The entirety of Katz's opinion with respect to the South Carolina territory is based on gross supposition without any basis in fact. *See Zenith,* 395 F.3d at 418 (an expert's "intuition" not a sufficient basis for opinion).

Second, Katz did not assert any damages related to Smith's or Whilden's actions in Maryland and Georgia respectively, reinforcing the lack of a causal link between the alleged causes of action and Zimmer's claimed damages against Stryker.  (*See supra*).   Despite Zimmer's allegations that these individuals were complicit in the "Trojan Horse" scheme where they solicited orthopaedic customers as Vitagel sales representatives, Katz concluded that Zimmer is not due damages from their alleged wrongful conduct. (Katz Rept. at 29-30, 38-39). As to Smith, Katz stated he was "unable to identify that a reduction in sales for Zimmer resulted in a corresponding increase in sales for Stryker."  (Katz Rept. at 29).  Katz went so far to comment that the sales figures for Zimmer and Stryker in the Mid-Atlantic region were "inconsistent with the allegations in the complaint related to Mr. Smith."  (Katz Dep. at 84-86). Regarding Whilden, Katz recognized that there were reasons *other* than a potential breach of agreement that led to Zimmer's decreased sales in the territory including hospital sole source agreements and the fact that surgeons were already loyal customers of Stryker.  (Katz Rept. at 38-39; Katz Dep. at 86-88).  Katz concluded that it was "difficult to show from the data provided that sales that would have gone to Zimmer went to Stryker as a result of the alleged wrongdoings." (*Id.* at 39).

Third, Katz's assumption that "but for" Barnhardt, Dickerson, and Terrell joining CrossLink to sell non-competitive products such as Vitagel in South Carolina, Zimmer would

have maintained 100% retention of business in the region, is not supported by the facts. Once again, Katz cherry-picks two physicians out of the larger territory, Drs. Ridgeway and Jennings, yet concedes that Zimmer's decreased sales did not result in a corresponding increase in Stryker sales. (Katz Rept. at 30; Katz Dep. at 127-28). Indeed, in his review of the data, Katz noted that Zimmer sales to Dr. Ridgeway declined by $450,000, but Stryker's sales for competitive products increased only by $12,000 during the same period. (*Id.*) When confronted with this glaring disparity, Katz could not account for Zimmer's loss apart from Stryker, despite no causal connection. (Katz Dep. at 127).

Moreover, Katz overstated Zimmer's retention rate in the territory and failed to identify any evidence that Zimmer attempted to mitigate its losses in the territory by trying to retain the business of its surgeons, particularly Drs. Jennings and Ridgeway. (Katz Dep. at 99.) The factual record shows Zimmer doubted its own ability to continue to service the territory after the departure of Dickerson, Barnhardt and Terrell. (Dickerson Dep. Ex. 62, **Ex. 14**). Despite this, Katz calculates lost profits to Zimmer in the amount of $3,024,304.00 using the "before and after" methodology in the South Carolina Territory. (Katz Rept., Schedules 4a and 4b). By failing to consider alternative reasons for Zimmer's loss of sales in the territory, Katz also failed to take into consideration indisputable record evidence.

Accordingly, any opinion testimony regarding damages attributed to Stryker pursuant to non-party conduct is not supported by the factual record and must be barred. *See, e.g., McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, [when] based on assumed facts, must find some support for those assumptions in the record."); *see also Fuesting,* 421 F.3d at 534-35 (same). Katz's opinions are not supported by the facts of this case

or any empirical data, but rather his "*ipse dixit*" as an expert.  Too great of an analytical gap exists to render his opinions admissible or reliable and he should be barred.

III.  **KATZ'S CALCULATIONS OF ZIMMER'S ONGOING DAMAGES AFTER THE EXPIRATION OF THE ONE YEAR NON-COMPETE PERIOD AND HIS USE OF THE YARDSTICK METHOD ARE BOTH INAPPROPRIATE AND FLAWED.**

Based on the facts of this case, Katz failed to meet his *Daubert* and Rule 702 obligations to independently verify the reasonableness of the alleged losses incurred by Zimmer following expiration of the one-year non-compete and non-solicit period.  More specifically, after calculating damages for the non-compete period, Katz projects lost profits to Zimmer for one, three, and five year periods subsequent to the expiration of non-competes for Stovall, Bernhardt, Dickerson, and Terrell (hereinafter "Sales Representatives") based on unverified assumptions, at the request of Zimmer.  These projections for on-going damages to Zimmer are the result of unreliable methodology, pure speculation, and must be excluded.

A.  **Katz Overstates Damages in Amarillo and South Carolina Territories Based on Unverified Data.**

As discussed herein, Katz begins with the unsupported assumption that Zimmer would have retained 100% of its historical sales with Drs. North and Risko in Amarillo, and Drs. Ridgeway and Jennings in South Carolina, during the twelve month non-compete period.  (*See supra*).  Katz uses Zimmer North American sales growth rate for hips and knees from its 2012 10-K to project sales for Zimmer over the five year period after expiration of the sales representatives' non-competes.  (Katz Rept. at 16-18, 33-37; Katz Dep. at 108-10).  And other than reviewing Zimmer's 2012 10-K, Katz admittedly did not undertake any independent analysis to determine whether Zimmer was generally profitable as a company, in Amarillo, South Carolina, or otherwise. (Katz Dep. at 117).

