# EXHIBIT 2

USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 2 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION
September 28, 2015
1–4

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF INDIANA
 3               SOUTH BEND DIVISION
           CAUSE NO. 3:14-cv-00152-JD-CAN
 4
 5
 6
      ZIMMER, INC.,            )
 7                             )
                Plaintiff,     )
 8                             )
           vs.                 )
 9                             )
      STRYKER CORPORATION, STRYKER )
10    ORTHOPAEDICS and          )
      CODY STOVALL,             )
11                              )
                Defendants.     )
12
13
14       The deposition upon oral examination
      of JEFFREY M. KATZ, a witness produced and
15    sworn before me, Judie F. Roberts, a
      Notary Public in and for the County of
16    Hamilton, State of Indiana, taken on
      behalf of Defendants in the offices of
17    Quarles & Brady, LLP, 135 North
      Pennsylvania Street, Suite 2400,
18    Indianapolis, Indiana, taken on the 28th
      day of September, 2015, commencing at
19    12:06 p.m., pursuant to the applicable
      rules of procedure and with notice
20    thereof.
21
22
23
24
25
```

Page 2

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       Mr. Michael A. Rogers
         QUARLES & BRADY, LLP
 5       135 North Pennsylvania Street
         Suite 2400
 6       Indianapolis, Indiana 46204
         michael.rogers@quarles.com
 7
 8   FOR THE DEFENDANTS:
 9       Mr. Jason P. Stiehl
         SEYFARTH SHAW, LLP
10       131 South Dearborn Street
         Suite 2400
11       Chicago, Illinois 60603
         jstiehl@seyfarth.com
12
```

Page 3

```
 1   I N D E X   O F   E X A M I N A T I O N
 2
                                         PAGE
 3
     DIRECT EXAMINATION                    4
 4      QUESTIONS BY MR. STIEHL
 5
 6
 7
 8
 9      L I S T   O F   E X H I B I T S
10                                       PAGE
11
     DEFENDANTS' DEPOSITION EXHIBIT NO.:
12
     78 - Report of Jeffrey M. Katz        4
13
```

Page 4

```
 1              September 28, 2015
 2                 12:06 p.m.
 3              (Defendants' Deposition
 4         Exhibit No. 78 was marked for
 5         identification.)
 6
 7              JEFFREY M. KATZ,
 8    the witness herein, having been first duly
 9    sworn or affirmed to tell the truth, the
10    whole truth, and nothing but the truth,
11    was examined and testified as follows:
12
13       DIRECT EXAMINATION,
14         QUESTIONS BY MR. STIEHL:
15
16  Q.   Good morning, Mr. Katz.
17  A.   Good morning.
18  Q.   I introduced myself earlier.  I'm Jason
19       Stiehl.  I am counsel for Stryker
20       Corporation and Howmedica Osteonics.
21       We're here today to take your deposition
22       today as an expert in this matter.
23          Do you understand that?
24  A.   Yes.
25  Q.   All right.  I put in front of you what
```



Page 49

1  A. Well, other -- again, other than reading
2     Mr. Stovall's deposition, where I believe
3     he discussed about trying to go to
4     different companies, that would be the
5     only thing I would be aware of.
6  Q. Did the fact that Stryker and Zimmer
7     representatives were talking to their
8     doctors about the possibility of going to
9     Smith & Nephew, did that have any effect
10    one way or another on your opinions in
11    this case?
12 A. I wasn't aware of that until I read the
13    text messages that they were talking to
14    the doctors about it until they were
15    produced to me after the report, so I
16    couldn't have taken that into account.
17 Q. Again, having read them, you don't want to
18    make any changes to your report?
19 A. Correct.
20 Q. We talked a little bit about mitigation
21    earlier. I think you have a section on
22    Page 9 of your report where you discuss
23    it, if I can find it now. Here's the
24    section I want to ask you about.
25       On the very last two sentences on

Page 50

1     Page 9, you write, "In addition, such
2     arrangements also can allow a company such
3     as Zimmer to have the opportunity to keep
4     its customers after a sales representative
5     leaves by introducing the customer to a
6     new sales representative."
7        Do you see that?
8  A. Yes.
9  Q. Can you please tell me what efforts Zimmer
10    made to introduce other sales
11    representative to either Dr. North or Dr.
12    Risko?
13 A. Well, my understanding from speaking with
14    Mr. Victor -- or from Dan's discussion
15    with Mr. Victor is that he got to talk to
16    one of the two doctors immediately after
17    Mr. Stovall gave notice, and after
18    discussions with them, I think basically
19    there was nothing he could do to salvage
20    the relationship. So other than, than
21    asking if Zimmer ultimately put somebody
22    back in there -- I think they did -- but
23    at that point the relationship was already
24    poisoned with those doctors.
25 Q. Why do you say the relationship was

Page 51

1     poisoned?
2  A. Well, if there's problems -- if the
3     doctors perceive there are problems and
4     Mr. Victor goes there and asks them what
5     do you need to -- what do I need to fix
6     the problems, what can I do to help, and
7     they're just totally not interested,
8     something has happened before that that
9     doesn't even give Zimmer the opportunity
10    to keep that business. And assuming the
11    violation of the noncompete and
12    restrictive covenant and all those sorts
13    of things, again, you would have to look
14    in the but for world. In the but for
15    world things wouldn't have happened
16    beforehand to poison it.
17 Q. You said that there were problems.
18       What were the problems before?
19 A. I, I don't recall.
20 Q. Do you know if Carla Britton made any
21    effort to meet with Drs. Risko or North
22    subsequent to the termination of Mr.
23    Stovall's relationship with Zimmer?
24 A. I, I don't know.
25 Q. Do you have any evidence -- did you see

Page 52

1     any evidence in your review of the record
2     that Mr. Stovall serviced either Drs.
3     Risko or North subsequent to his
4     termination with Zimmer?
5  A. I'm sorry. I missed two of the people.
6  Q. Dr. Risko and Dr. North, did Cody Stovall
7     -- do you have any evidence that Cody
8     Stovall serviced either of those doctors
9     during his restricted covenant period?
10 A. Well, yes.
11 Q. What evidence is that?
12 A. Well, he was their sales rep before he
13    left Zimmer.
14 Q. Correct.
15 A. And I believe the restrictive covenant and
16    duty of loyalty and all of that covers the
17    period while he's still employed. It's
18    not just after.
19 Q. Okay. I think I understand your
20    confusion, so let me be clear.
21       Do you have any evidence that Cody
22    Stovall serviced either Dr. North or Dr.
23    Risko on behalf of Stryker?
24       MR. ROGERS: Same objection as
25    before. He's not been offered to testify

USDC IN/ND case 3:14-cv-00152-JD-MGG    document 145-2    filed 04/12/17    page 4 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015

57–60

Page 57

1   sales made by Stryker and the dollar value
2   of sales made by Zimmer post termination
3   of Stovall, you didn't look at any of the
4   actual facts surrounding how those sales
5   are made, who made those sales, under what
6   circumstances those sales were made in the
7   Amarillo territory?
8         MR. ROGERS:  Objection, confusing.
9   A.  Please reread the question.
10  Q.  I can restate it.  I don't think it was
11  confusing but I'll say it again.
12        You looked at the data, the sales
13  data in Amarillo post termination,
14  correct?
15  A.  Yes.
16  Q.  Other than looking at just the numbers,
17  the data that happened in Amarillo -- I'll
18  ask it open-ended -- did you look at any
19  other facts that affect your testimony or
20  your opinion in this case related to the
21  actual sales happening in Amarillo?
22  A.  Well, again, I got an understanding based
23  on my discussions with Mr. Victor what
24  happened right after Mr. Stovall gave his
25  resignation.  In addition, I looked at

Page 58

1   some of the detail prior to Mr. Stovall's
2   termination with regard to the Stryker
3   sales to Drs. Risko and North.  So I
4   wouldn't say I just took data.  I did, I
5   did more than that.
6   Q.  So do you have any evidence that Cody
7   Stovall made any sales in Amarillo during
8   his post termination restricted covenant
9   period?
10  A.  I haven't seen anything specifically with
11  regard to Mr. Stovall in the post
12  termination period where it's linking him
13  directly with the sales.  I mean, you have
14  suspect things in my opinion, such as when
15  they go on a fishing trip and he -- with
16  Dr. North, I think, and Mr. Stovall says
17  they never discussed business.  I mean,
18  that seems a little hard to believe, but I
19  don't have anything that directly says
20  this sale is Mr. Stovall's sale.
21  Q.  And do you know if there were any court
22  orders entered during the restricted
23  covenant period that affected whether or
24  not Mr. Stovall could or couldn't make
25  sales in Amarillo during his restricted

