IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ZIMMER, INC., | ) | Case No. 3:14-cv-00152-JD-CAN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Jon E. DeGuilio |
| | ) | |
| HOWMEDICA OSTEONICS CORP. d/b/a STRYKER ORTHOPAEDICS; and CODY STOVALL, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF ZIMMER, INC.'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT OF JEFFERY M. KATZ AND BAR HIM FROM TESTIFYING AT TRIAL**

Plaintiff Zimmer, Inc. ("Zimmer"), by counsel, hereby submits its Response to Defendants' Motion *in Limine* to exclude the report and testimony of Zimmer's expert witness, Jeffery M. Katz ("Katz"), at trial.

### I.  INTRODUCTION

This case involves Zimmer's contention Defendants engaged in a nationwide scheme to circumvent Zimmer's restrictive covenants and steal business from Zimmer. While Stryker employed or planned to employ the scheme in four different geographical regions (Texas, Maryland, South Carolina, and Georgia), the scheme had more success in some places than others. Thus, through a lengthy discovery process involving depositions of fact witnesses and analysis of sales records and other documents, Zimmer has narrowed its damages claim to the loss of business from four surgeons—Drs. North and Risko (Amarillo, Texas) and Drs. Ridgeway and Jennings (Greenville, South Carolina). As this Court noted in its summary judgment ruling, causation of damages with respect to those four surgeons is a "hotly contested" issue that must be presented to the jury. (*See* Order at ECF NO. 131, p. 12 (holding that the

issues of damages and causation are "hotly contested," but "substantial support" exists for the conclusion Stryker's conduct "caus[ed] Zimmer to lose profits.") Another issue discussed at length in the summary judgment Order and that will be presented to the jury is whether agency or joint tortfeasing existed such that Stryker can be held liable for the actions of its distributor, CrossLink Orthopaedics. (*Id.*, pp. 16 & 17.)

Zimmer submitted a report of Jeffrey Katz (the "Katz Report") for the purpose of quantifying lost profits Zimmer suffered from alleged wrongdoing of Defendants. Katz did not offer any specific opinions on causation with respect to the four surgeons at issue but, rather, assumed for purposes of his analysis Zimmer would prevail on liability and convince the jury the lost business from those four surgeons was caused by the alleged wrongdoing of Defendants and allocated damages accordingly. Katz did not assume causation or damages across the board in the geographical regions at issue. If he had, he would have assessed damages for every single loss Zimmer incurred in those regions. Quite to the contrary, Zimmer incurred other losses in the geographical regions at issue which, for a variety of reasons, neither Zimmer nor Katz are attributing to Defendants in this litigation. Examples of losses not being sought in this litigation would be: (1) business lost to competitors other than Stryker; (2) business lost because a surgeon moved territories; and (3) business that transitioned from Zimmer to Stryker before the alleged wrongful acts at issue in this case occurred. To conduct his analysis, Katz used two widely-acknowledged economic methodologies: the before-and-after method and the yardstick method. Both methodologies yielded damages in the millions of dollars. (Katz Report p. 2.) Defendants do not appear to dispute Katz employed appropriate methodology for calculating damages, but they criticize a handful of assumptions that Katz relied upon in formulating his opinion. A review of Katz's opinions unequivocally establishes his testimony related to Zimmer's loss of

revenue in Texas and South Carolina is sufficiently reliable to present to the jury and, if liability is established, to assist the jury in calculating damages.

A.   **Zimmer's damages in Amarillo, Texas – Drs. North and Risko**

Defendant Cody Stovall ("Stovall") began his career as a Zimmer sales representative in the Amarillo territory in February 2008, first with the distributor Zimmer Southwest and then directly with Zimmer. As a condition of his employment with Zimmer, Stovall executed a Confidentiality, Non-Competition and Non-Solicitation Agreement for Sales Managers and Representatives on September 11, 2012, which included covenants regarding non-competition, non-solicitation of employees, non-solicitation of customers, duty of loyalty, and confidential information non-disclosures.

