UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ZIMMER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:14-CV-152 JD |
| | ) |
| STRYKER CORPORATION; | ) |
| HOWMEDICA OSTEONICS CORP. | ) |
| d/b/a STRYKER ORTHOPAEDICS; and | ) |
| CODY STOVALL, | ) |
| | ) |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Now before the Court are, among other pretrial items, two motions related to damages in this case between plaintiff Zimmer, Inc. and defendants Stryker Corporation, Howmedica Osteonics Corp. d/b/a Stryker Orthopedics, and Cody Stovall. Zimmer asserts claims for breach of contract and fiduciary duty, unfair competition, and tortious interference with contracts and business relationships. The underlying facts have been set forth at length in prior orders, and the Court assumes familiarity with those orders. Zimmer and Defendants have each filed a *Daubert* motion seeking to exclude or narrow the expert damages opinions offered by the opposing party. For the following reasons, the Court will grant Defendants' motion to exclude the damages opinions of Zimmer's expert. The Court will consequentially deny as moot Zimmer's motion to exclude portions of Defendants' expert's report and testimony.

**STANDARD OF REVIEW**

Rule 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

  (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

  (b)  the testimony is based on sufficient facts or data;

  (c)  the testimony is the product of reliable principles and methods; and

  (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court has a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834-35 (7th Cir. 2015). As the Seventh Circuit has emphasized, a court does not assess "'the ultimate correctness of the expert's conclusions.'" *Textron*, 807 F.3d at 834 (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Schultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). And as always in the Rule 702 analysis, the Court is free to consider concerns specific to the facts of the case at hand. *United States v. Scott*, No. 3:11-CR-104, 2013 WL 252247, at *8 (N.D. Ind. Jan. 23, 2013). The expert's proponent bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

# DISCUSSION

Zimmer asked its expert, Jeffrey Katz, to "assess, among other things, the amount of Zimmer lost profits, if any, which resulted from Stovall's and other former Zimmer sales representatives' breaches of their various agreements as well as from Stryker's actions which induced those former Zimmer employees to breach their agreements with Zimmer." [Katz Report at 1] To calculate lost profits, Katz used both the "before-and-after" methodology, which examines a plaintiff's past profits in estimating its future profits, and the "yardstick" methodology, which examines the profits of closely comparable businesses in estimating a plaintiff's future profits. *See Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1068 (5th Cir. 1985). When an expert uses either or both methodologies, "[h]is assumptions and projections must rest on 'adequate bases,' and cannot be the product of mere speculation." *Park*, 764 F.2d at 1067 (internal quotation marks omitted); *see also United States v. Brown*, 7 F.3d 638, 652-53 (7th Cir. 1993) ("expert testimony [must] be rejected if it lacks an adequate basis in fact"). Accordingly, if the "principal assumptions" underlying Katz's opinions lack the reliability expected by experts in the field, his lost profits calculations do not satisfy Rule 702. *Park*, 764 F.2d at 1067; *see also Junk v. Terminix Int'l Corp.*, 628 F.3d 439, No. 08-3811, 2010 WL 4978801, at *7 (8th Cir. Dec. 9, 2010) (affirming exclusion of expert testimony due, in part, to expert's "reliance on unfounded assumption in his comparative method"); *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006) (reversing admission of expert testimony due, in part, to expert's unjustified assumption that debtor's "expenses were essentially the same each year").

Katz's determinations of lost revenues form the bases of his lost profits calculations. [Katz Report at 14-19] Relating to Zimmer's lost revenues from Drs. North and Risko after Stovall resigned, Katz examined the monthly sales data from those two doctors for both one year

prior to and one year after Stovall's resignation. *Id.* at 21-22. Katz formed the basic assumption that "Stovall's pre-resignation actions, Stovall's alleged breach of the Agreement and Stryker's alleged inducement" caused the decline in sales to Drs. North and Risko. *Id.* With that in mind, Katz used the before-and-after method to calculate the sales he believed Zimmer would have earned during Stovall's non-compete period "but for [Stovall's] wrongdoing." *Id.* at 22. To reach that lost revenues figure for these two doctors in Amarillo, Texas, Katz calculated Zimmer's expected profits based on Zimmer's growth rates for the Americas listed in its 10K. *Id.* Katz then took the difference between the resulting expected revenues and actual revenues Zimmer earned during the non-compete period ($1,723,760). *Id.* at 22-23.