In addition, Katz's use of North American sales growth overstates Zimmer's sales in Amarillo and South Carolina as steadily increasing, despite evidence to the contrary. The manifest error of these calculations is illustrated by the fact that Zimmer undeniably could not fully service either territory after the sales representatives' respective departures (*see supra*) and Katz's recognition that "not all of the doctors' business would have remained with Zimmer because the former sales representatives would be able to compete." (Katz Rept. at 17; *see also* Report Schedules 3a, 4a). Even so, Katz claims that his chosen period of five years after expiration of the non-compete period is a "reasonable period to calculate damages" based on a Morningstar analyst report that most surgeons are loyal to medical device companies for 15 years. (Katz Rept. at 19; Katz Dep. at 126). Katz's projections over a five year period are both arbitrary and based on pure speculation. Katz provides no basis for accepting that his findings regarding the growth rate in the medical device industry based on the Zimmer 2012 10-K report can be extrapolated and applied over a 5-year period in the Amarillo and South Carolina territories. *See, e.g., Manpower Inc. v. Ins. Co. of Pennsylvania*, 08–C–0085, 2010 WL 3730968, at *3 (E.D. Wis. Sept. 20, 2010) (finding that expert's projection of business's growth rate was not based on reliable methods where he was not an expert on business management, examined a short base period for calculating lost revenues, performed no economic analysis of the various factors affecting revenues during the base period, and made no effort to determine additional factors that might affect the growth rate).

Thus, because Katz failed to analyze the reasonableness of his extended assumptions for the damages period beyond the one year non-compete based on the specific facts of this case, his testimony should be excluded. *See, e.g.*, *Ask Chemicals, LP v. Computer Packages, Inc.,* 593 F. App'x 506, 510-11 (6th Cir. 2014) (affirming exclusion of excluding expert testimony where the

expert undertook no "independent verification or analysis" of his client's revenue projections); *Rich & Rich P'Ship v. Poetman Records USA, Inc.*, 2010 U.S. Dist. LEXIS 48900, at *13-15 (E.D. Ky. May 18, 2010) (excluding lost profits opinion where expert did not verify reasonableness of sales projections and growth rate); *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (excluding expert testimony based on "the conclusory statements of [the party] and not on his independent evaluation of the facts"); *King-Ind. Forge*, 2009 WL 3187685, at *2-3 (excluding expert opinion where he failed to verify the cost estimates of an employee and selected a damages period based on nothing more than the representation of his client, and without considering industry data); *MDG, Int'l*, 2009 WL 1916728, at *4 (excluding distributorship lost profits opinion where "expert fail[ed] to consider the possibility that [the manufacturer] would and could terminate [the distributor's] rights in any territory," which "makes any opinion he offers on value and lost profits inherently incomplete and thus unreliable for a trier of fact.").

**B.      Katz's Application of the Yardstick Method to Calculate Damages is Flawed.**

Finally, Katz's application of the yardstick method, which examines the profits of closely comparable businesses in estimating Zimmer's future profits, for his calculation of on-going damages is inappropriate.  Katz applied Stryker's U.S. sales growth for hips and knees as a point of comparison to Zimmer, without ever evaluating the appropriateness of applying a country-wide growth rate to Amarillo or South Carolina.  (Katz Dep. 114-15; Katz Rept. at 24-29.)  Katz never asked Zimmer for any underlying data to break down the national growth rate into regions or territories to have an accurate comparison nor could he articulate why he thought the national growth rate was a better benchmark.  (Katz Dep. at 109-10.)  In calculating damages for lost profits, the proper measure of damages is guided by analysis of "comparable business *in the area.*"  *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005)

24

(emphasis in original, citation omitted).  In choosing sample comparison data, experts must ensure that the "comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Id.* (citation omitted).  Here, Katz acknowledged that Stryker and Zimmer were not exactly the same, and further admitted that he did not undertake any independent analysis to determine whether pricing, discounts, products offered, or sales data for the two companies, were comparable in either territory.  (Katz Dep. at 117-120).  It is inapt to assume that Stryker sales could be used as a point of comparison for Zimmer sales in this case simply because they are both in the medical device business, with sales of their products nationwide to *some* overlapping customers.  *Loefflel,* 387 F. Supp. 2d at 812.  Because Katz did not engage in an "apples to apples" comparison, his yardstick analysis is unreliable.  *Id.*

Without any basis for assuming comparability between Stryker and Zimmer in Amarillo and South Carolina, "a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural." *Loeffel Steel Prods.*, 387 F. Supp. 2d at 812 (rejecting expert's yardstick damages analysis as insufficiently comparable based on assumptions that nine steel companies were the same because they competed for the same customers and were in the same industry). By failing to analyze the reasonableness of his projections for the five-year period subsequent to expiration of the non-compete, Katz's opinions are unreliable and inadmissible.  In other words, because the comparison data is manifestly unreliable and cannot "logically advance[ ] a material aspect of the proposing party's case," it should be excluded. *Loeffel Steel Prods.*, 387 F. Supp. 2d at 812.

## CONCLUSION

For these reasons, Stryker Corporation, Howmedica Osteonics Corp., and Cody Stovall, respectfully request that the Court grant their motion and exclude Jeffrey Katz's Expert Report and bar him from testifying and offering opinions at trial.

**Dated:  April 12, 2017**                    Respectfully submitted,

                                              **STRYKER CORPORATION, HOWMEDICA
                                              OSTEONICS CORP., and CODY STOVALL**


                                              By  s/ Michael D. Wexler
                                                      One of Their Attorneys

Michael D. Wexler
Kristine R. Argentine
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone (312) 460-5000

26

## CERTIFICATE OF SERVICE

The undersigned, an attorney, does hereby certify that he caused a true and correct copy of the foregoing to be served on all counsel of record through the ECF Filing System.

s/ Michael D. Wexler
Michael D. Wexler

38069619v.1