Page 59

1   covenant period?
2   A.  Yes.
3   Q.  Was that something you reviewed prior to
4   your opinion?
5   A.  I did not have -- I did not review it.  I
6   did discussions with counsel.
7   Q.  I don't want to know what you all talked
8   about.
9         As you sit here today, you have not
10  seen the actual order in that case -- in
11  this case?  It's not listed, I can tell
12  you that.  Go ahead and double-check me.
13  A.  Well, I think it's -- I'm not sure if it's
14  a permanent injunction.  I don't recall if
15  I saw it in the injunction which is part
16  of the complaint.
17  Q.  That would not be it.
18  A.  Okay.
19  Q.  I don't know if that's it, but there was
20  not a permanent injunction in this case.
21  There was a request for one.  There was
22  not a permanent injunction.  Okay.
23        Did you make any effort to
24  independently verify any of the statements
25  that you rely upon from the complaint in

Page 60

1   your review of this case?
2   A.  I'm not sure how to answer that question.
3   In reviewing documents, I'm always trying
4   to make sure the assumptions that I'm
5   given with regard to liability are
6   supportive or if there's not -- if there's
7   an assumption that I'm asked to give
8   that's kind of way out in outer space, I'm
9   going to question it.  So to the extent
10  there's allegations in the complaint and
11  in the reply, I think evidence that I
12  reviewed in this case is supportive of the
13  allegations in there.  But I wasn't
14  looking to verify everything that's
15  alleged in there.
16  Q.  In your review of the record and the
17  documents provided to you, do you find any
18  evidence that Mr. Stovall's conversations
19  with Drs. North and Risko resulted in Drs.
20  North and Risko giving their business to
21  Stryker?
22        MR. ROGERS:  Objection.  It's
23  outside the scope of his opinions.
24  A.  Again, I was given the assumption with
25  regard to liability and the breaching of



USDC IN/ND case 3:14-cv-00152-JD-MGG    document 145-2    filed 04/12/17    page 5 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
61–64

Page 61

1    the agreement.  However, I found
2    inconsistent Mr. Stovall's testimony where
3    on the one hand, he tells the doctors if
4    you need anything, call Carla Britton, and
5    on the other hand nobody from Stryker --
6    not the doctors saying; Mr. Stovall saying
7    Dr. North said that nobody from Zimmer
8    contacted them.
9        Well, which is it?  Did you tell the
10   doctors to contact Zimmer or did you not
11   tell them to do anything and then spring
12   it on management at Zimmer that you're
13   leaving and they have no opportunity to
14   get in there to help, help the doctors?
15 Q.  Let's talk about the springing it on
16   Zimmer.  We haven't gotten to that point
17   yet.  Did you see any testimony from
18   anybody that Cody Stovall had actually
19   quit Zimmer prior to his resignation a
20   couple months before he actually resigned
21   and then was asked to come back and
22   rejoined Zimmer?
23 A.  I do not recall seeing anything on that.
24 Q.  Did you see any evidence that Cody Stovall
25   actually worked for a different company

Page 62

1    for a short period of time before he came
2    back to work for Zimmer?
3  A.  You know, I may have read this in his
4    deposition, but it's just -- it didn't
5    strike me as significant to my opinion, so
6    I don't recall.
7  Q.  Did you see anything in the text messages
8    you read that indicated that Cody Stovall
9    had made any indication months prior to
10   his resignation that he was going to be
11   leaving Zimmer?
12 A.  I, I don't recall seeing that in the
13   months prior.  It seemed to me he was
14   trying to figure out where he could make
15   the most money, and that's where he was
16   going to go.  Whether that was bringing
17   Stryker folks over, him going to Smith &
18   Nephew, him going, you know, where he
19   could make the most comp.
20 Q.  Did you, did you have any conversations
21   with Dr. North or Dr. Risko in preparing
22   your report?
23 A.  No.
24 Q.  Did you ask for the opportunity to talk to
25   those two doctors?

Page 63

1  A.  No.
2  Q.  Did you talk to any of the doctors in
3    North or South Carolina or Georgia in
4    preparing your report?
5  A.  No.
6  Q.  Did you ask to talk to any of those
7    doctors?
8  A.  No.
9  Q.  Did you take into consideration whether or
10   not a doctor may transfer business when
11   they don't feel like they're being valued
12   by a company like Zimmer?
13       MR. ROGERS:  Objection.  Same
14   objection as before.  It's outside the
15   scope of his report.
16 A.  I mean, I took into account that the
17   research shows but for some intervening
18   event, doctors stay long term with the
19   medical device manufacturer that they're
20   using.  So, I mean, I did take it into
21   account from that perspective.  As far as
22   the doctors saying there was some sort of
23   problem, is that what you were --
24 Q.  No.  Not being valued by Zimmer?
25 A.  No.  I mean, again, with regard to the

Page 64

1    liability, I was given an assumption that
2    I've accepted which was not inconsistent
3    with industry research.
4  Q.  You keep saying liability.  Is it your
5    testimony here today, Mr. Katz, that
6    liability and causation are the same
7    things for purposes of your report?
8  A.  Yeah.  Well, the wrongdoing has to be the
9    proximate cause of the damages.
10 Q.  Did you assume proximate cause as well for
11   your report?
12 A.  Yes.  I'm assuming -- based on the
13   assumption that I was given -- let me get
14   how it was worded in the report -- that
15   the sales representatives breached the
16   terms of their representative agreements
17   with Zimmer and that Stryker's action
18   included those former sales -- induced
19   those former sales -- Zimmer's sales
20   representatives to breach their agreements
21   with Zimmer.  With that assumption, these
22   are the damages that were caused by that
23   breach of the agreement.
24 Q.  Just so I understand, for purposes of your
25   report, you are assuming causation was



USDC IN/ND case 3:14-cv-00152-JD-MGG    document 145-2    filed 04/12/17    page 6 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
65–68

Page 65

1    from those breaches?
2  A.  Yes.
3  Q.  Did you then investigate at all whether or
4    not any other intervening acts in the
5    Stovall -- in the Amarillo market may have
6    affected the damages at all other than the
7    bad acts you're assuming?
8  A.  Well, it was something I was keeping in
9    mind and asked the staff to keep in mind
10    when we were reviewing it if anything else
11    came out in the depositions as far as what
12    may have caused the loss to Zimmer.
13    Nothing struck us as, as being
14    significant.
15 Q.  And again, just to be clear, you didn't
16    review prior to your report the affidavit
17    of Drs. North and Risko, correct?
18 A.  Correct.
19 Q.  You didn't review the deposition
20    transcripts of either Victor or Ms.
21    Britton, correct?
22 A.  Correct.
23 Q.  You make note in your report about the
24    lack of notice given by Mr. Stovall,
25    correct?

Page 66

1  A.  Yes.
2  Q.  Does that have an effect on your damage
3    calculation, whether or not there was or
4    wasn't notice?
5  A.  Well, I mean, ultimately, Mr. Stovall did
6    give notice.  It was sort of an
7    immediate --
8  Q.  That's fair.
9  A.  -- termination.
10 Q.  Does whether or not Cody Stovall gave a
11    week or two weeks or a month notice have
12    any effect on your opinions in this case?
13 A.  Only it helps to support my numbers.  If
14    he had given notice, then Zimmer may have
15    had the opportunity or would have had the
16    opportunity to get in there and get the
17    doctors set up and develop that -- start
18    developing that relationship to make sure
19    they are covered before they leave which
20    then may have resulted in less damages.
21    So to the -- but that didn't happen, so
22    it's sort of reflected.
23 Q.  Okay.  What you just said, I think, so if
24    Cody had given notice and Zimmer rejected
25    that notice, would that affect your

Page 67

1    damages opinion?
2    Let me be clear.  If Cody had
3    offered to give a two weeks notice period
4    before he left Zimmer and Zimmer rejected
5    that two-week offer would that have an
6    effect on your damages opinion?
7  A.  Well, first, let me clarify, when he did
8    give notice, his notice letter says that
9    he'll support for two weeks, but in his
10    deposition testimony -- I believe he gave
11    notice on January 10th.  His deposition
12    testimony says he was starting at Stryker
13    on the 13th, so I don't how he could have
14    given two weeks notice.  But again, if he
15    had, it may have reduced damages if Zimmer
16    could have gotten in there and salvaged
17    the relationship.
18 Q.  Do you know if Ms. Britton had any prior
19    relationship with either Dr. Risko or Dr.
20    North prior to Mr. Stovall's resignation?
21 A.  I know the testimony is that originally
22    that territory was joint and then they
23    split it where Cody Stovall took Drs.
24    Risko and North and some other doctors,
25    and Carla Britton took a different group