Between the fall of 2013 and Stovall's January 10, 2014 resignation from Zimmer, and in the weeks thereafter, Stovall breached his agreement with and duty of loyalty to Zimmer, and Stryker wrongfully induced Stovall's breach, causing Zimmer millions of dollars in damages. The evidence reveals Stovall and Stryker wrongfully interfered with Zimmer's business relationships with surgeon customers Drs. North and Risko, and Stovall and Stryker unfairly competed against Zimmer. Stovall's and Stryker's plan to assign Stovall as a Vitagel sales representative did not remedy their wrongful conduct, but rather, served as a guise for converting Zimmer customer goodwill and sales. The evidence is clear Drs. North and Risko switched from using primarily Zimmer total joint implants to primarily Stryker products immediately following Stovall's resignation. Zimmer retained Katz to assess the amount of lost profits, which resulted from Stovall's breach of his agreement with Zimmer in Amarillo.

B.   **Zimmer's damages in South Carolina – Drs. Jennings and Ridgeway**

Katz further opined on Zimmer's damages in the state of South Carolina where, prior to Stovall's resignation, three other Zimmer reconstructive implant sales representatives resigned

3

from Zimmer to join Stryker and were assigned as Vitagel sales representatives. The evidence shows Stryker wrongfully induced these former Zimmer sales representatives—Leon Cameron Dickerson, Jay Barnhardt, Christopher Terrell (the "Dickerson Team")—to breach their non-compete agreements with Zimmer by allowing them to solicit their former Zimmer customers.

The Dickerson Team covered upstate South Carolina and all resigned from Zimmer Carolinas on September 27, 2012, effective immediately, to start working for CrossLink Orthopaedics ("CrossLink"), Stryker's distributor in the same territory. The evidence will show Stryker was consistently, directly, and jointly involved in CrossLink's hiring of the Dickerson Team. The day after the Dickerson Team's resignations, their largest account, St. Francis Hospital in Greenville, South Carolina, demanded Zimmer completely remove its inventory in favor of Stryker. Two of the highest-volume surgeons in the territory and at that hospital (Drs. Jennings and Ridgeway), who both had been long-time Zimmer customers, switched almost immediately to Stryker products. While Stryker's wrongful conduct extends to the entire Vitagel scheme, Zimmer has focused its compensatory damages outside of Texas on Dr. Jennings and Dr. Ridgeway in South Carolina.

C.    **Stryker's Vitagel scheme**

Stryker argued Vitagel was "noncompetitive" because Zimmer does not offer a similar product, allowing the sales representatives to work in their former Zimmer territories in front of the very same surgeon customers. Each time, the former sales representatives made minimal or no sales of Vitagel. And, in both Amarillo and South Carolina, Zimmer saw a corresponding and significant decrease in its sales. While Stryker asserts it had no involvement in its distributor CrossLink's use of the Vitagel scheme, CrossLink's president confirmed Stryker's Area Vice President was involved in the hire and assignment, and Stryker's Vice President of Sales confirmed he agreed to pay CrossLink $500,000 to hire the lead sales rep at issue (who was paid

4

a total of $1 million to "sell" Vitagel but never made a single sale of it). While the evidence will show Stryker's Vitagel scheme was conducted nationwide, Katz has only calculated damages attributable to loss of revenue associated with Drs. North, Risko (Amarillo) and Drs. Jennings and Ridgeway (South Carolina). It is these opinions which are at issue here.

## II.     ARGUMENT

Katz's opinions satisfy Rule 702 of the Federal Rules of Evidence and the two-step inquiry set forth in *Daubert* to be admissible at trial. The *Daubert* inquiry is intended to evaluate proposed expert testimony to ensure it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). However, it is "not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (*quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)).

Even if there was merit to Defendants' criticisms of Katz (and there is not), none of the criticisms would be grounds for excluding him from testifying. Defendants' recourse is to present its arguments to the jury through cross-examination because the issues Defendants have raised go to the weight to be assigned to Katz's testimony, not its admissibility. *See Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir, 1989) (defendant's expert sought to expose the unreliability of the formula used by plaintiff's expert and the court held "[w]hile this obviously weakened [plaintiff's] theory of damages, it did not preclude [the expert's] testimony altogether. Rather, it goes to weight, not admissibility.") *Bright v. Land o'Lakes, Inc.*,

5

844 F.2d 436, 441 (7th Cir. 1988) (holding that "[e]xperience and knowledge establish the foundation for an expert's testimony; the accuracy of such testimony is a matter of weigh and not admissibility.")