Based on the same causation assumptions, Katz also determined lost revenues related to Stovall using the yardstick method. *Id.* at 23. To do so, Katz first determined an expected growth rate for Stryker by computing Stryker's actual sales to Drs. North and Risko during the twelve months prior to the non-compete period and multiplying those sales by Stryker's national growth rates. *Id.* According to Katz, the resulting figure represents Stryker's expected revenues "had the wrongdoing not occurred." *Id.* Katz then compared these expected revenues to Stryker's actual revenues from Drs. North and Risko from the non-compete period; the excess of Stryker's actual revenues for these two doctors above its expected revenues served as Katz's benchmark for the sales Zimmer would have had "but for the alleged wrongdoing" during Stovall's non-compete period ($2,247,332). *Id.*

Katz utilized the same process to determine lost revenues from Drs. Jennings and Ridgeway in South Carolina after the departure of Cameron Dickerson, Jay Barnhardt, and Christopher Terrell (the "Dickerson team").[1] *Id.* at 30-33. Katz again reviewed sales data for

---

[1] Defendants emphasize the fact that this lawsuit does not name the members of the Dickerson team as defendants, and argue that that somehow weakens Katz's analysis. [DE 145 at 18-22] It does not. Here,

4

those two doctors and assumed that the decline in sales stemmed from the Dickerson team's "wrongdoing," with an exception for Zimmer's lost hip products sales to Dr. Ridgeway. *Id.* at 30. Based on this assumption, Katz employed the before-and-after and the yardstick methods to settle on lost revenue amounts ($2,556,964 and $3,224,698, respectively) for Zimmer during the Dickerson team's non-compete period. *Id.* at 31-33.

Starting with the lost revenues he determined corresponding to Stovall's and the Dickerson team's non-compete periods, and then applying the same growth rates along with a 50% business retention rate, Katz also calculated lost revenue amounts at the one- , three- , and five-year marks subsequent to the various non-compete periods. *Id.* at 16-19, 24-29, 33-38. Katz determined these extended lost revenues using both the before-and-after and yardstick methods. *See id.*

In closing, Katz added the losses associated with Stovall to those of the Dickerson team, averaged his findings under the before-and-after and yardstick approaches, adjusted for incremental costs of revenue and discounts, and opined that Zimmer incurred $2,493,364 in lost profits during the non-compete period as a result of the alleged wrongdoing in this case. He also added that figure to the average lost profit amounts from the post-non-compete periods to reach $3,601,696 (one year), $5,632,123 (three years), and $7,501,758 (five years).[2] *Id.* at 39-42.

---

Defendants create an argument on the legal issue of agency that has no bearing on the admissibility of Katz's opinions, and which the Court explicitly reserved for the jury in its summary judgment order. [DE 131 at 13-17]

[2] These figures do not include lost profits related to sales representatives Chris Smith or William Whilden. Defendants argue, in part, that Katz's findings of no damages related to Smith or Whilden reinforce the lack of a causal link between the alleged causes of action and Zimmer's claimed damages. [DE 145 at 20] The Court will decline to address this argument. Zimmer does not seek damages relating to these two sales representatives, and the Court has already acknowledged this. [DE 131 at 3] For similar reasons, the Court will also decline to address Defendants' argument that Katz "cherry-picked" sales data of certain doctors in Amarillo and South Carolina while ignoring the data from other doctors. [DE 145 at

5

A.   **Katz Confuses Liability and Causation**

Defendants criticize Katz's report for failing to link Zimmer's lost profits to Defendants' alleged wrongdoing. [DE 145 at 10-18] Indeed, Katz's lost profits determination flows from his calculation of revenues that Zimmer would have realized "but for the wrongdoing" or "had the wrongdoing not occurred." In Indiana, consequential damages, recoverable by a party injured by a breach of contract, may include lost profits, providing the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness. *Indianapolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009). A trier of fact, "may not award damages on the mere basis of conjecture and speculation." *Farm Bureau Mut. Ins. Co. v. Dercach*, 450 N.E.2d 537, 540 (Ind. Ct. App. 1983).[3] In cases involving covenants not to compete, a plaintiff has the burden of demonstrating the loss attributable to defendant's competition versus the loss attributable to other potential causes of declines in revenue. *See Turbines, Inc. v. Thompson*, 684 N.E.2d 254, 258 (Ind. Ct. App. 1997) (affirming trial court's award of only fractional lost profits where plaintiff failed to distinguish revenue decreases due to defendant's breach of a non-competition agreement from those attributable to the cyclical nature of its business).