Page 68

1    of doctors, but I don't know if she
2    serviced them previously.  I believe she
3    may have covered for them at times if Cody
4    wasn't available.  He did mention that
5    typically during Christmas, he would take
6    off or every other Christmas he would get
7    off and she would cover his, so I assume
8    she had some relationship with those
9    doctors.
10 Q.  In your report, you separate out damages
11    for the Amarillo market and you have
12    damages for the CrossLink market, correct?
13 A.  Yes.
14 Q.  For the Amarillo market, have you done any
15    work that is not in your report that
16    separates out the damages number amongst
17    the possible violations of Mr. Stovall's
18    agreement?  For example, that you can say
19    X number of dollars is related to his
20    breach of his duty, Y dollars is related
21    to his solicitation, Z dollars is related
22    to his noncompete?
23 A.  No.
24 Q.  Why not?
25 A.  Because I've been asked to assume it was a



Page 73

1     Amarillo market?
2 A.  I did not do anything specific with regard
3     to the Amarillo market, but I also didn't
4     come across anything indicating to me that
5     the Amarillo market was significantly
6     different from any other market.
7 Q.  Do you do any investigation as to whether
8     anyone expressed concerns to Zimmer
9     regarding Zimmer's capacity to service the
10    surgeons in Amarillo prior to Mr.
11    Stovall's resignation?
12 A.  I'm sorry. Could you repeat the question,
13    please?
14 Q.  Sure. Did you investigate whether anyone
15    expressed concerns to Zimmer regarding
16    Zimmer's capacity to service the surgeons
17    in Amarillo prior to Mr. Stovall's
18    resignation?
19 A.  I think that was discussed in Mr.
20    Stovall's deposition, but other than
21    reading it there, I didn't research it any
22    further.
23 Q.  Do you know if Dr. North ever expressed
24    concerns regarding Zimmer's ability to
25    service his business as it grew?

Page 74

1 A.  I'm not aware specifically unless it was
2     -- like I said, I recall reading something
3     about that in Mr. Stovall's deposition.
4 Q.  Did you see any evidence that Dr. North
5     cancelled any Zimmer surgeries in 2013 as
6     a result of Zimmer not having equipment
7     available for his surgeries?
8 A.  Again, there were discussions in Mr.
9     Stovall's deposition with regard to this
10    issue, at least I believe it was his
11    deposition, but it was unclear as to
12    whether Zimmer wasn't available. There
13    was some testimony that the representative
14    from Stryker was there and the Zimmer rep
15    wasn't there yet, and there seemed to be a
16    miscommunication, if I recall.
17       This was around the, the Christmas
18    holiday time where Mr. Stovall said well
19    -- something to the effect, and I'm
20    paraphrasing, that Carla always covers him
21    during the Christmas season and one of
22    them needs to work longer while he's away,
23    but he didn't specifically talk to her
24    about it this time. He just assumed she
25    would cover it.

Page 75

1     So I believe there were some
2     surgeries cancelled. However, I think
3     this all relates to kind of the issues
4     beforehand that I have been asked to
5     assume as to what did Cody do or Mr.
6     Stovall do here that caused that to be
7     cancelled.
8 Q.  On Page 11 you make a statement that --
9     discussing the split of the territories,
10    and you state that Stovall would be
11    "exclusively responsible for relationships
12    with certain long-time and high-volume
13    customers."
14       Do you see that statement?
15 A.  Not yet.
16 Q.  At the very top of Page 11.
17 A.  Yes.
18 Q.  Is the sole basis for your statement that
19    the doctors that Stovall serviced were
20    long-time Zimmer doctors the citation to
21    the complaint here below?
22 A.  The support for that statement is the
23    amended complaint, the statement of facts.
24    However, I can tell you for one of the
25    doctors, the Zimmer data shows they had

Page 76

1     been using Zimmer products going back to
2     mid 2009.
3 Q.  The -- you understand there's allegations
4     by Zimmer in this case that Stryker was
5     going to have Cody Stovall sell Vitagel to
6     his doctors in Amarillo?
7 A.  Yes.
8 Q.  Do you know if that ever happened?
9 A.  From reviewing the testimony, it did not
10    happen.
11 Q.  Does that fact that he never went to any
12    of his doctors to sell Vitagel have any
13    effect one way or the other on your
14    opinions?
15 A.  No.
16 Q.  Did you -- you state in here that you
17    spoke with Mr. Victor and Mr. Victor told
18    you that typically it's his experience
19    that even after the departure of a sales
20    representative, the company retains --
21    that Zimmer would retain 75 to 80 percent
22    of the sales representatives' sales.
23       Do you recall that?
24 A.  Yes.
25 Q.  Did you do anything to independently



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 8 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
77–80

Page 77

1   verify Mr. Victor's statements?
2  A.  No, other than, you know, it's supported
3       by the -- other testimony that I cite
4       here, like Mr. Leinen saying that if
5       you're -- the business, if you're out of
6       sight, you're out of mind.  If you sit out
7       a year, it leads to all kinds of
8       complications.
9           And then you've got Mr. Cowart's
10      testimony which says in his experience,
11      the company would retain 25 percent.
12          So I've got somewhere between 25, 75
13      out of the market, it's too much of a risk
14      that you're going to lose anything.  So I
15      kind of -- it's clear that on all sides of
16      this, if a rep leaves, you're somewhere in
17      between there.  So yes, there was other
18      information from the other testimony that
19      I felt was supportive of what Mr. Victor
20      said.
21  Q.  Did you do any independent analysis as to
22      what happens where a representative leaves
23      a territory but does not violate a
24      noncompete agreement of the restricted
25      covenant?

Page 78

1  A.  Did I -- what was your question?
2  Q.  Sure.  Did you look to determine what
3       effect it has on either Zimmer or Stryker
4       when a sales representative leaves a
5       territory but is not in breach of the
6       restricted covenants?
7  A.  No, other than Mr. Victor's discussions
8       with him.
9  Q.  And that is that basically the loss of a
10      representative alone is going to result in
11      some loss of business?
12 A.  Yes.
13 Q.  And Mr. Victor says 75 to 80 percent?  I'm
14      sorry.  Victor says they'll retain 75 to
15      80 percent?
16 A.  Correct.
17 Q.  And it was Mr. Cowart's position that the
18      company usually only retains about
19      25 percent?
20 A.  Correct.
21 Q.  And it was Mr. Leinen's fear that if he
22      were to leave Stryker to go to Zimmer, he
23      would lose all of his business?
24 A.  Yes.
25 Q.  So you took all of those pieces, and my

Page 79

1       understanding is you gave an estimate of
2       50 percent?
3  A.  Correct, after the noncompete period
4       expires.
5  Q.  Correct.  I guess I'm not -- that wasn't
6       my question.  My question was it's my
7       understanding from your analysis that just
8       the loss of a representative without the
9       breaches has an effect on a territory,
10      that's what Mr. Victor told you, right?
11      If you want to, it's on Page 18 of your
12      report.
13 A.  Well, the specific question that was
14      discussed with Mr. Victor was after the
15      noncompete expired, so maybe the wording
16      -- if you go down further, that's why I
17      said this suggests that they would have
18      retained the majority of the surgeons'
19      business after the non -- that's how I got
20      -- that's what the discussion -- maybe the
21      word is not as clear, but the discussions
22      with Mr. Victor were if somebody -- I
23      mean, it's written both ways here.  If
24      somebody just leaves and if it was -- if
25      they observe the noncompete.

Page 80

1  Q.  So you did not -- is it fair to say then
2       you did no analysis as to what happens in
3       the scenario where a representative leaves
4       but works in a noncompetitive position?
5           MR. ROGERS:  Objection.  I think
6       that's inconsistent with his report.
7           MR. STIEHL:  I agree, but that's not
8       what he just said.  That's why I'm asking
9       the question.
10 A.  No.
11          MR. ROGERS:  I don't think that's
12      what he said.
13 A.  Mr. Zimmer --
14 Q.  Mr. Victor?
15 A.  Mr. Victor, in our discussions with him,
16      said 75 to 80 percent they would retain.
17      That's -- the way we talked to him about
18      it was if somebody transferred to a
19      different division, that would happen, but
20      it was also the discussion if somebody
21      went and observed their noncompete, he
22      felt they would still keep 75 to
23      80 percent of the business.
24 Q.  Okay.  So going back then, without a
25      breach, you have someone who goes to a



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 9 of 20

JEFFREY M. KATZ  
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015  
81–84

Page 81

1  different business line or observes a
2  noncompete, Mr. Victor's position is
3  you're going to lose 20 to 25 percent of
4  your business, correct?
5  A.  Yes.
6  Q.  It was Mr. Cowart's belief that you're
7  going to lose probably 75 percent of your
8  business?
9  A.  Yes.
10 Q.  And it was Mr. Leinen's fear that he would
11 lose all of his business if he observed
12 his noncompete?
13 A.  Yes.
14 Q.  Other than those anecdotal statements by
15 those three folks, did you do anything
16 independent to study either generally or
17 Amarillo what effect losing a sales rep
18 had?
19 A.  I tried doing some Google searches to see
20 if anything would come up, but I couldn't
21 find any.
22 Q.  Do you know where Mr. Cowart's -- if Mr.
23 Cowart was just making that observation
24 off the cuff during his deposition or if
25 he was pointing to a particular document