**A.    Katz's assumptions, including those related to causation, are supported by the evidence and appropriate for a damages expert.**

Rule 703 of the Federal Rules of Evidence provides, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Under this rule, "an expert witness is not required to verify all the facts on which he relies." *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015). The only requirement is reliance on the facts at issue be an accepted practice in the expert's profession. *Id.* Furthermore, damages experts are "entitled to presume causation (a prerequisite to recovery which will have to be established by evidence other than [the expert's] testimony)." *Wholesale Partners, LLC v. MasterBrand Cabinets, Inc.*, No. 12-C-747, 2014 WL 435129 (E.D. Wisc. Feb. 4, 2014) (quoting *CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc.*, No. CIV-04-0651-F, 2006 WL 2054646, at *4 (W.D.Okla. July 24, 2006); *see also Luitpold Pharmaceuticals, Inc. v. Ed. Geistlich Sohne A.g. Fur Chemische Industrie*, No. 11-cv-681 (KBG), 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ("a damages expert does not need to perform her own causation analysis to offer useful expert testimony").

In fact, courts consider it to be "perfectly acceptable for an expert to calculate an estimated amount of damages without regard to causation or any other elements of liability." *Univac Dental Co.*, No. 1:07-cv-0493, 2010 WL 1816745, at *3 (M.D. Pa. Apr. 27, 2010); *see also RMD, LLC v. Nitto Americas, Inc.*, No. 09-2056-JAR-DJW, 2012 WL 5398345 (D. Kan. Nov. 5, 2012); *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 21, 30 (1st

6

Cir. 2013) ("As is customary for such experts, [the expert] testified that she 'assumed that the allegations in the complaint are true' for purposes of conducting her analysis").

Principally, courts allow damages experts to assume causation because the existence of causation is a question of fact for the jury to decide through plaintiff's presentation of the case. *Sleepy's, LLC v. Select Comfort Wholesale Corp.*, No. 07-CV-4018(TCP)(ARL), 2012 WL 441190, at *2 (E.D.N.Y. Feb. 10, 2012) ("causation . . . presents a mixed question of fact and law that only the trial judge will be in a position to evaluate"). Moreover, the "fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Jahn v. Equinse Servs. PSC*, 233 .3d 382, 390 (6th Cir. 2000).

Accordingly, as an expert retained to assess potential damages, Katz is permitted to assume Zimmer will prevail at trial on issues of liability and causation with respect to the four physicians for which Zimmer is seeking damages. As Katz explains in his attached Affidavit (Exhibit A), the American Institute of Certified Public Accounts ("AICPA") specifically states "[an] expert witness can base opinion testimony on either facts or assumptions. Likewise, an expert witness may base assumption on facts; presumptions from facts; or assumptions provided by the client, other experts, or counsel . . . Ultimately the trier of fact will determine the reasonableness of the assumptions." (Katz Affidavit ¶ 15.) While Defendants argue Katz overlooked other potential factors in Zimmer's loss of business, Zimmer intends to prove at trial (through evidence other than Katz's testimony), that it was Defendants and their wrongful acts that form the backbone of this litigation that caused those losses. This is the central factual dispute of this case which cannot be resolved short of trial. Accordingly, since liability and causation are disputed issues to be determined by the jury, it was appropriate for Katz to assume

Zimmer will succeed in proving its claim as to these four physicians at trial for purposes of calculating damages. (*Id*. at ¶ 16.) If Defendants' arguments were accepted, it would make it impossible for a plaintiff to have a damages expert in any case where causation is one of the disputes.

As to the facts assumed for purposes of calculating damages, which will be discussed in more detail below, Katz is not required to independently verify this information since the facts provided to him are typically relied upon in his profession. (*Id*. at ¶ 16.) Furthermore, the cases referenced by Defendants in support of their argument that an expert cannot merely "parrot" information provided to them are not applicable here. For example, in *King-Indiana Forge, Inc.*, the court rejected expert testimony that an estimate of the plaintiff's cost savings was reasonable based <u>solely</u> on the plaintiff's say-so. *King-Indiana Forge, Inc. v. Millennium Forge, Inc.,* No. 1:07-CV-00341-SEB-DM, 2009 WL 3187685 (S.D. Ind. Sept. 29, 2009). Similarly, in *MDG Int'l, Inc.*, the expert's opinion rested on factual assumptions contradicted by the evidence provided to him. *MDG Int'l, Inc. v. Australian Gold, Inc*., No. 1:07-CV-1096-SEB-TAB, 2009 WL 1916728 (S.D. Ind. June 29, 2009). By contrast, Katz determined it was reasonable to assume liability based on <u>his</u> review of the evidence and conclusion that the evidence could support liability. (Katz Affidavit ¶ 16.) This approach is entirely appropriate under Rules 702 and 703.