As the Supreme Court noted, "[t]he first step in a damages study is the translation of a *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) (citation omitted). However, Katz skipped this first step and provided no explanation of how to distinguish lost profits that resulted from

---

14-15, 20-21] Zimmer does not seek damages relating to any doctors except Drs. North, Risko, Jennings, and Ridgeway, and therefore Katz did not improperly limit his analysis.

[3] It is long settled that federal courts sitting in diversity apply state substantive law and federal procedural law. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437, 130 S. Ct. 1431, 1460 (2010) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)).

Defendants' alleged wrongdoing (i.e., poaching Zimmer's customers and violating the various non-compete agreements) from lost profits that resulted from the sales representatives' mere departure. Zimmer provides no substantive counter to Defendants' argument on this point, but rests on the notion that damages experts may presume causation and that Katz may therefore "assume Zimmer will prevail at trial on the issues of liability and causation with respect to the four physicians for which Zimmer is seeking damages." [DE 198 at 7]

The Court acknowledges that Katz has been proffered as a damages expert, not as an expert on liability, and that Zimmer indicates it intends to prove causation of damages through other evidence at trial. As such, "Rule 702 permits an expert, at least in some circumstances, to assume that the defendant's alleged misdeeds caused the plaintiff's loss." *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743, at *4 (N.D. Ill. Feb. 3, 2011) (citing *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)). But even assuming Zimmer can prove causation at trial, it "must still establish that it is reasonably certain that the damages it seeks are a consequence of the breach, not some other factor." *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *16 n. 6 (N.D. Ill. Aug. 21, 2017) (excluding plaintiff's damages expert's opinion in a bad faith breach of contract case, in part, for failing to connect damages to alleged breach despite the presence of other witnesses that could testify as to causation); *see also KLLM Transp. Servs., LLC v. JBS Carriers, Inc.*, No. 3:12-CV-116, 2015 WL 11005024, at *8 (S.D. Miss. Aug. 17, 2015) (excluding damages expert's lost profits calculations in action for breach of non-compete agreement under Mississippi state law where expert failed to consider the possibility that costs could eat into expected profits, and therefore did not prove plaintiff's loss "by competent evidence with reasonable certainty").

Here, Zimmer and Katz confuse the question of whether Defendants may have "caused" a violation of the non-compete agreements with the question of whether Defendants' violations of the agreements, assuming they happened, "caused" Zimmer's damages; Katz can assume the first kind of causation, but not the second. *Elorac*, 2017 WL 3592775, at *16 n. 6; *see also MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("The courts have always distinguished between proof of *causation* of damages and proof of the *amount* of damages.").

Katz does not merely assume that second type of causation; he makes it "part and parcel of his opinion." *Victory Records*, 2011 WL 382743, at *5. The introduction to his report states that Zimmer tasked him with assessing the amount of lost profits "*which resulted from* Stovall's and the other former Zimmer sales representatives' breaches of their various agreements as well as from Stryker's actions which induced those former Zimmer employees to breach their agreements with Zimmer." [Katz Report at 1] (emphasis added). At every critical point in his opinion, Katz attributes lost revenues and profits to Defendants' alleged wrongdoing, without ever considering the possibility that the lost revenues and profits flowed from other non-actionable events. *See id.* at 14-16, 18, 22-23, 30-35, 39. In so doing, Katz equates liability with the notion that the alleged breaches in this case caused *all* of the lost revenues and profits suffered by Zimmer during the non-compete periods and beyond. To illustrate, Katz notes in his report that Zimmer asked him to assume liability, *id.* at 1 n. 2, but his deposition testimony clearly highlights his blurring of liability and causation:

> Q: You keep saying liability. Is it your testimony here today, Mr. Katz, that liability and causation are the same things for purposes of your report?
>
> A: Yeah. Well, the wrongdoing *has to be the proximate cause* of the damages.
>
> Q: Did you assume proximate cause as well for your report?