Page 82

1  that had that 25 percent retention concept
2  in it?
3  A.  I don't know.  I recall reading it in his
4  deposition.
5  Q.  If Mr. Cowart's was based on
6  documentation, would have an effect -- you
7  know, underlying documentation, would that
8  affect your weighting of who was more
9  accurate in retention rates in business?
10 A.  It may or may not.  I would have to take a
11 look at that data and analyze it.
12 Q.  Was it your understanding that Mr. Victor
13 and/or Mr. Cowart were discussing
14 retention rates for specific surgeons or
15 just a general territory discussion?
16 A.  My understanding is it was just a general
17 discussion based on their perspective
18 experiences in the industry.
19 Q.  And do you think it's appropriate to apply
20 territory-wide retention rates to specific
21 surgeon sales?
22 A.  I think it's appropriate in order to come
23 up with a reasonably certain estimate of
24 damages.
25 Q.  Do you believe that the personal

Page 83

1  relationships between surgeons and a sales
2  representative could cause surgeons to
3  follow a sales representatives even if
4  they're not servicing that surgeon?
5  A.  Well, again, I was asked to assume
6  liability in this matter, but, I mean, it
7  would make sense that that may have -- be
8  a factor in some doctor's decision-making.
9  However, like I said, the research shows
10 they tend -- doctors tend to stay with the
11 same manufacturer.
12 Q.  Can you think of any reasons why a surgeon
13 may transfer their business from one
14 company to another unrelated to a sales
15 representative?
16 A.  Yes.
17 Q.  Can you give me some examples of those?
18 A.  The research mentions improved --
19 technology that improves patient outcomes,
20 that would be a reason that doctors would
21 change manufacturers irrespective of sales
22 representatives.
23 Q.  You did an analysis of two former Zimmer
24 representatives that went to Stryker to
25 which you assigned no damages, correct?

Page 84

1  A.  Correct.
2  Q.  And that would be Mr. Smith up in the
3  Mid-Atlantic region and Mr. Whilden down
4  in Georgia, correct?
5  A.  Yes.
6  Q.  Let's go to -- just take a peak at those
7  quickly.  I believe Mr. Smith is found on
8  Page 29 of your report.
9     MR. ROGERS:  Are you going to
10 impeach that testimony?
11    MR. STIEHL:  Just looking to make
12 sure I'm reading it right.
13 Q.  Are you there, sir?
14 A.  Yes.
15 Q.  All right.  You note here in your analysis
16 of the Mid-Atlantic region that Zimmer
17 lost $400,000 in sales in 2012 and another
18 670,000 in 2013, but there's no equivalent
19 effect reflected in Stryker's records,
20 correct?
21 A.  Correct.
22 Q.  Did you do any analysis to determine why
23 Zimmer lost the business in the
24 Mid-Atlantic region?
25 A.  I asked a question of counsel because this



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 10 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
85–88

Page 85

1  seemed inconsistent with the allegations
2  in the complaint related to Mr. Smith.
3  Q.  And I don't want to know what they
4     responded to your question, but based upon
5     -- let me ask the question again.
6          Did you do anything other than ask
7     that question of counsel to determine what
8     the basis for the loss by Zimmer in the
9     Mid-Atlantic region was if not related to
10    Mr. Smith or Stryker?
11 A.  I didn't do any other research into it.
12 Q.  It's fair, though, you ultimately
13    concluded as an opinion that the sales
14    lost was not due to Mr. Smith's or
15    Stryker's actions, correct?
16         MR. ROGERS:  I object to form.
17 A.  Can you read the question again?
18 Q.  Sure.  I'll ask it again.  Is it true,
19    sir, that you ultimately conclude in your
20    report -- and you can read it on 29 --
21    that you do not associate any losses by
22    Zimmer to any wrongful acts by either
23    Smith or Stryker?
24 A.  Within my report, I have not calculated
25    damages related to Mr. Smith because the

Page 86

1  data did not show sales going from Zimmer
2  to Stryker.  There could be other damages
3  related to it that I haven't calculated
4  and is not part of my opinion, so I don't
5  want to say there's no damages, but I'm
6  willing to say that I haven't calculated
7  any.
8  Q.  You state here, though, definitively that
9     Stryker does not appear to have gained
10    Zimmer's lost sales, right?
11 A.  For the Mid-Atlantic region, correct.  And
12    just to clarify your last -- a few
13    questions ago when you were asking me
14    reasons why doctors would change, there's
15    already -- the research also talks about
16    -- which I believe is the issue here --
17    hospitals entering into sole source
18    agreements with various manufacturers
19    could be another reason.
20 Q.  You don't know one way or the other in the
21    Mid-Atlantic if that's true, right?
22 A.  I haven't seen any evidence one way or the
23    other that I'm recalling.
24 Q.  Page 38, you reference Mr. Whilden in the
25    Georgia region?

Page 87

1  A.  Yes.
2  Q.  I think it's actually -- I get the sole
3     source thing you were referencing.  But
4     also is it fair to say here that
5     ultimately you conclude that you cannot
6     calculate any damages to Zimmer related to
7     any actions by Mr. Whilden or Stryker for
8     purposes of your report?
9  A.  Well, again, within my report, I have not
10    calculated damages as the data didn't
11    support clearly that sales went from --
12    Zimmer's lost sales were acquired by
13    Stryker.
14 Q.  Do you understand that Mr. Whilden worked
15    for a distributor, not directly for
16    Stryker?  Do you have any understanding?
17 A.  Yes, I do.  I read the agreement.  I'm
18    just forgetting the name of the business.
19 Q.  If I told you it was Triple Play
20    Orthopaedics, does that help refresh your
21    memory?
22 A.  It does.
23 Q.  Does the fact that Mr. Whilden worked for
24    a distributor rather than directly for
25    Stryker have any effect on your opinion

Page 88

1  one way or the other as it relates to Mr.
2  Whilden?
3  A.  No.
4  Q.  Let's go back to Mr. Stovall.  I think he
5     is on Page 21, starts on 21.
6          Was there a reason why you limited
7     your analysis to Dr. North and Dr. Risko
8     and no other doctors in the Amarillo
9     market?
10 A.  Yes.
11 Q.  Why?
12 A.  When counsel initially approached us, we
13    asked about all of the doctors in the
14    region, and they said -- I believe that my
15    recollection, rather, is that Zimmer had
16    already done an analysis to identify the
17    doctors that had a significant decline in
18    sales after they left, and we were asked
19    to focus on those doctors.
20 Q.  Did you look to determine -- did you ask
21    Zimmer which other doctors Stovall had
22    serviced while working for Zimmer?
23 A.  We may have asked that.  I know the sales
24    data we got had other doctors in it for
25    the region.  I don't recall which ones



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 11 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
89–92

Page 89

1      were his specifically versus others.
2  Q.  Did you determine -- did you make any
3      effort to determine whether or not Zimmer
4      had a higher retention rate for doctors
5      other than Dr. North and Dr. Risko in the
6      Amarillo territory?
7  A.  What do you mean by higher retention rate?
8  Q.  You understand that Cody Stovall serviced
9      doctors beyond just North and Risko,
10     correct?
11 A.  Yes.
12 Q.  Did you do any analysis to determine
13     whether the sales were affected by the
14     departure of Cody as to those other
15     doctors in the Amarillo territory?
16 A.  Yeah.  I mean, within our sales analysis
17     of the sales by region, it had the other
18     doctors, and it showed sales continuing
19     with the other doctors and not a big
20     decline like we saw with Drs. Risko and
21     North.
22 Q.  Did you think to determine whether or not
23     -- what the reason was why certain doctors
24     that Cody serviced still continued their
25     business and certain others didn't?