**B.    Katz's calculation of Zimmer's lost revenue for Amarillo and South Carolina is sufficiently reliable and will assist the trier of fact in assessing damages**

**1.    <u>Sales data for Amarillo</u>**

Defendants are first critical of Katz for "cherry picking" sales data related Drs. North and Risko for purposes of calculating Zimmer's lost revenue for Amarillo. It was perfectly reasonable and appropriate for Katz to consider the sales data for Drs. North and Risko for the

8

purposes of his final damages analysis since he was ultimately only calculating damages related to these two physicians. (Katz Report pp. 21-29.) Katz did not consider sales data for other physicians in Amarillo because it does not appear (and Zimmer is not alleging) other physicians were impacted by Stovall's wrongful conduct. (Katz Report p. 21.) As such, since Zimmer is only seeking damages related to lost sales to Drs. North and Risko in Amarillo, it was proper for Katz to only consider sales data relevant to them. Zimmer is only seeking damages (as it relates to Amarillo, Texas) for the loss of Drs. North and Risko. Increases and decreases in business from other surgeons have no bearing on the value of that lost business.

The reliability of Katz's opinion on damages is further supported by his decision not to include sales data related to lost revenue attributable to another cause. So, contrary to Defendants' accusations, he did in fact consider causation. For example, Katz did not attribute any damages to Defendants' wrongful actions as it relates Drs. Fernicola and Zimmerman in Georgia, for whom Zimmer lost sales as a result of their hospital's sole source agreement with competitors other than Stryker. (Katz Report p. 38.) For these reasons, utilizing the parties' sales data for Drs. North and Risko was reasonable and calculated to produce reliable conclusions as to Zimmer's lost revenue on account of Stovall's misconduct.

### 2. **Zimmer's damages during one-year non-competition period**

For purposes of calculating lost revenue incurred by Zimmer during Stovall's one-year non-competition period, Katz assumed a 100% retention rate of physician customers. The retention rate was determined based on Katz's research of factors influencing a physician's product choice which revealed "[o]rthopedists are reluctant to switch vendors due to both efficiency and safety reasons." (Katz Report p. 18.) Katz further considered the deposition testimony of Derek Leinin, a Stryker sales representative, characterizing the medical device industry as an "out of sight, out of mind business" when discussing the potential impact of sitting

9

out of his territory for one year in accordance with his non-competition agreement with Stryker. (Katz Report pp. 17-18.) While Defendants have introduced facts to the contrary, some of which are heavily contested, this does not change the fact Katz is entitled to make assumptions, particularly those with a strong basis in the evidence. Here, the evidence and industry research supports Katz's conclusion that, but for Stovall's wrongful conduct, Zimmer would have retained 100% of its business during the one-year non-compete period. And, much like causation, Zimmer's ability to retain the business is an issue Zimmer intends to prove at trial through fact witnesses—not experts. To the extent Defendants find Katz's proposed retention rates and reliance on the above-referenced facts unpersuasive, they will have an opportunity to make that argument through cross-examination at trial and, accordingly, to try to convince the jurors they should award a smaller amount of damages than Zimmer is requesting.

### 3. **Zimmer's damages attributable to conduct of non-parties in South Carolina**

As set forth in the Introduction, Zimmer's claims against Stryker extend beyond Stryker's partnering with Stovall to unfairly compete in Amarillo. The evidence will show Stryker wrongfully induced other Zimmer sales representatives to breach their non-compete agreements by assigning them to sell Vitagel, which allowed them to solicit their former Zimmer customers under the guise of a non-competitive product. Focusing on South Carolina, Defendants contend Katz cannot identify a causal link between the Zimmer's loss of revenue and the alleged misconduct of the Dickerson Team and Stryker's distributor, CrossLink. This argument is without merit.

As previously discussed, causation will ultimately be determined by the jury and Katz may presume causation for purposes of his damages analysis. Like causation, a determination of the proper entity deemed liable for any proven misconduct is an issue of fact that must be left for the jury. *Sys. Dev. Integration, LLC v. Computer Sciences Corp.*, 886 F.Supp.2d 873 (N.D. Ill.