8

> A: Yes. I'm assuming – based on the assumption I was given … that the sales representatives breached the terms of their representative agreements with Zimmer and that Stryker's action … induced [Zimmer's former sales representatives] to breach their agreements with Zimmer. *With that assumption, these are the damages that were caused by that breach of the agreement.*
>
> Q: Just so I understand, for purposes of your report, you are assuming causation was from those breaches?
>
> A: Yes.

[Katz Dep. 64:4-65:2] (emphasis added).

The Court fails to see how Katz's damages opinions will assist the trier of fact pursuant to Rule 702 if they do not bear on whether the damages flowed from the alleged breach; "any opinion that purports to measure damages without making a judgment as to which effects stem from the breach and which do not is useless." *Elorac*, 2017 WL 3592775, at *16 n. 6. As the Supreme Court explained in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is the case here. Katz opines that Zimmer suffered lost profits in the millions of dollars because of the alleged breach of the non-compete agreements and the inducement of said breach. But in arriving at his figures, Katz measures only one thing: the profits Zimmer would have made had Stovall and the Dickerson team not resigned. Thus, he simply does not account for any lost profits that resulted from the "alleged wrongdoing" as opposed to those stemming from Zimmer's failure to retain its business after its sales representatives left. For this reason, his opinions are based upon an assumption that does not legitimately support his conclusion. *Target Market Pub., Inc. v. ADVO Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998); *see also MicroStrategy*

*Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005) (affirming exclusion of expert report that did not link a single loss to a specific misconduct). As Defendants aptly put it, "[q]uitting Zimmer is not actionable, but breaching non-compete agreements is." [DE 145 at 2]

Defendants raise multiple issues with Katz's opinions, but the Court need not delve into all of them because his failure to link the alleged misconduct to any damages is itself fatal.[4] This "analytical gap" permeates throughout Katz's entire report and impacts all of his conclusions, including his calculation of lost profits subsequent to the non-compete periods.[5] Thus, his report will not be admitted, pursuant to the standards in *Daubert*.

---

[4] The Court separately notes that, in response to several of Defendants' arguments, Zimmer submitted an affidavit of Katz. [DE 198-1] Federal Rule of Civil Procedure 26 governs witness disclosures and the need to timely update them. Failure to comply with this rule results in exclusion unless the violating party can show that its untimely submission was harmless or justified. Fed. R. Civ. P. 37(c)(1). Submitted in response to Defendants' *Daubert* motion and after the pretrial disclosures deadline, this affidavit is untimely. Fed. R. Civ. P. 26(e)(2) ("Any additions or changes to [a party's expert report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.") Here, Zimmer only states that its expert recently received doctor-specific sales records for 2015-2017. While technically a true statement, the Court finds this excuse unpersuasive. Of course, when Katz wrote his report in July 2015, he did not possess doctor-specific sales information for 2015-2017 because those records did not yet exist. He did, however, have access to doctor-specific sales records up until that point [Katz Report at 21-22, 30-31], yet chose to use national growth rates rather than surgeon-specific growth rates in forming his opinions. "[A]lthough Fed. R. Civ. P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Allgood v. Gen. Motors Corp.*, No. 1:02-cv-1077, 2007 WL 647496, at *4 (S.D. Ind. 2007) (quoting *Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003)). Katz's affidavit comes as an attempt to "satisfy Defendants' purported concerns," not to supplement his original report. [DE 198 at 14] Indeed, his affidavit employs a new methodology by exchanging his prior use of national growth rates for surgeon-specific ones. Zimmer gives no explanation as to how this affidavit would not prejudice Defendants; at this stage in the litigation, such a submission would require a reopening of discovery, additional depositions, motions, etc. Furthermore, Katz's affidavit does nothing to remedy his assumption that the alleged misconduct in this case caused all of Zimmer's damages, as he continues to confuse causation and liability with causation of damages. [DE 198-1 ¶¶ 14-17] Accordingly, Katz's affidavit will be stricken. As *Allgood* recognized, to "rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports …." 2007 WL 647496, at *4 (citations omitted).