Page 90

1  A.  I'm drawing a blank right now.  I mean,
2      clearly, the doctors were okay with the
3      Zimmer products because they continued to
4      use them, but I don't recall specifically.
5  Q.  I might not be able to find it right away,
6      but there's a statement in here when you
7      talked to Mr. Victor that he had
8      calculated sales projections on the
9      Amarillo territory.
10         Do you remember that?
11 A.  Actually, I don't.
12 Q.  Unfortunately I don't remember where it is
13     in here.  Did you see any evidence in your
14     review of the record that any Stryker
15     representatives were making any inroads to
16     -- with Dr. Risko or Dr. North?
17 A.  What do you mean by inroads?
18 Q.  Any efforts to increase sales with either
19     of those doctors?
20 A.  Well, with regard to the hips and knees,
21     the sales data shows minimal Stryker sales
22     to those doctors prior to late 2013.
23 Q.  All right.  That wasn't my question,
24     though.
25         Did you see any testimony from any

Page 91

1      of the individuals in the Amarillo market
2      that Stryker was gaining any traction with
3      Dr. Risko or Dr. North for hips and knees
4      sales?
5  A.  I don't recall that, that testimony.
6  Q.  So is it fair to say that you didn't take
7      that into account in rendering your
8      opinion in this case one way or the other?
9  A.  I wouldn't say that.  I would say I don't
10     recall reading it, if I read it in one of
11     the depositions or my staff did.
12     Obviously, somebody thought about it, but
13     -- I don't want to say it wasn't taken
14     into account.
15 Q.  Okay.  Then let's say there was testimony
16     by either Dax Rattan or Marcus Rye that
17     they had success in getting Dr. North and
18     Dr. Risko to trial Stryker products in
19     2013.
20         What effect, if any, does that have
21     on your opinion?
22         MR. ROGERS:  Same objection.  This
23     isn't a liability report.
24 A.  Which Stryker products?
25 Q.  Hips and knees.

Page 92

1  A.  Again, I didn't -- I was asked to assume
2      liability, but I, I don't think it would
3      have impacted it.  Clearly it didn't if it
4      was actually in somebody's testimony.
5  Q.  Okay. Let's go back to Page 10 for a
6      second.  I'm sorry to go backwards.  You
7      go through the history of Mr. Stovall and
8      note that it wasn't until 2012 that Mr.
9      Stovall signed a confidentiality,
10     noncompetition and nonsolicitation
11     agreement with Zimmer.
12         Do you see that about three or four
13     lines down on Page 10?
14 A.  Yes.
15 Q.  Would that have any effect on your opinion
16     if the relationships that Mr. Stovall
17     developed with Drs. Risko and North
18     occurred prior to his execution of that
19     agreement?
20 A.  I don't think so unless this was more
21     information related to the relationship
22     prior that I would then have to analyze.
23     Just based on him signing the sales reps
24     in, in September of 2012 and having a
25     prior relationship, that doesn't impact my



USDC IN/ND case 3:14-cv-00152-JD-MGG    document 145-2    filed 04/12/17    page 12 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
93–96

Page 93

1   analysis.
2 Q. As you sit here today, do you know the
3   difference in the medical device industry
4   between a direct sales force and a
5   distributor sales force?
6 A. Yes.
7 Q. What's your understanding of the
8   difference?
9 A. Well, the direct sales force, the sales
10   representatives are hired by the medical
11   device manufacturers and the distributor
12   sales force are actually hired by a
13   distributor that often one of the medical
14   device manufacturers is the main -- they
15   represent one main manufacturer, not
16   always but often.
17 Q. Do you have an understanding of whether
18   CrossLink is a direct or distribution
19   based company?
20 A. I, I don't know. I would -- I've seen
21   them in the documents referred to as a
22   distributor.
23 Q. Does whether a company or a representative
24   works for Stryker directly or works for
25   the distributor have any effect -- did it

Page 94

1   have any effect on your damages analysis
2   in this case?
3 A. We took that into account with regard to
4   the variable expenses in our discussions
5   with Joe Leja.
6 Q. Other than that, does it have any effect?
7 A. No.
8 Q. As it relates to the damages you associate
9   with CrossLink, what evidence do you have
10   that Stryker did any -- took any action
11   that resulted in the damage you associate
12   with CrossLink?
13      MR. ROGERS: Objection. It's
14   outside the scope of his report.
15 A. With regard to the South Carolina region
16   and CrossLink, at the time of my report,
17   one of the key things of Stryker
18   involvement, I think was your word, was
19   the fact that the day after Mr. Barnhardt,
20   Dickerson and Terrell gave their notice to
21   Zimmer that the doctors called Zimmer to
22   have the products and the Zimmer devices
23   removed, which would mean that Stryker
24   probably was notified beforehand to be
25   ready to supply it almost immediately.

Page 95

1   So that suggests to me there was
2   some sort of involvement. And then
3   subsequently you at least had the
4   deposition of Mr. Fleetwood where he spoke
5   to Mr. Fain.
6 Q. So those are the two pieces of evidence
7   you think that you can recall that you tie
8   Stryker's involvement to CrossLink in the
9   South Carolina region?
10 A. Well, it helps to support the assumption
11   that I was given. Ultimately I was given
12   the assumption that there's liability here
13   or that the parties breached the
14   agreement.
15 Q. So I want to get sure. This is kind of a
16   similar question I asked you about
17   Amarillo. You understand that Cam
18   Dickerson, Jay Barnhardt and Chris Terrell
19   are individuals, correct?
20 A. Yes.
21 Q. All right. And it's your understanding
22   based upon assumptions that you've been
23   told to make by Zimmer that those three
24   folks had obligations to Zimmer directly,
25   correct, contractual obligations?

Page 96

1 A. For those three, I'm not sure stating it
2   that they had it directly to Zimmer
3   because I think their employment
4   agreements -- oh, yes, to Zimmer, yes,
5   yes. I'm ahead of myself.
6 Q. Yes, you are. I think you're getting to
7   where we're going which is you understand
8   that those three individuals were then
9   hired by CrossLink Orthopaedics, correct?
10 A. Yes.
11 Q. You understand CrossLink Orthopedics is a
12   company that is separate and independent
13   from Stryker?
14      MR. ROGERS: Objection. I don't
15   think that's in his report.
16 Q. Do you have an understanding?
17 A. I'm not sure what you mean by separate and
18   independent. They were a distributor for
19   Stryker and they're Stryker's largest
20   distributor. I don't know if that makes
21   them independent. I mean, they're a
22   separate company. I don't know what --
23 Q. Fair enough. They're not owned by
24   Stryker, correct?
25 A. Not far as I know.



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 13 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
97–100

Page 97

1  Q.  Okay. And you said you've now read
2      Fleetwood's testimony, correct?
3  A.  No. I've skimmed through parts of it. I
4      haven't read the whole thing.
5  Q.  Okay. If Mr. Fleetwood were to testify
6      that the ideas of what to do with these
7      three individuals, where to place them and
8      how they were to operate within the South
9      Carolina region independently were derived
10     by Mr. Fleetwood, okay? Are you with me
11     so far?
12 A.  Yes.
13 Q.  Would that have any effect on your opinion
14     that the damages you associate in this
15     case with Stryker should or shouldn't be
16     associated with them?
17 A.  Again, I was given the assumption on
18     liability. I have calculated the losses.
19     I think that gets into a legal issue as
20     far as who becomes liable because if I
21     recall, the CrossLink agreement had
22     something where the liability may flow to
23     Stryker. Really, it's outside of the
24     scope of what I've done.
25 Q.  Okay. So fair to say also for the

Page 98

1      CrossLink, South Carolina region, you're
2      also assuming causation in that case as
3      well?
4  A.  Yes.
5  Q.  Did you do any independent analysis as to
6      whether or not the business in South
7      Carolina went to another orthopedic
8      company such as Smith & Nephew or
9      Medtronic?
10         MR. ROGERS: Could you clarify what
11     business you're talking about?
12 Q.  Any other business that Zimmer lost in
13     South Carolina, determine whether or not
14     any of it would have gone to one of the
15     other competitive companies in that
16     region?
17 A.  I don't know if it went to another
18     competitive company in the region.
19     However, the data shows that for hips, Dr.
20     Ridgeway's sales do not appear to have
21     gone -- Zimmer's sales do not appear to
22     have gone to Stryker or it was hard for me
23     to connect it from the data, so I didn't
24     calculate any damages related to the hips
25     related to Dr. Ridgeway.

Page 99

1  Q.  Is it fair to say that there's no effort
2      in your report to tie any of the losses in
3      South Carolina to Mr. Stovall?
4  A.  Correct.
5  Q.  Did you inquire from Zimmer's counsel or
6      from Zimmer specifically as to why they
7      never brought litigation against
8      CrossLink?
9  A.  No.
10 Q.  Does the fact that CrossLink is not named
11     in this lawsuit have any effect one way or
12     the other on your opinion?
13 A.  No. I've calculated the amount of loss to
14     Zimmer for this region. I think it
15     requires a legal conclusion as far as who
16     is liable.
17 Q.  You undertook efforts in Amarillo to
18     determine what, if anything, Zimmer did to
19     mitigate damages in Amarillo, right?
20 A.  Yes.
21 Q.  Did you conduct a similar type of
22     investigation as to what Zimmer did or
23     didn't do in the South Carolina region to
24     mitigate damages?
25 A.  I don't recall doing that.