2012) ("It is entirely appropriate for a damages expert to assume liability for the purposes of his or her own opinion. To hold otherwise would be illogical.") Although Katz may properly assume both causation and liability, his assumptions related to Stryker's unlawful activities in South Carolina are fully supported by the evidence.

At trial, Zimmer will present evidence of the Dickerson Team working with CrossLink to circumvent their non-competition agreements with Zimmer through use of the Vitagel scheme and their success in converting business from Drs. Jennings and Ridgeway to Stryker. Although Defendants argue the Dickerson Team's lack of success in selling Vitagel is supportive of its argument there is no causal link, Zimmer contends this fact actually bolsters Zimmer's theory that Vitagel was merely a ruse to allow former Zimmer representatives to contact their customers under the guise of a non-competitive product. The evidence will further reveal Stryker was directly involved in CrossLink's hiring of the Dickerson Team, even financially contributing to the hires, and the day after the Dickerson Team's resignations, their largest account, St. Francis Hospital in Greenville, South Carolina, demanded Zimmer completely remove its inventory in favor of Stryker. (Katz Report p. 13.) In addition, two of the highest-volume surgeons in the territory and at that hospital (Drs. Jennings and Ridgeway), who both had been long-time Zimmer customers, switched almost immediately to Stryker products. (Katz Report p. 30.) The significance of this evidence has been acknowledged by the Court in its November 1, 2016 Order, "Zimmer has presented sufficient evidence to raise a fact issue as to whether CrossLink was Stryker's agent" and "Stryker could be liable for CrossLink's actions under [Second Restatement of Torts] § 876." (ECF No. 131, pp. 16 & 17.) The Court further acknowledged "a reasonable juror to conclude that Stryker supervises CrossLink in the promotion and sale of its products, exercising sufficient control over CrossLink to establish an agency relationship." (ECF

No. 131, p. 15.) While no amount of evidence submitted prior to trial can <u>conclusively</u> establish an issue which must be determined by the jury, there is ample evidence to support Katz's assumption of causation for purposes of his damages assessment.

Much as they did in Amarillo, Defendants further accuse Katz of "cherry-picking" data by only considering the sales data for Drs. Jennings and Ridgeway in South Carolina. And again, this argument is unpersuasive given Katz only allocated damages in South Carolina for these two physicians. Zimmer has never argued, as Defendants suggest, it would have "maintained 100% retention of business in the <u>region</u>" (emphasis added) but for the wrongful actions of the Stryker. (ECF No. 145, p. 21.) Quite to the contrary, Zimmer did incur other losses in the region (as well as some gains) that neither Katz nor Zimmer are attributing to the Defendants and, frankly, which have nothing to do with this lawsuit. Defendants further misrepresent Katz's analysis by falsely claiming Katz "conceded that Zimmer's decreased sales did not result in a corresponding increase in Stryker's sales." *Id*. In fact, Katz simply noted Stryker did not have a corresponding gain to Zimmer's loss of sales for <u>hip products</u> to Dr. Ridgeway. (Katz Report p. 30.) But importantly, due to this discrepancy, Katz <u>excluded</u> Zimmer's loss of revenue related to Dr. Ridgeway's use of hip products in his calculation of damages. (Zimmer's sales of hip products to Dr. Ridgeway declined by more than $450,000, but Stryker's hip product sales increased by only approximately $12,000. "This suggests that Zimmer's lost hip sales to Dr. Ridgeway were not acquired by Stryker. **Thus, I have excluded hip sales to Dr. Ridgeway from the analysis.**") *Id.* So, effectively, Defendants first criticize Katz by wrongfully implying he did not consider issues like this then, even when he clearly did consider the issues, Defendants try to imply he allocated damages for losses that were actually excluded from his damages analysis.

Finally, to further ensure the reliability of his damages assessment, Katz did not calculate <u>any</u> damages for territories in which the Vitagel scheme was in place for which Zimmer is not seeking damages. For example, although Stryker also conducted the Vitagel scheme through former Zimmer sales representative, William Whilden ("Whilden") in the State of Georgia and Chris Smith ("Smith") in Mid-Atlantic region, Katz (and Zimmer) does not attribute Zimmer's losses in these territories to the wrongful conduct of Stryker because the sales data does not suggest Whilden and Smith were successful in converting business to Stryker. (Katz Report p. 39.) Katz's decision to exclude Zimmer's loss of revenue in Georgia and the Mid-Atlantic region further justifies his assumption of causation for the territories in which the evidence supports this finding.