[5] Katz's extrapolations of lost profits sustained by Zimmer one, three, and five years after the various non-compete periods all use his non-compete period lost revenues calculations as a starting point. Thus, because Katz's flawed assumptions form the base of those extrapolations, his projected/ongoing lost profits suffer from the same inherent flaws discussed above. Moreover, notwithstanding Katz's flawed

### B. Katz Fails to Consider Obvious Alternative Explanations Regarding the Amarillo Doctors

Katz's lost profits calculations related to Drs. North and Risko in the Amarillo region suffer from an independent and additional flaw because Katz ignored obvious alternative explanations that would impact his conclusions. While they pose technically different inquiries, Rules 702(b), (c), and (d) all require the expert to base his opinion on at least the amount of data that a reliable methodology demands. Charles Alan Wright & Victor James Gold, Fed. Prac. & Proc. § 6268, at 319 (Supp. 2016). "The question is whether a factual foundation is present upon which the expert could have based his conclusions, or whether one or more logically necessary foundational facts are absent." *Scott*, 2013 WL 252247, at \*4. Rule 702(d) further requires the expert to reliably apply his principles and methods to the facts of the case. The question for Rule 702(d) is "whether he has '*bridged* the analytical gap' between the mere existence of his principles and methods in theory and his application of them to specific facts of the case before the court." *Scott*, 2013 WL 252247, at \*7 (emphasis added) (citing *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005) (partially vacated on unrelated grounds, 448 F.3d 936)).

Likely due to his equation of liability with causation of damages, Katz failed to consider "obvious alternative explanations" for Zimmer's lost revenues from Drs. North and Risko during Stovall's non-compete period. Fed. R. Evid. 702 Advisory Comm. Notes (2000 amends.) (An important benchmark for gauging reliability is "[w]hether the expert has accounted for obvious alternative explanations."); *see also Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010); *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008). Granted, even where some alternative explanations must be addressed, an expert need not consider and

---

bases for his calculation of ongoing damages, the Court finds it suspect that the damages period could even be so extended when the non-compete periods at issue lasted only for one year.

account for "each and every possible cause of a given outcome." *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010). But that does not permit the expert to conveniently disregard contrary evidence or evidence that would lead to different results. *See Scott*, 2013 WL 252247, at *4; *see also MicroStrategy*, 429 F.3d at 1355-56 ("[T]he district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative.").

Here, the record contains many readily apparent facts that pose alternative explanations for Zimmer's drop in sales figures, yet these details went unconsidered by Katz. For example, Drs. North and Risko each stated that Stovall did not solicit them to use any of Stryker's products or services, and that they had to switch business to Stryker due to Zimmer's failure to service their needs after Stovall's resignation. [North Aff. ¶¶ 13-14; Risko Aff. ¶¶ 11-12] Katz never reviewed these statements, nor did he even ask to interview Drs. North and Risko in preparing his report. [Katz Dep. 62:20-63:1, 65:15-18]

Relatedly, Katz assumed that Zimmer would have retained 100% of its business with Drs. North and Risko during Stovall's non-compete period.[6] Katz selected this retention rate based on the testimony of a Stryker sales representative that highlighted the "out of sight, out of mind" nature of the medical device business and after reading an article that stated "[o]rthopedists are reluctant to switch vendors due to both efficiency and safety reasons."[7] [Katz Report at 18] Katz did not, however, take into account multiple facts regarding Zimmer's personnel issues in

---

[6] Katz assumed the same retention rate for Drs. Jennings and Ridgeway relevant to the Dickerson team's non-compete periods, but Katz's failure to account for obvious alternative explanations as discussed in this section pertains to his analysis of Drs. North and Risko.

[7] Query whether these facts alone would even support the notion that Zimmer would have retained all of its business with Drs. North and Risko. Indeed, the same article relied on by Katz for his retention rate also found that orthopedists do change their preferences in vendors and products, albeit gradually. [Katz Report at 7]

12

Amarillo that would offer alternatives to his 100% business retention rate. Most notably, at the time of Stovall's departure, Carla Brittain was the only other Zimmer sales representative in the region. [North Dep. 64:21-65:1] So, when Stovall received a job offer from another Zimmer competitor in 2013, Zimmer's sales manager, Rocky Victor, expressed deep concerns that Stovall's departure would be "very compromising" to the business based on personnel issues. [Victor Dep. 59:18-23] Victor elaborated on these personnel issues by confirming that it "was not unusual" for the Amarillo Zimmer sales representatives to ask Stryker representatives to fill in for them on surgeries, and he admitted that Zimmer had received complaints from Dr. North regarding Zimmer's shortcomings in supporting his practice. *Id.* at 124:9-15, 135:9-22. Drs. North and Risko reiterated their concerns about Zimmer's service capabilities in their depositions, but again, nothing in Katz's report speaks to this. [North Dep. 64:21-65:1; Risko Dep. 55:25-56:11]