Page 100

1  Q.  Did you undertake any investigation to
2      determine whether Mr. Barnhardt, Mr.
3      Dickerson or Mr. Terrell undertook any
4      effort to sell Vitagel in the same
5      territory in which they sold orthopedic
6      products while working for Zimmer?
7  A.  Isn't Vitagel a Stryker product? So I
8      don't understand how they could sell it
9      when they were Zimmer.
10 Q.  I'm sorry. I thought you might be
11     confused by the way I worded it. The
12     prepositional phrases I think got twisted.
13         Did you undertake any effort to
14     determine whether or not Mr. Barnhardt,
15     Mr. Dickerson or Mr. Terrell sold Vitagel
16     while employed by CrossLink subsequent to
17     the departure from Zimmer in the same
18     territory in which they worked while
19     Zimmer representatives?
20 A.  I believe they testified in their
21     depositions that they did try to sell.
22 Q.  Do you make any association as to which
23     doctors they did or didn't try to service
24     with Vitagel?
25 A.  No. My recollection is their testimony



USDC IN/ND case 3:14-cv-00152-JD-MGG    document 145-2    filed 04/12/17    page 14 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
101–104

Page 101

1    was they couldn't really sell it. It
2    wasn't a product that the doctors were
3    really interested in and that it was a
4    competitor that -- the Vitagel was very
5    expensive compared to another product that
6    was out on the market.
7  Q.  And did you make any -- determine which of
8    the three individuals, Barnhardt,
9    Dickerson and Terrell, were responsible
10   for Dr., Dr. Ridgeway?
11 A.  No.
12 Q.  I asked you earlier if you met with any of
13   the doctors in either Amarillo or South
14   Carolina.
15        Did you meet with anyone in any of
16   the hospitals involved in this litigation
17   in either the Amarillo market or the South
18   Carolina region?
19 A.  I'll say not that I'm aware of only
20   because I could have met somebody who
21   worked at one of those hospitals and not
22   have been aware of it, but not with regard
23   to this case.
24 Q.  Fair enough. You mentioned earlier about
25   in a reference on Page 13 of your report

Page 102

1    this incident where Zimmer was asked to
2    move its equipment out of one of the
3    particular hospitals in South Carolina?
4  A.  Yes.
5  Q.  Did you see any evidence in the record as
6    to why the hospital asked for that
7    equipment to be moved?
8  A.  Not that I recall.
9  Q.  In your report, you mention two different
10   types of methods that can be utilized in
11   this case. One I believe you referred to
12   as the before-and-after, one you referred
13   to as the yardstick, correct?
14 A.  Yes.
15 Q.  Am I correct or would you agree with my
16   statement that the before-and-after method
17   requires a showing that the market
18   conditions were the same in a region both
19   before and after the alleged violations?
20 A.  I think it would need to be -- a damage
21   analysis needs to take into account if
22   there's been a change in the market. I
23   don't think they have to be same. I think
24   you need to take into account.
25 Q.  Okay. So when you say "take into

Page 103

1    account," that means you would have to
2    adjust your damage calculation if there
3    was some other events in the market that
4    affected the market conditions, correct,
5    in your before-and-after method?
6  A.  Well, the before-and-after method takes
7    what a company did as the basis for what
8    they're expected to do in the future. In
9    this case, I used the company's 10K's to
10   project how the sales in the market would
11   have grown into the future starting with
12   the base of the pre-termination period.
13 Q.  And does that, does that calculation then
14   assume that the market conditions remained
15   the same in the Amarillo and/or South
16   Carolina regions during the period of your
17   calculation?
18 A.  It takes into account that the expected
19   growth or decline in growth -- because we
20   actually had a decline in the overall
21   sales for, I think, the hips or in certain
22   years for the hips and knees for Zimmer
23   overall, it takes into account that those
24   markets acted similarly to how Zimmer's
25   overall market share changed or growth

Page 104

1    changed.
2  Q.  Would you consider the influx or departure
3    of doctors in a territory to be a market
4    condition change?
5  A.  I think it would have to be a significant
6    influx or outflow of doctors, but the
7    medical market needs to service the
8    people, so it's, it's driven by -- if
9    doctors are leaving, you've got to get in
10   new doctors to replace them, plus you have
11   overall as the IBISWorld talks about, the
12   population getting older, more people
13   going to need these kind of services.
14 Q.  Are you aware of what Carla Britton's
15   market, what her territory looked like
16   during the same period of time that's at
17   issue in your damage calculation?
18      MR. ROGERS: Objection, vague.
19 A.  Not specifically. I have a recollection
20   from a discussion with my staff, and I'm
21   not sure where they got it, as to who they
22   spoke to, that her doctors tended to be
23   long-time customers of hers, so
24   theoretically they're older doctors.
25 Q.  Do you know if any of her doctors have --



USDC IN/ND case 3:14-cv-00152-JD-MGG     document 145-2     filed 04/12/17     page 15 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
105–108

Page 105

1    are no longer in the Amarillo market?
2  A.  I don't know.
3  Q.  Do you know what Zimmer's market share is
4    in Amarillo, as we sit here today in
5    Amarillo?
6  A.  No.
7  Q.  Would you consider a loss of a sales
8    representative to be a market change in
9    the territory?  Forget the other
10   allegations about force and all of that
11   stuff, just losing your sales
12   representative, is that a market change?
13 A.  I don't know that the change -- I don't
14   think I would consider that a change in
15   the market.  That would be a change in the
16   circumstances for a particular company.
17 Q.  Okay.  The other methodology you
18   referenced that you used during your
19   opinion is the yardstick method, right?
20 A.  Yes.
21 Q.  Have you done any analysis as to whether
22   or not the yardstick method has been
23   accepted or rejected in the court that
24   we're currently in in this case?
25 A.  I have not.

Page 106

1  Q.  Independent of this opinion you've given,
2    do you have your own opinion as an expert
3    in a good number of cases whether the
4    before-and-after or the yardstick method,
5    which one is better for analyzing damages?
6  A.  No.  I think it depends on the facts and
7    circumstances of a particular case and
8    also the data available.
9  Q.  In this one you've offered both
10   before-and-after and the yardstick and I
11   would say a third option which is a
12   combined variation of both of those
13   methods; is that fair?
14 A.  I'm not sure what you mean by the combined
15   variation.
16 Q.  You added them together and took the
17   average of them, right?
18 A.  Right.  So ultimately I did two separate
19   analyses, the before-and-after and the
20   yardstick method or approach, and I
21   equally weighted them because I didn't
22   feel one was a better representation than
23   the other of damages.
24 Q.  Okay. I guess that's my question is in
25   this case, should we, should we be looking

Page 107

1    at the before-and-after method, the
2    yardstick method or the weighted average
3    of the two methods as the damages in this
4    case from your perspective?
5  A.  What I have as my opinion in the report is
6    the average of the two methods, again
7    because I felt that they were both equally
8    good representations of how to estimate
9    the loss.
10 Q.  On Page 16 of the report, you reference at
11   the very bottom Stryker's estimated growth
12   rates.
13      Are those the rates you later talk
14   about growing out of the 10K?
15 A.  Well, this paragraph is talking -- or this
16   sentence is talking about the period after
17   the noncompetition, nonsolicitation
18   requirements.  And yes, we use the growth
19   rate out of the 10K up until the last 10K
20   that we had, and then after that, the
21   growth rates are based on the analyst's
22   report.
23 Q.  Did you -- you had sales data from
24   Amarillo for both companies going back, I
25   think in some instances as far back as far

Page 108

1    as 2009, correct?
2  A.  No.
3  Q.  How far back did you have sales data for
4    Zimmer?
5  A.  2009.
6  Q.  How far back did you have sales data for
7    Stryker?
8  A.  2012.
9  Q.  Did you make any effort to determine
10   growth rates of either of the companies in
11   the actual Amarillo market prior to the
12   termination of Mr. Stovall?
13 A.  We may have looked at those growth rates,
14   but I felt the actual growth rates for the
15   company were a better representation going
16   forward.  I, I don't recall if we
17   specifically calculated the prior periods.
18   I think we may have.
19 Q.  Why did you think the companies' overall
20   growth rates were a better representative
21   number than the actual territory in which
22   we were looking at here?
23 A.  Well, it was the same periods.  I would
24   have to have used the historical to
25   project going forward where I had the



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 16 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
109–112

Page 109

1     actual year of damages from the 10K's.
2  Q.  Did you ask Zimmer for any underlying data
3     by region or territory to see if the 6
4     percent and 3 percent numbers you used
5     were similar equally across territories or
6     had variations?
7  A.  I'm confused by your question.
8  Q.  Sure.  You understand that the numbers
9     that are in Zimmer's 10K is a global
10    nationwide growth rate, right?
11 A.  Correct.
12 Q.  All right.  Did you ask Zimmer for any
13    underlying data to break that national
14    rate into regions or territories?
15 A.  No.
16 Q.  Did you ask them if they do any analysis
17    internally as to whether or not the
18    Amarillo market is similar to another
19    market that they have in their company?
20 A.  No.
21 Q.  All right.  So then I assume you also did
22    not ask them for comparable rates by
23    territory to Amarillo to conduct your
24    analysis?
25 A.  I didn't understand that last question.