Overall, Katz was careful to select data for his calculations that was narrowly tailored to the physicians at issue in this case and excluded accounts for which an assumption of causation is not supported by the evidence. This approach was calculated, reasonable and designed to produce the most reliable results possible given the inherent limitations associated with predicting future damages. Defendants failed to establish otherwise and aside from generally claiming Katz is wrong, Defendants fail to offer any coherent alternative.

**4.     Katz's use of national growth rate to calculate Zimmer's future lost revenue**

Defendants further argue Katz's opinions must be excluded because he utilized Zimmer's and Stryker's national, as opposed to a local or surgeon-specific, growth rate from 2012 – 2014 to estimate Zimmer's future damages. This is the perfect example of when a party's criticism of an expert's opinion goes to weight, not admissibility. Use of a national growth rate for calculating future lost revenue under both the before-and-after and yardstick methods is a widely-accepted approach which produces reliable results. (Katz Affidavit ¶ 7) Defendants have not provided any evidence to the contrary. Instead, Defendants simply argue a local or surgeon-

13

specific growth rate would be better. This cannot serve as grounds to exclude Katz's damages opinion because, even if Defendants were correct (they are not), it would result in a change in damages (here, actually adopting Defendants proposed approach resulted in increased damages as explained below)—not exclusion of them altogether.

Nonetheless, in an effort to satisfy Defendants' purported concerns related to the applicable growth rate, the parties have since exchanged updated sales data through March 2017 (which was not available because it did not yet exist when expert reports were exchanged), and Katz has updated his lost revenue calculations for the four surgeons at issue surgeon-specific growth rates. Defendants cannot object to use of the surgeon-specific growth rate given Defendants' expert, Thomas Vander Veen, specifically argued in his report that lost revenue calculation should be conducted with a surgeon-specific growth rate. (Vander Veen Report p. 32]. Katz's additional calculations squarely address Defendants' concerns because they were performed using updated Stryker sales data for Drs. North, Risko, Jennings and Ridgeway from March 2015 through March 2017.[1] The information allowed Katz to calculate <u>actual</u> growth rates over the last several years for these physicians. Use of the actual growth rates, as Mr. Vander Veen suggested, resulted in *increased* damages to Zimmer in Amarillo and decreased damages in South Carolina for a total loss of revenue of $7,033,233. (Katz Affidavit ¶ 17.) This new estimate of Zimmer's damages fully resolves Defendants' concerns related to the application of a national v. surgeon-specific growth rate (and also confirms Katz's original approach was reasonable and, in some respects, overly conservative). As such, there is no basis to exclude Katz's assessment of Zimmer's damages.

---

[1] As indicated by the date of the updated sales data, it was not provided to Zimmer until April 2017.

5. **Zimmer's loss of revenue beyond the expiration of the one-year non-competition period**

To assist the jury in potentially calculating Zimmer's future lost revenue, Katz has projected on-going damages to Zimmer for one, three, and five years after the expiration of restrictive covenants in both Amarillo and South Carolina. These increments will assist the jury in comprehending the calculations and allow it to easily award damages for less than five years if it deems appropriate. Despite Defendants' criticism of Katz's decision to calculate damages for up to five years, this window of potential damages is supported by Katz's industry research which revealed physicians generally switch their primary hip or knee manufacturer only once every five to fifteen years. (Katz Affidavit ¶ 12; Katz Report p. 15.) Again, this is an argument Defendants can (and presumably will) make at trial—but it is not appropriate for a motion seeking to exclude Katz from testifying altogether.