"When an expert 'ignores critical data' in forming his opinions, he fails to satisfy *Daubert*." *MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-CV-1096, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009). Katz did not evaluate whether these facts impacted Zimmer's ability to retain its business in the Amarillo region after Stovall's resignation, despite his own acknowledgment that the loss of a sales representative would result in a loss of business:

> Q: Sure. Did you look to determine what effect it has on either Zimmer or Stryker when a sales representative leaves a territory but is not in breach of the restricted covenants?
>
> A: No, other than Mr. Victor's discussions with him.
>
> Q: And that is that basically the loss of a representative alone is going to result in some loss of business?
>
> A: Yes.

13

[Katz Dep. 78:2-12] *See Tucker v. Nike, Inc.*, 919 F. Supp. 1192, 1197 (N.D. Ind. 1995) (excluding expert's opinion where he neither considered other factors as potential causes of plaintiff's injury nor provided an explanation for why he did not consider them). Given this significant gap in Katz's analysis, he cannot testify with the reliability demanded by Rule 702 that Zimmer would have retained *100%* of its business with Drs. North and Risko after Stovall left the company; indeed, the evidence contradicts such a rate. *See F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 802 (7th Cir. 2007) (finding expert's testimony insufficient where he "did not account for factors distinguishing" past sales from future sales); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (reversing admission of expert economic damages testimony that relied on empirical assumptions unsupported by the record); *Quinones-Pacheco v. Am. Airlines, Inc.*, 979 F.2d 1, 6 (1st Cir. 1992) (affirming exclusion of expert economic damages testimony "predicated on an assumption not supported by the record"); *see also MDG Int'l,* 2009 WL 1916728, at *4 ("[A]n expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence."). Therefore, independent from and in addition to the reasons discussed above, Katz's lost profits calculations pertaining to the Amarillo doctors cannot be admitted.

## CONCLUSION

Zimmer has failed to show that Katz's opinion is both reliable and helpful to the jury given the specific findings the jury will need to make in this case. In short, Katz's analysis presents a best-case-scenario estimate. It does not reflect the sort of rigor required to provide a fair and just determination of the damages that actually resulted from any particular instance of alleged misconduct the jury may find. Nor does it enable the jury to evaluate its applicability in light of the facts and issues in this case. The Court will exclude Katz's damages opinion.

In addition, Defendants retained Dr. Thomas Vander Veen to rebut Katz's damages opinions and to offer alternative damages calculations. Zimmer has moved to exclude portions of Dr. Vander Veen's report and testimony pertaining to causation and agency. [DE 155] These excerpts contain strictly rebuttal opinions, and do not include Dr. Vander Veen's alternative calculations [Vander Veen Rep. ¶¶ 25-51, 77-87]; Zimmer's motion does not challenge Vander Veen's ability to offer those figures. [DE 205 at 2] Inasmuch as the Court will exclude Katz's report and damages opinion, there is no expert testimony to rebut, and Zimmer's motion to exclude certain rebuttal opinions is therefore moot. *See, e.g.*, *Great Am. Ins. Co. of New York v. Vegas Const. Co.*, No. 2:06-cv-911, 2007 WL 2375056, * 4 (D. Nev. Aug 15, 2007) (denying as moot plaintiff's motion to strike defendants' rebuttal expert where the Court struck underlying expert report).

Therefore, Defendants' Motion to Exclude the Expert Report of Jeffrey M. Katz and to Bar Him from Testifying at Trial [DE 145] is **GRANTED**. Zimmer's Motion to Exclude Portions of Defendants' Expert's Report and Testimony [DE 155] is **DENIED** as moot. Lastly, the Affidavit of Jeffrey M. Katz [DE 198-1] is **STRICKEN** from the docket.

SO ORDERED.

ENTERED: January 3, 2018

    /s/ JON E. DEGUILIO
Judge
United States District Court