Page 110

1  Q.  That's fine.  Did you ever ask Mr. Victor
2     or anyone at Zimmer hey, is there a
3     territory in your marketplace in the
4     United States that you would think is
5     similar to the Amarillo market?
6  A.  No, not a specific similar market.
7  Q.  So therefore, is it fair to say that you
8     also didn't ask Zimmer can I see
9     statistics for a territory that you would
10    consider to be similar in growth as the
11    Amarillo market was?
12 A.  Correct.  I have a vague recollection that
13    we did have a discussion just about if
14    Amarillo is different from the rest of the
15    country in any particular way, and my
16    recollection is they didn't -- nothing was
17    identified to us.
18 Q.  Also, did you ever take into consideration
19    any specific data that Zimmer maintains
20    regarding its actual losses or gains when
21    a sales representative leaves the
22    territory in the orthopedic market?
23        Do you understand the question?
24 A.  Please repeat the question.
25 Q.  Earlier we talked about Rocky Victor's

Page 111

1     statement and others about their
2     expectations based upon experience as to
3     what business will or will not leave.
4         Do you remember those discussions?
5  A.  Yes.
6  Q.  All right.  Do you have any -- did you ask
7     Zimmer for any data that they kept as to
8     what effect they've actually seen in the
9     orthopedic market as a result of a
10    departing sales representative?
11 A.  Yes.
12 Q.  And did you receive that information?
13 A.  No.
14 Q.  Okay.  Thank you.  As you sit here today,
15    do you know the difference in the
16    orthopedic world as to reconstructive
17    surgeries and trauma surgeries?
18 A.  I know there's a difference.  I know
19    there's different sales reps.  I couldn't
20    give you the technical difference between
21    the two.
22 Q.  I noted in your report you excluded trauma
23    sales by Stryker based upon your
24    understanding that Stryker already had a
25    trauma presence with some of the doctors

Page 112

1     in Amarillo, correct?
2  A.  Yes.
3  Q.  Did you have any other assumptions as to
4     why the increase in trauma business would
5     not have also resulted in an increase in
6     reconstructive surgery business?
7  A.  Sorry.  Could you say that question again?
8  Q.  Sure.  Did you take into consideration one
9     way or another whether or not increasing
10    trauma sales to doctors may also result in
11    a company also increasing their recon
12    sales?
13 A.  Not specifically, although it would have
14    been reflected in the actual numbers in
15    the growth rates, I would think, that are
16    within the report.
17 Q.  I asked you the questions about Amarillo.
18    I should have been more general, so I'll
19    be specific now as to did you look at any
20    data reflecting the actual growth rates in
21    the South Carolina region when you
22    conducted your damage analysis for the
23    CrossLink portion of the case?
24 A.  No, other than we may have looked at it as
25    historical data, but other than that, no.



Page 113

1  Q.  In your professional opinion, you offered
2      -- I'm sorry.  In your report you offered
3      three scenarios, a one-year calculation, a
4      three-year calculation and a five-year
5      calculation, correct?
6  A.  Yes.
7  Q.  Would you agree with the statement that
8      every year you go beyond one year, damages
9      become more speculative?
10 A.  No, I don't think I would agree with that
11     it becomes more speculative.  That's part
12     of what the discount rate is supposed to
13     take into account, the risk that those
14     numbers won't be met.
15 Q.  And you have applied the discounting rate
16     to years three and five, correct?
17 A.  Actually, we applied a discount rate to
18     every year, even the restriction period
19     because we brought the loss back to the
20     date of each group's termination with
21     Zimmer, so even in the noncompete period,
22     we did a six-month discounting.
23 Q.  Did you look and see if any evidence
24     existed in the record either on your own
25     review or asking counsel the analysis that

Page 114

1      Stryker had done as to the anticipated
2      growth in the Amarillo market?
3  A.  No, I don't recall asking that.
4  Q.  Did you look and see if Stryker had -- if
5      there is any evidence in the record that
6      Stryker had done sales projections in the
7      Amarillo territory either before hiring
8      Stovall or after?
9  A.  I don't recall seeing that.
10 Q.  Do you believe sales growth rates are the
11     same -- I'm sorry.
12         Do you believe that sales growth
13     rates for North America would be the same
14     if the company was just U.S. only or if it
15     also had sales in Canada and Mexico?
16 A.  Could you say that question again?
17 Q.  Sure.  Let me ask it this way:  Do you
18     have an understanding as to whether or not
19     Zimmer and Stryker's orthopedic footprint
20     is similar or different in North America?
21 A.  Zimmer compared to Stryker?
22 Q.  Correct.
23 A.  I, I don't know.
24 Q.  If one of the companies sold to the U.S.
25     only and one sold into Mexico and Canada,

Page 115

1      would their growth rates in your opinion
2      be apples to apples comparisons?
3  A.  Zimmer and Stryker's?  Whether they did or
4      didn't, their growth rates are going to be
5      -- most likely are going to be different,
6      but I haven't done a specific analysis.
7  Q.  I guess a better question is if one
8      company was U.S. only and one company had
9      a larger North America footprint, does
10     that affect your analysis at all as to
11     whether or not -- which growth rates are
12     more appropriate to look at?
13 A.  Well, I applied in the before-and-after
14     method Zimmer's overall growth rate the
15     Zimmer sales and then I applied the
16     Stryker growth rate to the Stryker sales
17     because that is -- it's a yardstick.
18     Could there be differences?  Yes.
19 Q.  Do you know if Stryker's growth rate was
20     U.S., North America only or did it also
21     include -- U.S. only or do you know if it
22     included Canada and Mexico in the growth
23     rate for the 10K's?
24 A.  I don't recall.  I would have to go back
25     to Page 11 of the Stryker's 10K.

Page 116

1  Q.  If it was full North America growth rate,
2      would that change your belief as to
3      whether or not the growth rate was
4      appropriate to compare to Zimmer's growth
5      rates?
6  A.  I'm not really -- I'm struggling with your
7      question because I'm not really comparing
8      the growth rates. I'm applying one
9      company's growth rate in the
10     before-and-after and the other company's
11     in the yardstick.
12 Q.  That's fair.  I guess if you have your
13     preference in looking at Stryker's growth
14     rate in your yardstick method, would it be
15     more appropriate to utilize a North
16     America based growth rate or a U.S. based
17     growth rate, if you can choose?
18 A.  I would want to get a growth rate that's
19     as close to the -- what I'm trying to --
20     to the baseline that I'm trying to
21     project.  That may or may not matter.
22     Whether it's just North America or the
23     United States or how that's broken down,
24     it may make a difference.  I used the best
25     data that there was in the 10K's.



Page 117

1  (A recess was taken from
2  2:45 p.m. to 2:54 p.m.)
3  Q.  Mr. Katz, did you undertake any analysis
4     to determine whether or not Zimmer as a
5     company was profitable generally?
6  A.  Other than reading through the 2012 10K,
7     no.
8  Q.  Based upon your review of the 2012 10K, do
9     you have an understanding of whether or
10    not Zimmer is or isn't profitable?
11 A.  I don't recall.
12 Q.  Does that have any effect at all if they
13    are or they aren't in your methodology in
14    this case?
15 A.  I don't believe so.
16 Q.  We talked about it earlier, but you would
17    agree with me that Zimmer has a long sales
18    history in the Amarillo territory?
19 A.  I don't know how you define long, but I
20    know the data showed at least back to 2009
21    because that's what we were provided.
22 Q.  Do you consider Stryker and Zimmer to be
23    comparable companies?
24 A.  They're not exactly the same.  I think
25    they provide a reasonable basis for

Page 118

1     comparison.
2  Q.  Did you conduct any independent
3     investigation as to the comparability of
4     the sales process internally at Stryker
5     versus the sales process internally at
6     Zimmer?
7  A.  No.
8  Q.  Did you do any investigation as to whether
9     or not -- the comparability between
10    Stryker's product lines from the
11    orthopedic market versus Zimmer's product
12    line in the orthopedic market?
13 A.  To some extent, yes.  The IBISWorld report
14    talked about the products being similar.
15    There's some testimony that the products
16    are similar.  The analyst's report that I
17    referenced seems to indicate that the
18    Persona knee, which is a Zimmer product,
19    is a very good product, and there was some
20    testimony, I believe, in somebody's
21    deposition about how that's a very good
22    product compared to Stryker's comparable
23    product.
24 Q.  Would you agree with the statement that
25    different -- the product offering is one