Given the non-competition period has expired for purposes of these calculations and Stovall and the Dickerson Team would be permitted to compete in the territory, Katz reduced the customer retention rate to only 50% based on testimony from Zimmer's General Manager, Rocky Victor, and Stryker sales manager, Lance Cowart.[2] (Katz Report p. 18.) As previously discussed, Katz is permitted to make assumptions for purposes of his calculations that are reasonable in his profession. Katz has confirmed this to be true in his affidavit. (Katz Affidavit ¶ 16.) Overall, Defendants contend Katz's decision to calculate damages based on a 50% retention rate for up to five years is "arbitrary and based on pure speculation." While Zimmer adamantly disputes Defendants' characterization of Katz's reasoned calculations as such,

---

[2] Victor testified Zimmer is generally able to keep approximately 75-80% of a surgeon's business if he is able to introduce a new sales representative to the surgeon during the non-compete period. Cowart testified that, in his experience, 75% of a sales representative's business follows the rep if they switch companies. Accordingly, Katz averaged the contradicting testimony to arrive at an estimated retention rate of 50%. (Katz Report, p. 18.)

fortunately, Stryker's updated sales data has eliminated much of the inherent mystery of calculating future lost revenue. We now know how Stryker's sales fared up until March 2017 and Katz was able to include this information in his analysis. To summarize Katz's updated damages calculation, he applied the retention rates as previously discussed along with the updated sales data which yielded damages to Zimmer: (1) of $3,555,884 in Texas; (2) $3,477,350 in South Carolina; and (3) $7,033,233 in total. The difference between this and my original report is: (1) an increase in damages of $705,090 in Texas; (2) a decrease in damages of $277,506 in South Carolina; and (3) an overall increase in damages of $427,584 when comparing identical time periods.[3] (Katz Affidavit ¶ 17.) This updated damages assessment is most certainly not speculative because it is based on years of sales data. Furthermore, Defendants' argument that calculating damages beyond the one-year non-compete period is inconsistent with Stryker's actions in other non-compete cases in which they have retained an expert to estimate damages and the expert employed a methodology to calculate damages beyond the expiration of the non-competition period. (Katz Affidavit ¶ 13.) For these reasons, Defendants have failed to establish that Katz's opinions do not satisfy Rule 702 or the *Daubert* standard and there is no basis to exclude his testimony at trial.

      **6.**     **Katz's use of Stryker's national growth rate for yardstick method**

Finally, Stryker has argued Katz improperly relied on Stryker's national growth rate, as opposed to Stryker's local growth rate, for purposes of calculating damages through the yardstick

---

[3] Katz's original report allocated damages in South Carolina through September of 2017. Given that we've received actual sales data through March of 2017, we chose to only allocate damages in South Carolina through March of 2017 instead of projecting damages out for an additional six months, which nullifies Defendants' criticisms regarding future damages estimates in South Carolina. Thus, the main reason there was a decrease in overall damages is because these revised calculations encompass approximately six months fewer damages in South Carolina than Katz's original estimates. The fact that the actual sales data yielded damages results that are extremely close to Katz's original estimates also confirms the appropriateness of the assumptions and methodology he used.

method.  Now that more recent sales data is available and Katz was able to make his damages assessment based on the actual growth rates for Drs. North, Risko, Jennings, and Ridgeway, Zimmer believes this issue is moot.  However, to the extent Defendants continue to contend Katz's calculations are flawed because they are based on a national growth rate, this argument only affects the weight to be afforded to his testimony, not its admissibility because, in the end, even if the jury adopted Defendants view, it would just mean a slight change in the damages awarded--not that there were no damages at all.

### III.     CONCLUSION

For these reasons, Zimmer respectfully requests the Court deny Defendants' Motion *in Limine* to exclude the expert report and testimony of Jeffrey M. Katz and permit him to testify at trial.

QUARLES & BRADY LLP


By: */s/ Michael A. Rogers*
    Joshua B. Fleming, #25954-29
    Jeffrey M. Monberg, #21750-45
    Michael A. Rogers, #28038-29
    Attorneys for Plaintiff, Zimmer, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of May, 2017, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Michael D. Wexler
Kristine R. Argentine
Katelyn R. Miller
Robyn E. Marsh
Seyfarth Shaw LLP
mwexler@seyfarth.com
kargentine@seyfarth.com
krmiller@syfarth.com
rmarsh@seyfarth.com

                                             */s/ Michael A. Rogers*

QUARLES & BRADY LLP
135 North Pennsylvania Street
2400 BMO Building
Indianapolis, IN 46204
Phone: 317-957-5000
Fax: 317-957-5010
josh.fleming@quarles.com
michael.rogers@quarles.com

QUARLES & BRADY LLP
300 North LaSalle Street
Suite 4000
Chicago, IL 60654-3406
Phone: 312-715-5000
Fax: 312-715-5155
jeffrey.monberg@quarles.com

QB\45257905.1