Page 119

1     of the reasons why surgeons choose one
2     company over another?
3  A.  It could be.  I don't, I don't think
4     that's the only factor.  I imagine that's
5     something that may go into a doctor's
6     consideration.
7  Q.  Did you do any investigation as to whether
8     or not the price that Stryker was offering
9     for its product for the orthopedics in the
10    Amarillo market were similar to the prices
11    of the products Zimmer was offering
12    similar products at?
13 A.  I had a discussion with, I think it was
14    Joe Leja that the pricing was similar, but
15    I just asked generally.  I didn't ask
16    specifically for the Amarillo market.
17 Q.  Do you have any understanding as to
18    whether or not there are -- Zimmer or
19    Stryker sells certain specific products
20    for more or less than another?
21 A.  I'm sure things are sold -- similar
22    products are sold more or less than the
23    others.  It was the data that we got --
24    the two companies package their products a
25    little bit differently, so it was hard to

Page 120

1     really get a good product by product
2     comparison.
3  Q.  Do you know if Zimmer and Stryker offer
4     the same sales discounts and rebates that
5     the other does?
6  A.  I don't know if they're the same exactly
7     or not.  I did take into account in
8     calculating the loss that Zimmer does
9     offer the discounts.
10 Q.  Would you agree that pricing may be one
11    reason why a surgeon would choose one
12    company over another?
13 A.  What the research shows is that a -- the
14    research that I have read here that I
15    cited in the report indicates that that's
16    not really a big factor for doctors.
17    That's more a factor the hospitals.  The
18    doctors would prefer to use the products
19    they're used to using and what they think
20    gives the best patient outcome.
21 Q.  Do you know if the CrossLink organization
22    offered orthopedic products beyond just
23    Stryker products?
24 A.  Yes, I believe they did.
25 Q.  An enhanced or different product offering,



USDC IN/ND case 3:14-cv-00152-JD-MGG   document 145-2   filed 04/12/17   page 19 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
125–128

Page 125

1  familiar with it.  If we look at Page 23,
2  you've got a number for the 12-month
3  pre-resignation for North as 793,790 in
4  the before-and-after, and under the
5  yardstick the number is 93,642 for North.
6      Is the number in the
7  before-and-after version, is that Zimmer's
8  number and the one in yardstick, is that
9  Stryker's number?
10 A.  Correct.
11 Q.  Okay.  All right.  So the numbers we see
12     on Page 24, those are Stryker numbers?
13 A.  The numbers on Page 24 where it says the
14     12 months pre-resignation period, that's
15     the Stryker number.  The 12-month
16     projected is what I grew using Stryker's
17     growth rate from their 10K to say in the
18     12 months after they resigned, that's the
19     projection of what the sales would have
20     been had they done growth like the rest of
21     their company for that segment of
22     business, and their actual sales were
23     1,195,000 in that 12-month period after
24     the resignation.
25 Q.  Got it.  So then your lost revenue is

Page 126

1  simply the subtraction of the restriction
2  period column -- I'm sorry -- the 12-month
3  projected column from the restriction
4  column?
5  A.  Right, and the restriction is the actual
6     sales that Zimmer -- that Stryker had in
7     the period noted.
8  Q.  If we go back to Page 19, you go through
9     and talk about in the Morningstar analyst
10    report that most surgeons only switch once
11    every 15 years, and then you go on to say
12    for purposes of this analysis I'm using
13    five years after the expiration.
14        How did you come to choose five
15    years rather than four or 12 or ten or any
16    other number?
17 A.  We tried to take a look at how old the
18    doctors were, and we knew the Amarillo
19    Drs. Risko and North were relatively
20    young, so 15 years didn't seem out of the
21    question, so five years beyond didn't seem
22    unreasonable.  It's also why I provided
23    the one and three years estimates.
24        I know in the other matter that I
25    was involved in, Stryker's expert did one

Page 127

1  year beyond the noncompete period.
2  Q.  Is it fair to say that the one, three and
3     five gives options for a court as to how
4     far or little it wants to go out?
5  A.  Yes.
6  Q.  We talked about it briefly earlier but
7     didn't discuss it in any detail the Dr.
8     Ridgeway data.  You noted that there was
9     some -- you noted here on the bottom of
10    Page 30 that was there a reflection that
11    Ridgeway's sales declined by almost
12    $450,000 for Zimmer, but that the hip
13    sales of Stryker only seemed to increase
14    by $12,000 during the same period.
15        Do you see that discussion?
16 A.  Yes.
17 Q.  Did you come to any conclusion in your
18    review of the data as to what accounted
19    for Zimmer's loss if not Stryker?
20 A.  I'm not recalling.  I don't remember.
21 Q.  Okay.  Did you have any conversations with
22    a gentleman by the name of Greenhagen?
23 A.  No.
24 Q.  You only looked at sales to Dr. Ridgeway
25    and Dr. Jennings for the South Carolina

Page 128

1  region, correct?
2  A.  Yes.
3  Q.  Is there a reason why you only looked at
4     those two doctors?
5  A.  The same reason as I mentioned before,
6     those were the doctors that, that came --
7     that, that Zimmer had identified as having
8     the significant declines in the region.  I
9     know there was one doctor that was
10    excluded because he -- I'm not sure if
11    that's the trauma surgeon, but one was
12    excluded because I think he did trauma and
13    Stryker had a relationship with the trauma
14    surgeon already.
15 Q.  I think I may have asked this so I
16    apologize, but did you undertake any
17    effort to determine which individual,
18    Barnhardt, Dickerson or Terrell, serviced
19    Dr. Ridgeway or Dr. Jennings?
20 A.  No.
21    MR. STIEHL:  I may be done.  Give me
22    a few minutes to make sure I don't have
23    anything else.
24        (A recess was taken from
25    3:13 p.m. to 3:17 p.m.)



USDC IN/ND case 3:14-cv-00152-JD-MGG    document 145-2    filed 04/12/17    page 20 of 20

JEFFREY M. KATZ
ZIMMER, INC. vs. STRYKER CORPORATION

September 28, 2015
129–132

Page 129

1  Q.  Mr. Katz, is Mr. Dickerson an employee of
2      Stryker?
3  A.  No.
4  Q.  Is Mr. Terrell an employee of Stryker?
5  A.  Not to my knowledge.
6  Q.  Is Mr. Barnhardt an employee of Stryker?
7  A.  Not to my knowledge.
8  Q.  Are any of those men I just referenced
9      actually named as parties to this
10     litigation?
11 A.  No.
12 Q.  Is CrossLink a party to this litigation?
13 A.  Not that I know.
14 Q.  Is CrossLink a subsidiary of Stryker?
15 A.  Not that I'm aware of.
16 Q.  Does Stryker have any involvement in the
17     management of CrossLink?
18         MR. ROGERS: Objection, outside the
19     scope of his report and knowledge.
20 A.  I don't know one way or the other.
21 Q.  Does Stryker have any involvement in the
22     hiring of employees by CrossLink?
23         MR. ROGERS: Same objection.
24 A.  Based on the testimony of Mr. Fleetwood,
25     he said he discussed the hiring of Mr.

Page 130

1  Barnhardt, Dickerson and Terrell with Mr.
2  Fain at Stryker.  Other than that, I don't
3  know what, say, Stryker has or not.
4      MR. STIEHL: I'm done.
5      MR. ROGERS: I'm not asking
6  anything.
7      AND FURTHER THE DEPONENT SAITH NOT.
8          3:28 p.m.
9
10         JEFFREY M. KATZ
11         (Signature of witness
            subscribed above is
            subject to any notations
12          on Errata sheet)

Page 131

1  STATE OF INDIANA   )
                      ) SS:
2  COUNTY OF HAMILTON )
3
4      I, Judie F. Roberts, a Notary
5  Public in and for said county and state,
6  do hereby certify that the witness herein
7  was by me first duly sworn to tell the
8  truth, the whole truth and nothing but the
9  truth in the aforementioned matter;
10
11     That the foregoing oral deposition
12 was taken on behalf of Defendants;
13
14     That said deposition was taken
15 before me at the time and place herein set
16 forth and was taken down by me in
17 shorthand and thereafter transcribed into
18 typewriting under my direction and
19 supervision and then presented to Mr.
20 Jeffrey M. Katz, BDO Consulting, 100 Park
21 Avenue, New York, NY 10017 for the purpose
22 of obtaining deponent's signature;
23
24     That this certificate does not
25 purport to acknowledge or verify the

Page 132

1  signature hereto of the witness;
2
3      I further certify that I am neither
4  counsel for nor related to any party to
5  said action, nor in any way interested in
6  the outcome thereof.
7
8      IN WITNESS WHEREOF, I have hereunto
9  set my hand and affixed my Notarial Seal
10 this 29th day of September, 2015.
11
12
13                    _____
                      Judie F. Roberts
14                    Notary Public
15
16
17 My County of Residence is:
   Hamilton
18 My Commission Expires:
   April 27, 2023

